STRADLEY RONON STEVENS & YOUNG, LLP
A Pennsylvania Limited Liability Partnership
By:  Julie M. Murphy
      Joseph W. Catuzzi
457 Haddonfield Road, Suite 100
Cherry Hill, NJ   08002-2223
T: (856) 321-2400
F: (856) 321-2415
E: jmmurphy@stradley.com;
    jcatuzzi@stradley.com

*Attorneys for Plaintiff, Investors Bank,*
*a division of Citizens Bank, N.A.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INVESTORS BANK, a division of Citizens Bank N.A., | No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| NIRMAL MULYE | |
| Defendant. | Filed Electronically |

Plaintiff, Investors Bank, a division of Citizens Bank, N.A., hereby files this Complaint against Defendant, Nirmal Mulye, and states as follows:

## INTRODUCTION

1.      This case is about Defendant's failure to repay Citizens more than $17,000,000, from loans that directly benefitted Defendant, as the ultimate owner of the borrower.

## THE PARTIES

2.     Plaintiff, Investors Bank, a division of Citizens Bank, N.A. ("Citizens" or the "Bank"), is a national banking association, chartered by the Comptroller of the Currency of the United States Treasury, with its main office of business, as specified in its articles of association, in Providence, Rhode Island.

3.     Defendant, Nirmal Mulye, is the president and chief executive officer of Nostrum Laboratories, Inc., a New Jersey corporation, and is the president of Nostrum Pharmaceuticals, LLC, a Delaware limited liability company.

4.     Defendant, Nirmal Mulye, owns a majority of the voting membership interests in Nostrum Pharmaceuticals, LLC, which, in turn owns one hundred percent (100%) of the equity interests of Nostrum Laboratories, Inc.

5.     Defendant, Nirmal Mulye, also owns, directly or indirectly, all of the equity in Nostrum Hamilton Realty, LLC, a New Jersey limited liability company owning multiple parcels of real estate in the State of New Jersey.

6.     Defendant, Nirmal Mulye, resides at Unit 4044, 1000 Biscayne Boulevard, Miami, Florida.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(a) because the plaintiff and defendant are citizens of different

states—Rhode Island (Citizens) and Florida (Mulye)—and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Mulye does business in the State of New Jersey as president and chief executive officer of Nostrum Laboratories, Inc.

9.    Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Citizens's claims occurred in this judicial district.  Mulye has further agreed to the exclusive jurisdiction of the federal courts located within the State of New Jersey.

## FACTUAL BACKGROUND

### *The Loan Documents*

10.    On December 31, 2020, Citizens extended to Nostrum Laboratories, Inc. ("Borrower") three credit facilities, as follows: (a) a line of credit term loan in the maximum principal amount of $5,000,000 (the "Line/Term Loan"), (b) a revolving line of credit in the maximum principal amount of $12,000,000 (the "RLOC"), and (c) a term loan in the original principal amount of $5,000,000 (the "Term Loan", and together with the Line/Term Loan and RLOC, collectively, the "Loans").

11.    The obligations of Borrower to Citizens for the Loans are evidenced by, among other things a Loan Agreement between Borrower, Nostrum

Pharmaceuticals, LLC ("Pharma", and together with Borrower and Defendant, the "Obligors") and Defendant, dated as of December 31, 2020 (as amended, modified, and/or supplemented from time to time, including by the Letter Agreement defined below, the "Loan Agreement"). A true and correct copy of the Loan Agreement is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

12.     The Obligations of Borrower to Citizens under the Loan Agreement are evidenced by, among other things, (a) a Line of Credit/Term Loan Note, in the maximum amount of $5,000,000 by Borrower in favor of Citizens; (b) a Revolving Credit Note by Borrower in favor of Citizens in the maximum amount of $12,000,000; and (c) a Term Loan Note by Borrower in favor of Citizens in the original principal amount of $5,000,000 (together, as the same may be amended, modified, supplemented and/or restated from time to time, the "Notes").

13.     To induce Citizens to make the Loans, on or about December 31, 2020, Defendant executed and delivered to Citizens an Individual Guaranty Agreement dated December 31, 2020 (as the same may have been amended, modified, ratified, confirmed and/or supplemented from time to time, the "Guaranty"), pursuant to which Defendant agreed to pay to Citizens the full principal amount of the Loans, together with accrued and unpaid interest, all expenses, fees and costs associated therewith, and all amounts due and owing under any swap agreement, commercial

card agreement or other similar transaction.  A true and correct copy of the Guaranty is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

14.     Pursuant to the Guaranty, Defendant, among other things,

(a)     waived any requirement that Citizens demand or seek payment or performance by Borrower or any other party as a condition precedent to bringing an action against Defendant (<u>See</u> Ex. B, Section 2);

(b)     agreed that failure to pay or comply with the obligations, terms and conditions of the Loan Documents renders Defendant liable for payment (<u>id.</u>, Section 4);

(c)     waived presentment, demand, protest and notice of any kind (<u>id.</u>); and

(d)     agreed that Citizens may enforce the Guaranty without proceeding against Borrower or any other party or joining Borrower or any other party as a party to such action (<u>id.</u>, Section 14).

15.     The Guaranty expressly provides for the payment by Defendant of attorneys' fees of Citizens, including in connection with collection of the Loans, the Guaranty, enforcement thereof and/or in connection with any Event of Default.  <u>Id.</u>, Sections 1(a), 15.

16.     Defendant likewise consented to the jurisdiction of the courts sitting in the State of New Jersey.  <u>Id.</u> Section 18.

17.    The obligations of Borrower to Citizens for the Loans are also secured by, among other things, a security interest in all of Borrower's personal property pursuant to that certain Security Agreement by Borrower in favor of Citizens dated December 31, 2020 (the "Security Agreement"), a pledge of certain bonds to Citizens and a guaranty by Pharma of Borrower's obligations to Citizens.

18.    The Loan Agreement, Notes, the Guaranty, the Security Agreement and all other documents evidencing the obligations of Borrower, Pharma and/or Defendant to Citizens for the Loans shall be hereinafter referred to as the "Loan Documents."

### The Defaults

19.    The Borrower, Pharma, and Defendant defaulted under the terms of the Loan Documents, which included (a) the Borrower's failure to satisfy its financial covenants for the fiscal year ended December 31, 2021, in violation of Section 5.03 of the Loan Agreement, which failures constitute Events of Default under the Loan Agreement, and (b) the Obligors failure to deliver financial reporting information in accordance with Sections 5.01(b)(i), (iii), (v), (xiii), (xiv) and (xv) of the Loan Agreement.

20.    As a result of numerous defaults by Borrower, Pharma and Defendant under the terms of Loan Documents, on June 2, 2022, counsel for Citizens sent

Obligors a notice of default. A true and correct copy of June 2, 2022, notice of default is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

21.    The financial information required to be delivered pursuant to Section 5.01(b) was not delivered within fifteen days of the June 2, 2022 notice of default, rendering the breaches of Section 5.01(b) Events of Default under the Loan Agreement. <u>See</u> Ex. A (Loan Agreement), Section 6.01(c)(ii).

22.    Thereafter, the parties commenced negotiations regarding the terms of a potential forbearance agreement and, in furtherance thereof, on or about June 30, 2022, Borrower, Pharma and Defendant entered into that certain letter agreement (the "Letter Agreement") with Citizens pursuant to which, among other things, Bank agreed to extend the maturity date for the Loans to August 15, 2022. A true and correct copy of the Letter Agreement is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

23.    When the Obligors failed to repay the full amount of the outstanding indebtedness under the Loan Documents on or before August 15, 2022, and no forbearance agreement had been agreed to, counsel for Citizens sent to Obligors a Notice of Additional Event of Default, Setoff and Reservation of Rights on October 20, 2022. A true and correct copy of the October 20, 2022 notice of default is attached hereto as <u>Exhibit E</u> and incorporated herein by reference.

### *The Forbearance Agreement*

24.    On or about October 31, 2022, Obligors and Citizens entered into the Forbearance Agreement (the "Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached hereto as <u>Exhibit F</u> and incorporated herein by reference.

25.    In connection with the Forbearance Agreement, Citizens agreed to forbear from exercise of its rights and remedies as a result of the Existing Defaults (as such term is defined in the Forbearance Agreement) until the earlier of the occurrence of any Default or Event of Default under the Forbearance Agreement and December 2, 2022 (the "Forbearance Expiration Date"). <u>Id.</u>, Section 7.

26.    Pursuant to the Forbearance Agreement, Obligors acknowledged and agreed, among other things:

(a)    to the continuing validity and binding effect and force of the Loan Documents (<u>id.</u>, Section 2);

(b)    that the Existing Defaults (as defined in the Forbearance Agreement) occurred, were continuing and had not been waived or cured (<u>id.</u>, Section 3);

(c)    that none of them has any defense, set off, counterclaim or challenge against the payment of any sums owing under the Loan Documents (<u>id.</u>, Section 5);

(d)     that the full amount of the indebtedness under the Loan Documents was validly and duly owing to Citizens (<u>id.</u>, Section 6);

(e)     to waive presentment for payment, demand, notice of demand (<u>id.</u>, Section 23); and

(f)     to the exclusive jurisdiction of the courts of the State of New Jersey, waiving any objection to venue, *forum non convenience* and personal service (<u>id.</u>, Section 25).

27.     In addition to the interest accruing on the Loans in accordance with the Loan Documents as modified by the Forbearance Agreement, the Obligors agreed in the Forbearance Agreement to the accrual of additional interest at a per annum rate equal to 0.50% (the "PIK Interest").  <u>Id.</u>, Section 9.

28.     PIK interest is added to the outstanding principal balance of the Loans on a quarterly basis, accrues interest thereafter, and continues to accrue after the Forbearance Expiration Date.  <u>Id.</u>

29.     The Forbearance Agreement obligated Obligors to pay in full all Bank Indebtedness (as such term is defined in the Forbearance Agreement) on or before the Forbearance Expiration Date, including all PIK Interest.  <u>Id.</u>, Section 11(c).

30.     Obligors defaulted under the terms of the Forbearance Agreement by, among other things, failing to satisfy timely the covenants set forth therein, including failing to (a) submit a strategic business report to Citizens, (b) provide Cash Flow

Projections, (c) provide financial statements and covenant compliance certificates, (d) provide quarterly financials for the quarter ending September 30, 2022, (e) provide the Borrowing Base Certificate for October and November 2022, and (f) provide the fully executed Eversana Agreement, all as detailed in the Final Default Notice (as hereinafter defined).

31.    The Forbearance Expiration Date occurred on December 2, 2022, and the Forbearance Agreement has not been extended.

32.    On December 6, 2022, counsel for Citizens sent to Obligors a Notice of Default and Expiration of Forbearance Agreement (the "Final Default Notice"), a true and correct copy of which is attached hereto as <u>Exhibit G</u> and incorporated herein by reference.

33.    While Obligors thereafter provided some of the information they had failed to provide previously, Obligors have failed to pay the Bank Indebtedness, including the PIK Interest Payment, in full.

34.    Pursuant to the Forbearance Agreement, upon the expiration of the forbearance period, without further notice or demand each of which are expressly waived, Citizens is permitted to exercise each and every right and remedy under the Forbearance Documents, at law, in equity or otherwise.  <u>Id.</u>, Section 19.

### *Bank Indebtedness*

35.    As of the date hereof, there is due and owing to Citizens the following

amounts:

### Line/Term Loan

| Principal | $3,000,000.08 |
|---|---|
| PIK Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $3,695.60 |
| Unpaid Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $7,800.00 |

### RLOC

| Principal | $12,000,000.00 |
|---|---|
| PIK Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $14,500.00 |
| Unpaid Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $31,200.00 |

### Term Loan

| Principal | $1,936,961.00 |
|---|---|
| PIK Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $2,340.49 |
| Unpaid Interest<br><br>(*accrued from 1/1/23 to 1/27/23*) | $5,036.10 |

**Attorneys' Fees and Costs**

| From November 1, 2022 through the date hereof | **$12,537** |
|---|---|

36.     The foregoing sums will continue to accrue interest and PIK Interest, and Citizens will continue to accrue attorneys' fees, all of which shall be due and owing by Defendant in accordance with the terms of the Loan Documents and the Forbearance Agreement.

37.     Citizens incorporates all of the allegations in the foregoing paragraphs as if set forth fully herein.

## COUNT I – BREACH OF CONTRACT

38.     Citizens incorporates all of the allegations in the foregoing paragraphs as if set forth fully herein.

39.     The Forbearance Agreement required payment in full of the outstanding Bank Indebtedness on or before December 2, 2022.

40.     Obligors have failed to repay the outstanding Bank Indebtedness.

41.     These failures by Defendant constitute breaches of the Forbearance Agreement, Guaranty and Loan Documents.

42.     As a result of Defendant's breaches, Citizens has been damaged, as described more fully above.

WHEREFORE, Plaintiff, Citizens Bank N.A., demands judgment against Defendant, Nirmal Mulye, in the amount of $17,014,070.27 plus all accrued and accruing interest from and after January 27, 2023, all accrued and accruing attorneys' fees and costs from and after January 27, 2023, and such other relief as the court shall deem just and fair.

## COUNT II – PROMISSORY ESTOPPEL

### (*In the Alternative*)

43. Citizens incorporates all of the allegations in the foregoing paragraphs as if set forth fully herein.

44. Defendant made clear and definite promises to repay any amounts borrowed from Citizens under the Loans, pursuant to the terms of the Loan Documents, together with accrued and accruing interest, PIK Interest, and all other costs, fees and expenses as provided under the Loan Documents and the Forbearance Agreement.

45. Defendant made those clear and definite promises with the expectation that Citizens would rely thereon.

46. Citizens did so rely on those clear and definite promises, and that reliance was reasonable.

47. As a result of this reasonable reliance, Citizens has suffered a detriment of definite and substantial nature, as described more fully above.

WHEREFORE, Plaintiff, Citizens Bank N.A., demands judgment against Defendant, Nirmal Mulye, in the amount of $17,014,070.27, plus all accrued and accruing interest from and after January 27, 2023, all accrued and accruing attorneys' fees and costs from and after January 27, 2023, and such other relief as the court shall deem just and fair.

## COUNT III – UNJUST ENRICHMENT

### (*In the Alternative*)

48.    Citizens incorporates all of the allegations in the foregoing paragraphs as if set forth fully herein.

49.    Defendant is the direct or indirect owner of the majority of voting equity interests of Pharma, which in turn owns one hundred percent (100%) of the equity interests in Borrower.

50.    As such, Defendant benefitted directly and indirectly by the making of the $22,000,000 in loans to Borrower.

51.    The Loans were extended to Borrower in reliance upon and conditioned upon the provision of the Guaranty by Defendant.

52.    By retaining the benefits of the $22,000,000 borrowing without honoring the terms of the Guaranty and repaying the Bank Indebtedness in full, Defendant has been unjustly enriched.

53.     As a result of Defendant's actions and inactions, Citizens has incurred actual and significant expenses.

54.     For the foregoing reasons, it is against equity and good conscience to permit Defendant to retain the benefits of the Loans without repaying the same.

WHEREFORE, Plaintiff, Citizens Bank N.A., demands judgment against Defendant, Nirmal Mulye, in the amount of $17,014,070.27, plus all accrued and accruing interest from and after January 27, 2023, all accrued and accruing attorneys' fees and costs from and after January 27, 2023, and such other relief as the court shall deem just and fair.

Respectfully submitted,

 /s/ Julie M. Murphy
STRADLEY, RONON, STEVENS & YOUNG, LLP
Julie M. Murphy
Joseph W. Catuzzi
A Pennsylvania Limited Liability Partnership
457 Haddonfield Road, Suite 100
Cherry Hill, NJ  08002-2223
T: (856) 321-2400
F: (856) 321-2415
E: jmmurphy@stradley.com;
    jcatuzzi@stradley.com
*Attorneys for Plaintiff, Investors Bank, a division of Citizens Bank, N.A.*

Dated:  January 31, 2023

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

I hereby certify that the matters in controversy are not the subject of any

other action pending in any court or arbitration or administrative proceeding.

_/s/ Julie M. Murphy_
STRADLEY, RONON, STEVENS &
YOUNG, LLP
Julie M. Murphy
Joseph W. Catuzzi
A Pennsylvania Limited Liability Partnership
457 Haddonfield Road, Suite 100
Cherry Hill, NJ  08002-2223
T: (856) 321-2400
F: (856) 321-2415
E: jmmurphy@stradley.com;
   jcatuzzi@stradley.com
_Attorneys for Plaintiff, Investors Bank, a_
_division of Citizens Bank, N.A._

4884704

# EXHIBIT A

# LOAN AGREEMENT

### By and Between

### NOSTRUM LABORATORIES, INC.
**Borrower,**

### NIRMAL MULYE
**Individual Guarantor,**

### NOSTRUM PHARMACEUTICAL LLC
**Corporate Guarantor,**

### And

### INVESTORS BANK
**Bank**

### As of December 31, 2020

# TABLE OF CONTENTS

### Table of Contents

Page

**ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS**..................................................4
    **SECTION 1.01.  Certain Defined Terms.**...................................................................4
    **SECTION 1.02.  Computation of Time Periods.**...................................................17
    **SECTION 1.03. Accounting Terms.**.......................................................................17
**ARTICLE II  AMOUNT AND TERMS OF THE LOANS** ............................................17
    **SECTION 2.01.  The Revolving Credit Loans.**......................................................18
    **SECTION 2.02.  Notice of Revolving Credit Loans.**............................................18
    **SECTION 2.03.  Revolving Credit Note.** ..............................................................19
    **SECTION 2.04.  Payment of Interest on Revolving Credit Note.** .........................19
    **SECTION 2.05.  Use of Proceeds Revolving Credit Loans.** .................................19
    **SECTION 2.06.  Fees.**...........................................................................................19
    **SECTION 2.07.  Reduction of Commitment.**........................................................20
    **SECTION 2.08.  Prepayment of Revolving Credit Loans.**...................................20
    **SECTION 2.09.  The Term Loan and Line of Credit/Term Loan.**........................20
    **SECTION 2.11.  Term Loan Note and the Line of Credit/Term Loan Note**..............21
    **SECTION 2.12.  Repayment of Term Loan Note and the Line of Credit/Term Loan Note**........21
    **SECTION 2.13.  Payment of Interest on the Term Loan Note and the Line of Credit/Term Loan Note**..................22
    **SECTION 2.15.  Use of Proceeds Term Loan and Line of Credit/Term Loan.** ...........22
    **SECTION 2.16.  Prepayment of Term Loan and Line of Credit Term Loan.**..............22
    **SECTION 2.17.  Authorization to Debit Borrower's Account.** ...........................24
    **SECTION 2.18.  Late Charges, Default Interest.**.................................................24
    **SECTION 2.19.  Payments.**..................................................................................25
    **SECTION 2.20.  Interest Adjustments.** ................................................................25
    **SECTION 2.21.  Eurocurrency Reserve Requirement**.........................................25
    **SECTION 2.22.  Increased Costs**..........................................................................26
    **SECTION 2.23.  Capital Adequacy**......................................................................26

SECTION 2.24. Change in Legality.............................................................................27

SECTION 2.25. Funding Losses..................................................................................27

SECTION 2.26. Change in LIBOR; Availability of Rates.........................................28

ARTICLE III CONDITIONS OF LENDING.............................................................30

SECTION 3.01. Conditions Precedent to the Making of the Initial Revolving Credit Loan and
the Term Loan......................................................................................................30

SECTION 3.02. Conditions Precedent to All Revolving Credit Loans......................32

SECTION 3.03. Conditions Precedent to Advances Under Line of Credit/Term Loan. ...........32

ARTICLE IV REPRESENTATIONS AND WARRANTIES ....................................33

SECTION 4.01. Representations and Warranties. ......................................................33

ARTICLE V COVENANTS OF THE BORROWER .................................................40

SECTION 5.01. Affirmative Covenants.......................................................................40

SECTION 5.02. Negative Covenants............................................................................45

SECTION 5.03. Financial Requirements.....................................................................50

ARTICLE VI EVENTS OF DEFAULT ........................................................................50

SECTION 6.01. Events of Default.................................................................................50

SECTION 6.02. Remedies on Default...........................................................................52

SECTION 6.03. Remedies Cumulative.........................................................................53

SECTION 6.04. Grace Provision..................................................................................53

ARTICLE VII MISCELLANEOUS ..............................................................................54

SECTION 7.01. Amendments. Etc. ..............................................................................54

SECTION 7.02. Notices, Etc. ........................................................................................54

SECTION 7.03. No Waiver, Remedies..........................................................................56

SECTION 7.04. Costs, Expenses and Taxes.................................................................56

SECTION 7.05. Right of Set-off....................................................................................57

SECTION 7.06. Binding Effect......................................................................................57

SECTION 7.07. Further Assurances.............................................................................57

SECTION 7.08. Section Headings, Severability, Entire Agreement.........................57

SECTION 7.09. Governing Law.....................................................................................58

SECTION 7.10. Successors and Assigns.......................................................................58

SECTION 7.11. Waiver of Jury Trial...........................................................................59

SECTION 7.12. Anti-Terrorism Laws..........................................................................59

SECTION 7.12 Anti-Terrorism Laws...........................................................................59

**SECTION 7.13.  Execution in Counterparts; Electronic Signatures.**.............................. 59

**SCHEDULE 4.01(a)**........................................................................................................ 62

**SCHEDULE 4.01(h)**........................................................................................................ 62

**SCHEDULE 4.01(bb)**...................................................................................................... 62

**SCHEDULE 4.01(cc)**....................................................................................................... 62

**SCHEDULE 4.01(dd)**...................................................................................................... 62

**SCHEDULE 4.01(ee)**....................................................................................................... 62

**SCHEDULE 5.02**............................................................................................................. 68

EXHIBIT A.......................................................................................................................... 69

EXHIBIT B ............................................................................................................................ 2

EXHIBIT B ............................................................................................................................ 5

**LOAN AGREEMENT**

Dated as of December 31, 2020

**NOSTRUM LABORATORIES, INC.,** a New Jersey corporation, having an office at 1370 Hamilton Street, Somerset, New Jersey 08873 (the "Borrower"), **NOSTRUM PHARMACEUTICALS LLC**, a Delaware limited liability company, having an office at 1370 Hamilton Street, Somerset, New Jersey 08873 (the "Corporate Guarantor"), NIRMAL MULYE, residing at 1000 Biscayne Boulevard, Miami, FL 33132 (individually the "Individual Guarantor"; the Corporate Guarantor and the Individual Guarantor collectively, the "Guarantors") and **INVESTORS BANK**, a New Jersey commercial chartered bank having an address of 101 JFK Parkway, Short Hills, New Jersey 07078 (the "Bank"), hereby agree as follows:

**ARTICLE I**

**DEFINITIONS AND ACCOUNTING TERMS**

**SECTION 1.01.  Certain Defined Terms.**  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

**"Affiliate"** means, as to any Person (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner or senior executive officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such

Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

**"Aggregate Outstandings"** means, at any time, the aggregate of the principal amount of outstanding Revolving Credit Loans.

**"Agreement"** means this Loan Agreement, as amended, supplemented or modified from time to time.

**"Anti-Terrorism Laws"** shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

**"Assignment and Assumption Agreement"** shall have the meaning set forth in Section 7.10 hereof.

**"Board of Governors"** means the Board of Governors of the Federal Reserve System of the United States of America.

**"Borrowing Base"** means (i) Seventy-Five percent (75%) of the Borrower's Eligible Accounts Receivable, (ii) less rebates, credits and allowances to account debtors in the form of credit memos or invoices from customers, (iii) plus fifty percent (50%) of the Borrower's Eligible Inventory up to a maximum of fifty percent (50%) of the aggregate Borrowing Base.

**"Business Day"** means any day other than Saturday or Sunday or a legal holiday on which commercial banks in New Jersey are authorized or required by law to be closed for business and, if the applicable Business Day relates to any LIBOR Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

**"Capital Expenditures"** means, as to any Person, expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements (or of any replacements or substitutions thereof or additions thereto) which have a useful life of more than one year and which, in accordance with GAAP, would be classified as capital expenditures (but excluding expenditures made in connection with the repair, replacement or restoration of assets to the extent funded from insurance proceeds paid on account of the loss of or damage to, or from awards or compensation arising from the taking by eminent domain or condemnation of, the assets being repaired, replaced or restored). Capital Expenditures shall include the total principal portion of Capitalized Lease Obligations.

**"Capitalized Lease Obligations"** means any indebtedness of the Borrower and Corporate Guarantor represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

5

**"Closing Date"** shall mean December 31, 2020 or such other date as may be agreed to by the parties hereto.

**"Collateral"** shall have the meaning set forth in the Security Agreement.

**"Commitment"** means the Bank's obligation to make the Loans pursuant to the terms and conditions of this Agreement.

**"Compliance Certificate"** shall mean a compliance certificate of the President or the Chief Financial Officer of the Borrower in form and substance acceptable to the Bank.

**"Computer System(s)"** means any and all hardware, software, databases, websites, applications, mobile devices and applications, storage devices, servers, transmission media, internet connected devices and applications, network-connected devices and applications, computers, operating systems, network interfaces, network devices, interface cards, hubs, bridges, switches, routers, gateways, firewalls, media and peripherals.

**"Covered Entity"** shall mean (a) the Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

**"CPLTD"** means current portion of long term Debt.

**"Cyber Attack"** means any action by any Person, any of its employees, or any third party that has the effect, or potentially may have the effect, of altering, damaging, stealing, accessing, acquiring, disabling and/or destroying any portion of data or the Computer Systems of Borrower or Corporate Guarantor or any Subsidiary of Borrower.

**"Data Breach"** shall have the meaning ascribed to it by any applicable Privacy Law that pertains to the unauthorized access or acquisition of data.

**"DEA"** means the Drug Enforcement Administration of the United States and any successor agency thereof.

**"Debt"** means, as to any Person, (i) all indebtedness or liability of such Person for borrowed money; (ii) indebtedness of such Person for the deferred purchase price of property or services; (iii) obligations of such Person as a lessee under Capitalized Lease Obligations; (iv) current liabilities of

6

such Person in respect of unfunded vested benefits under any Plan; (v) obligations of such Person under letters of credit issued for the account of such Person; (vi) obligations of such Person arising under acceptance facilities; (vii) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person, or otherwise to assure a creditor against loss; (viii) obligations secured by any Lien on property owned by such Person whether or not the obligations have been assumed; and (ix) all other liabilities recorded as such, or which should be recorded as such, on such Person's financial statements in accordance with GAAP.

**"Debt Service Coverage Ratio"** shall have the meaning given such term in Section 5.03

**"Default"** means any of the events specified in Section 6.01 of this Agreement, whether or not any requirement for notice or lapse of time or any other condition has been satisfied.

**"Dollars" and the sign "$"** mean lawful money of the United States of America.

**"Drug Application"** means a new drug application, an abbreviated drug application, a biologic license application, or any other product license application for any Product, as appropriate, as those terms are defined in the FDCA.

**"EBITDA"** shall mean for any period with respect to any Person, earnings before interest, taxes, depreciation, and amortization, all as determined by the Bank in accordance with GAAP.

**"Eligible Accounts Receivable"** means those accounts receivable of the Borrower which (i) arise in the ordinary course of business, (ii) are subject to a first, perfected security interest of the Bank, and (iii) are evidenced by an invoice or other documentary evidence reasonably satisfactory to the Bank provided, however no account receivable shall be an Eligible Account Receivable if:

> (a)  it arises out of a sale made by the Borrower to an Affiliate or to a person controlled by such an Affiliate;

> (b)  it is due or unpaid more than ninety (90) days after its invoice date;

> (c)  the account receivable is from an account debtor of which fifty (50%) percent or more of such account debtor's accounts receivable are otherwise ineligible hereunder;

> (d)  any covenant, representation or warranty contained in any Loan Document with respect to such account receivable has been breached;

> (e)  the account debtor has commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in the premises in respect of the account debtor in an involuntary case

7

under any state or federal bankruptcy laws, as now constituted or hereafter amended, or if any other petition or other application for relief under any state or federal bankruptcy law has been filed against the account debtor, or if the account debtor has failed, suspended business, ceased to be solvent, called a meeting of its creditors, or consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets of affairs;

(f) the sale to the account debtor is on a guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(g) the account debtor is the United States of America, any state or any department, agency or instrumentality of the United States of America or any state;

(h) the account debtor is not domiciled in the United States unless the receivables from such account debtor are covered pursuant to credit insurance or letters of credit satisfactory to the Bank in its sole discretion;

(i) the goods giving rise to such account receivable have not been shipped and delivered to or have been rejected by the account debtor or the services giving rise to such receivable have not been performed by the Borrower or have been rejected by the account debtor or the account receivable otherwise does not represent a final sale;

(j) the account debtor is also a creditor or supplier of the Borrower or has disputed liability to Borrower, or has made any claim with respect to any other account receivable due to the Borrower, or the account receivable otherwise is or may become subject to any right of set-off;

(k) the Borrower has made any agreement with the account debtor for any deduction therefrom, (except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto) provided, that only the amount of any such deduction shall be ineligible pursuant to this clause (k);

(l) any return, rejection or repossession of the merchandise has occurred;

(m) such account receivable is not payable to the Borrower;

(n) the Bank, in good faith and in the exercise of its discretion in a reasonable manner, believes that collection of such account receivable is insecure or that such account receivable may not be paid by reason of the account debtor's inability to pay, or the accounts receivable of the account debtor exceed a credit limit determined by

8

the Bank, in good faith and in the exercise of its discretion in a reasonable manner, provided that only the amount of such excess shall be ineligible; or

(o) the Bank determines in its reasonable discretion, that such account receivable, or such category of accounts receivable, is ineligible.

**"Eligible Inventory"** means all finished goods inventory of the Borrower valued at the lower of cost or market value, determined on a first-in-first-out basis, other than (i) inventory which is, in the Bank's reasonable opinion, obsolete, slow moving or unmerchantable, (ii) inventory located at a business premises not located in the United States, (iii) inventory not subject to a perfected security interest in favor of the Bank, or (iv) goods or materials which would not be classified as inventory on a balance sheet of the Borrower prepared in accordance with GAAP. To the extent the inventory is at a location not owned by Borrower, the Borrower will receive such Landlord/Warehouse waivers as it deems it to be necessary, satisfactory to the Bank.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder and the published interpretations thereof as in effect from time to time.

**"ERISA Affiliate"** means any trade or business (whether or not incorporated) which together with any other Person would be treated, with such Person, as a single employer under Section 4001 of ERISA.

**"Event of Default"** means any of the events specified in Section 6.01 of this Agreement, provided that any requirement for notice or lapse of time or any other condition has been satisfied.

**"FDA"** means the Food and Drug Administration of the United States or any successor entity thereto.

**"FDCA"** means the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. Section 301 *et seq.,* and all regulations promulgated thereunder, including but not limited to 21 C.F.R. Parts 803, 806, 807, 812, and 820.

**"Field Audit"** means an examination of the books and records of the Borrower to be performed by employees or other representatives of the Bank.

**"Fixed Charge Coverage Ratio"** shall have the meaning given such term in Section 5.03

**"Fixed Rate"** means, for the Term Loan, an annual interest rate of 3.60%.

**"Fixed Rate Loan"** means the Term Loan bearing interest at the Fixed Rate in accordance with the provisions of Article II hereof., and the Line of Credit/Term Loan after the Line of Credit/Term Loan Conversion Date, fixed at a rate equal to 325 basis points in excess of the 5 year

9

United States Treasury Securities as made available by the Federal Reserve Board in effect five (5) business days prior to the Line of Credit/Term Loan Conversion Date. In no event shall the 5 year United States Treasury Securities index be below 1.25%. A floor of 3.60% will be instituted.

**"Funded Debt"** shall mean, with respect to any Person, without duplication, (a) all Aggregate Outstandings and (b) the aggregate principal amount of all Debt of Borrower as described in clauses (i),(ii), and (iii) of the definition of Debt, as reflected on the balance sheet prepared at such date of determination in accordance with GAAP.

**"GAAP"** means Generally Accepted Accounting Principles.

**"Generally Accepted Accounting Principles"** means those generally accepted accounting principles and practices which are recognized as such by the American Institute of Certified Public Accountants acting through the Financial Accounting Standards Board ("FASB") or through other appropriate boards or committees thereof and which are consistently applied for all periods so as to properly reflect the financial condition, operations and cash flows of a Person, except that any accounting principle or practice required to be changed by the FASB (or other appropriate board or committee of the FASB) in order to continue as a generally accepted accounting principle or practice may be so changed. Any dispute or disagreement between the Borrower and the Bank relating to the determination of Generally Accepted Accounting Principles shall, in the absence of manifest error, be conclusively resolved for all purposes hereof by the written opinion with respect thereto, delivered to the Bank, of the independent accountants selected by the Borrower and approved by the Bank for the purpose of auditing the periodic financial statements of the Borrower.

**"Good Manufacturing Practices" or "GMP"** means current good manufacturing practices, as set forth in the Quality System Regulation, 21 C.F.R. Part 820 and as set forth in 21 C.F.R. Parts 210 and 211.

**"Governmental Body"** shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

**"Guarantor" or "Guarantors"** means one or more of the Individual Guarantor or the Corporate Guarantor, and any other Person who is required to guarantee the obligations of the Borrower in accordance with Section 5.01(l) of this Agreement.

**"Guaranty" or "Guaranties"** means the guaranty or guaranties executed and delivered by the Guarantors pursuant to Section 3.01(f) of this Agreement.

10

**"Hazardous Materials"** includes, without limit, any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related materials defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 9601 et. seq.), and in the regulations adopted and publications promulgated pursuant thereto, or any other federal, state or local environmental law, ordinance, rule or regulation.

**Healthcare Laws** means all applicable Laws relating to the development, distribution, manufacturing, marketing, sale or use of the Products and the possession, control, warehousing, marketing, sale, and distribution of medical devices and/or pharmaceuticals generally, including, without limitation, all federal and state laws governing the sale and distribution of drugs, including over-the-counter drugs, biologicals, and supplements, including the Controlled Substances Act (21 U.S.C. § 801 *et seq.),* the Food, Drug and Cosmetic Act of 1938 (21 U.S.C. Chapter 9), the Dietary Supplement Health and Education Act (P.L. 103-417 (1994)), the Omnibus Budget and Reconciliation Act of 1990 (P.L. 101-508 (1990)), the Generic Drug Enforcement Act of 1992, Food and Drug Administration Amendments Act (FDAAA) of 2007 (P.L. 110-85 (2007)), the Patient Protection and Affordable Care Act (P.L. 111-148 (2010)), the Health Care and Education Reconciliation Act of 2010 (P.L. 111-152 (2010)) and the Food and Drug Administration Safety and Innovation Act (FDASIA) (P.L. 112-114 (2012)).

**"Interest Determination Date"** means, in the case of a LIBOR Rate Loan, the last day of the applicable Interest Period.

**"Interest Payment Date"** means (i) as to each LIBOR Rate Loan, the first Business Day of each month, and (ii) as to each Fixed Rate Loan, the first Business Day of each month.

**"Interest Period"** means as to any LIBOR Rate Loan, the period commencing on the date of such LIBOR Rate Loan and ending on the numerically corresponding day in the calendar month that is three months thereafter, as the Borrower may elect (or, if there is no numerically corresponding day, on the last Business Day of such month); provided, however, (i) that no Interest Period for a Revolving Credit Loan shall end later than the Revolving Credit Maturity Date, (ii) that no Interest Period for the Line of Credit/Term Loan shall end later than the Line of Credit/Term Loan Conversion Date (iii) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (iv) interest shall accrue from and including the first day of such Interest Period to but excluding the date of payment of such interest, and (v) no Interest Period of particular duration may be selected by the Borrower if the Bank determines, in its sole, good faith discretion, that LIBOR Rate Loans with such maturities are not generally available.

**"Investment"** means any stock, evidence of Debt or other security of any Person, any loan,

11

advance, contribution of capital, extension of credit or commitment therefor, including without limitation the guaranty of loans made to others (except for current trade and customer accounts receivable for services rendered in the ordinary course of business and payable in accordance with customary trade terms in the ordinary course of business) and any purchase of (i) any security of another Person or (ii) any business or undertaking of any Person or any commitment or option to make any such purchase, or any other investment.

**"Law(s)"** shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

**"Line of Credit/Term Loan"** shall have the meaning assigned to such term in Section 2.09(b) of this Agreement.

**"Line of Credit/Term Loan Conversion Date"** means January 1, 2022, or such later date as agreed to by the Bank in writing, without there being any obligation on the part of the Bank to extend the Line of Credit/Term Loan Conversion Date.

**"Line of Credit/Term Loan Drawdown Period"** means the period of time commencing on the Closing Date and ending of December 31, 2021.

**"Line of Credit/Term Loan Maturity Date"** means January 1, 2027.

**"Line of Credit/Term Loan Note"** means a promissory note of the Borrower payable to the order of the Bank, in substantially the form of Exhibit C annexed hereto, evidencing the indebtedness of the Borrower to the Bank resulting from the Line of Credit/Term Loan made by the Bank to the Borrower pursuant to the Agreement.

**"Leverage Ratio"** shall have the meaning given such term in Section 5.03.

**"LIBOR Alternate Source"** shall have the meaning set forth in the definition of LIBOR Rate.

**"LIBOR Rate"** shall mean for any LIBOR Rate Loan for the then current Interest Period relating thereto, the interest rate per annum determined by the Bank by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (a) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or, if not available from Bloomberg, the rate which is quoted by another source selected by the Bank for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "LIBOR Alternate Source"), at approximately 11:00

12

a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such LIBOR Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by the Bank at such time (which determination shall be conclusive absent manifest error)), by (b) a number equal to 1.00 <u>minus</u> the Reserve Percentage.

The LIBOR Rate shall be adjusted with respect to any LIBOR Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. Bank shall give reasonably prompt notice to Borrower of the LIBOR Rate as reasonably determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

**"LIBOR Rate Loan"** shall means (i) the Line of Credit/Term Loan during the Line of Credit/Term Loan Drawdown Period, and (ii)any Revolving Credit Loan that bears interest based on the LIBOR Rate.

**"LIBOR Successor Rate"** shall have the meaning set forth in Section 2.26(b) hereof.

**"Lien"** means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction to evidence any of the foregoing.

**"Loan" or Loans"** means the Revolving Credit Loans, the Term Loan, and the Line of Credit/Term Loan, as the context requires.

**"Loan Documents"** means this Agreement, the Notes, the Guaranties, the Security Agreement, and any other instrument, document or agreement executed or delivered pursuant to this Agreement.

**"Medicaid"** means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.) and any statutes succeeding thereto.

**"Medicare"** means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.) and any statutes succeeding thereto.

**"Malware"** means any software that may, or does, alter, damage, steal, access, acquire, destroy and/or disable any portion of data and/or the Computer Systems of Borrower or Corporate Guarantor or any Subsidiary of Borrower.

13

**"Material Adverse Change"** means, as to any Person, (i) a material adverse change in the financial condition, business, operations, properties or results of operations of such Person or (ii) any event or occurrence which could have a material adverse effect on the ability of such Person to perform its obligations under the Loan Documents.

**"Multiemployer Plan"** means a Plan described in Section 4001(a)(3) of ERISA which covers employees of the Borrower or any ERISA Affiliate.

**"Note"** or **"Notes"** means one of more of the Revolving Credit Note, the Term Loan Note, and the Line of Credit/Term Loan Note, as the context requires.

**"Organizational Documents"** shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

**"Overadvance"** means a Revolving Credit Loan which causes the principal amount of all Aggregate Outstandings to exceed the Borrowing Base.

**"PBGC"** means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

**"Permits"** means registrations, listing, licenses, certificates, accreditations (including ISO 13485 or ISO 13488), product clearances or approvals, provider numbers or provider authorizations, marketing authorizations, other authorizations, registrations, permits, consents and approvals or exemptions thereto required in connection with the conduct of Borrower's business or to comply with any applicable laws, including, without limitation, Healthcare Laws, establishment registrations, establishment licenses, device listings, drug listings, drug establishment registrations, Investigational Device Exemptions (IDEs), 510(k) exemptions, 510(k) clearances, PMA approvals, biologic license application (BLAs), Drug Identification Numbers (DINs), as those terms are defined in the FDCA and implementing regulations and the corresponding medical devices regulations and food and drug regulations, and those issued by State governments for the conduct of Borrower's business or necessary in the manufacturing, importing, exporting, possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under laws applicable to the business of Borrower or any Device Application or Drug Application.

**"Permitted Investments"** means, (i) direct obligations of the United States of America or any governmental agency thereof, or obligations guaranteed by the United States of America, provided that such obligations mature within one year from the date of acquisition thereof; (ii) time

14

certificates of deposit having a maturity of one year or less issued by any commercial bank organized and existing under the laws of the United States or any state thereof and having aggregate capital and surplus in excess of $1,000,000,000.00; (iii) money market mutual funds having assets in excess of $2,500,000,000.00; (iv) commercial paper rated not less than P-1 or A-1 or their equivalent by Moody's Investor Services, Inc. or Standard & Poor's Corporation, respectively; or (v) tax exempt securities rated Prime 2 or better by Moody's Investor Services, Inc. or A-1 or better by Standard & Poor's Corporation.

**"Person"** means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a federal, state or local government, or a political subdivision thereof or any agency of such government or subdivision.

**"Plan"** means any employee benefit plan established, maintained, or to which contributions have been made by the Borrower or any ERISA Affiliate.

**"Prime Rate"** means the rate which appears on the Bloomberg Page PRIMBB (or on such other substitute Bloomberg page that displays the published prime rate), or the highest prime rate if more than one is published thereon. If a Bloomberg page ceases to be available, the Bank may use the rate which is quoted by another source selected by the Bank for the purpose of a similar published prime rate. The Prime Rate is not necessarily the best or lowest rate of interest charged by the Bank in connection with extensions of credit to borrowers, subject to increase or decrease in such prime rate effective as of the day any such change occurs. The Bank's determination of the Prime Rate shall be conclusive and final.

**"Privacy Laws"** means all international, federal, state and local privacy, cybersecurity, data breach, data collection, data disposal, data security, data storage, data transfer, and digital advertising and marketing laws, statutes, regulations, ordinances and codes relating to the protection of data and/or governing the collection, use, storage, transfer, sharing, or disposal of data and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of international, federal, state, and local governmental agencies and authorities with respect thereto.

**"Products"** means any products manufactured, sold, licensed, developed, tested, distributed or marketed by Borrower or the Corporate Guarantor.

**"Prohibited Transaction"** means any transaction set forth in Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time.

**"Recall"** means the removal, modification, relabeling, field-correction, destruction, or correction of a marketed product.

**"Regulation D"** means Regulation D of the Board of Governors, as the same may be amended and in effect from time to time.

15

**"Regulation T"** means Regulation T of the Board of Governors, as the same may be amended and in effect from time to time.

**"Regulation U"** means Regulation U of the Board of Governors, as the same may be amended and in effect from time to time.

**"Regulation X"** means Regulation X of the Board of Governors, as the same may be amended and in effect from time to time.

**"Reportable Compliance Event"** means that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

**"Reportable Event"** means any of the events set forth in Section 4043 of ERISA.

**"Reserve Percentage"** means as of any day the maximum effective percentage in effect on such day as prescribed by the Board of Governors (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

**"Revolving Credit Loans"** shall have the meaning assigned to such term in Section 2.01 of this Agreement.

**"Revolving Credit Maturity Date"** means December 31, 2021, or such later date as the Bank may extend the Revolving Credit Maturity Date in writing until, without there being any obligation of the Bank to extend the Revolving Credit Maturity Date.

**"Revolving Credit Note"** means the promissory notes of the Borrower payable to the order of the Bank, in substantially the form of Exhibit A annexed hereto, evidencing the indebtedness of the Borrower to the Bank resulting from Revolving Credit Loans made by the Bank to the Borrower pursuant to this Agreement.

**"Sanctioned Country"** shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

**"Sanctioned Person"** shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

16

**"Security Agreement"** means the security agreement to be executed and delivered pursuant to Section 3.01(g) of this Agreement.

**"Subordinated Debt"** means Debt of any Person, the repayment of which the obligee has agreed in writing, on terms which have been approved by the Bank in advance in writing, shall be subordinate and junior to the rights of the Bank with respect to Debt owing from such Person to the Bank.

**"Subordination Agreement"** is described in Section 5.01(p).

**"Subsidiary"** means, as to any Person, any corporation, partnership or joint venture whether now existing or hereafter organized or acquired: (i) in the case of a corporation, of which a majority of the securities having ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency) are at the time owned by such Person and/or one or more Subsidiaries of such Person or (ii) in the case of a partnership or joint venture of which a majority of the partnership or other ownership interests are at the time owned by such Person and/or one or more of its Subsidiaries.

**"Term Loan"** shall have the meaning assigned to such term in Section 2.09 of this Agreement.

**"Term Loan Maturity Date #1"** means January 1, 2026.

**"Term Loan Note #1"** means a promissory note of the Borrower payable to the order of the Bank, in substantially the form of Exhibit B annexed hereto, evidencing the indebtedness of the Borrower to the Bank resulting from the Term Loan made by the Bank to the Borrower pursuant to the Agreement.

**"Unfunded Capex"** shall mean, for any period, the amount of Capital Expenditures which are not financed.

**"Unused Facility Fee"** means the fee payable pursuant to Section 2.06 of this Agreement.

**SECTION 1.02. <u>Computation of Time Periods.</u>** In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

**SECTION 1.03. <u>Accounting Terms.</u>** Except as otherwise herein specifically provided, each accounting term used herein shall have the meaning given to it under GAAP.

## ARTICLE II

## AMOUNT AND TERMS OF THE LOANS

17

**SECTION 2.01.  The Revolving Credit Loans.**  (a)  The Bank agrees on the terms and subject to the conditions of this Agreement, to lend to the Borrower prior to the Revolving Credit Maturity Date such amounts as the Borrower may request from time to time (individually, a "Revolving Credit Loan" or collectively, the "Revolving Credit Loans"), which amounts may be borrowed, repaid and reborrowed, provided, however, that the Aggregate Outstandings shall not exceed the lesser of (x) Twelve Million Dollars ($12,000,000), or (y) the Borrowing Base (the "Commitment") (or such lesser amount of the Commitment as may be reduced pursuant to Section 2.07 hereof).  At no time shall the Aggregate Outstandings exceed the Borrowing Base.  Within the limit of the Commitment, and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Credit Loans.

(b)  Each Revolving Credit Loan shall be a LIBOR Rate Loan as the Borrower may request subject to and in accordance with Section 2.02.  The Bank may at its option make any LIBOR Rate Loan by causing a foreign branch or affiliate to make such Loan, provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of the Revolving Credit Note.  Subject to the other provisions of this Agreement, Revolving Credit Loans of more than one type may be outstanding at the same time provided, however, that not more than five (5) LIBOR Rate Loans may be outstanding at any time, under this Agreement.

**SECTION 2.02.  Notice of Revolving Credit Loans.**  (a)  The Borrower shall give the Bank irrevocable written notice at least three (3) Business Days prior to each Revolving Credit Loan comprised in whole or in part of one or more LIBOR Rate Loans (subject to Section 2.25 hereof).  If a notice of borrowing is received by the Bank after 12:00 p.m. on a Business Day, such notice shall be deemed to have been given on the next succeeding Business Day.

(b)  Each notice given pursuant to this Section 2.02 shall specify the date of such borrowing and the amount thereof and the principal amounts thereof and Interest Period or Interest Periods with respect thereto.

(c)  The Borrower shall have the right, on such notice to the Bank as is required pursuant to (a) above, to continue any LIBOR Rate Loan or a portion thereof into a subsequent Interest Period subject to the following:

(i)  if a Default or an Event of Default shall have occurred and be continuing at the time of any proposed continuation the loan shall bear interest at a rate per annum of the Prime Rate plus .50% with a floor of 3.60%;

(ii)  in the case of a continuation of fewer than all Loans, the aggregate principal amount of each LIBOR Rate Loan continued shall be in the minimum principal amount of $250,000.00 and in increased integral multiples of $50,000.00;

(iii)  each continuation shall be effected by the Bank applying the proceeds of

18

the new Loan to the Loan (or portion thereof) being continued;

(iv) if the new Loan made as a result of a continuation shall be a LIBOR Rate Loan, the first Interest Period with respect thereto shall commence on the date of continuation;

(v) in the event that the Borrower shall not give notice to continue a LIBOR Rate Loan as provided above, the Loan shall be repaid by the Borrower at the then current Interest Period.

**SECTION 2.03.  Revolving Credit Note.**  (a)  Each Revolving Credit Loan shall be in the minimum principal amount of $100,000.00, and in minimum multiples of $50,000.00 thereafter. The Revolving Credit Note shall be dated the Closing Date and be in the principal amount of Twelve Million and 00/100 Dollars ($12,000,000.00) and shall mature on the Revolving Credit Maturity Date, at which time the entire outstanding principal balance and all interest thereon shall be due and payable.  The Revolving Credit Note shall be entitled to the benefits and subject to the provisions of this Agreement.

(b) At the time of the making of each Revolving Credit Loan and at the time of each payment of principal thereon, the Bank is hereby authorized by the Borrower to make a notation on the schedule annexed to the Revolving Credit Note of the date and amount, and the type and Interest Period, if applicable, of the Revolving Credit Loan or payment, as the case may be.  Failure to make a notation with respect to any Revolving Credit Loan shall not limit or otherwise affect the obligation of the Borrower hereunder or under the Revolving Credit Note, and any payment of principal by the Borrower shall not be affected by the failure to make a notation thereof on said schedule.

**SECTION 2.04.  Payment of Interest on Revolving Credit Note.**  In the case of a Revolving Credit Loan, interest shall be payable at a rate per annum equal to the higher of (i) the LIBOR Rate plus 3.50%, or (ii) 3.60% and shall be computed on the basis of the actual number of days elapsed over a year of 360 days).  Such interest shall be payable on each Interest Payment Date, commencing with the first Interest Payment Date after the date of such LIBOR Rate Loan and on the Revolving Credit Maturity Date.

**SECTION 2.05.  Use of Proceeds Revolving Credit Loans.**  The proceeds of the Revolving Credit Loans shall be used by the Borrower to repay existing debt and for working capital needs. No part of the proceeds of any Revolving Credit Loan may be used for any purpose that directly or indirectly violates or is inconsistent with, the provisions of Regulations T, U or X.

**SECTION 2.06.  Fees.**  The Borrower agrees to pay to the Bank, commencing on  180 days after the commencement of this agreement from the date of this Agreement and for so long as the Commitment remains in effect, on the 1st Business Day of each calendar quarter, and on any day that

the Commitment is reduced or terminated, an Unused Facility Fee computed at a rate per annum equal to .25% (computed on the basis of the actual number of days elapsed over 360 days) on the average daily unused amount of the Commitment, such Unused Facility Fee being payable for the calendar quarter, or part thereof, preceding the payment date.

**SECTION 2.07.  Reduction of Commitment.**  Upon at least three (3) Business Days' written notice to the Bank, the Borrower may irrevocably elect to have the unused Commitment terminated in whole or reduced in part provided, however, that any such partial reduction shall be in a minimum amount of $100,000.00 and in increased integral multiples of $50,000.00.  The Commitment, once terminated or reduced, shall not be reinstated without the express written approval of the Bank.

**SECTION 2.08.  Prepayment of Revolving Credit Loans.**

(a)  The Borrower shall have the right at any time and from time to time, subject to the provisions of this Agreement including but without limitation Section 2.25, prepay any Revolving Credit Loan which is a LIBOR Rate Loan, in whole or in part, on three (3) Business Days' prior irrevocable written notice to the Bank, provided, however, that each such prepayment shall be on a Business Day and shall be in an aggregate principal amount which is in the minimum amount of $100,000.00 and in increased integral multiples of $50,000.00.

(b) In the event that the Aggregate Outstandings exceed the Borrowing Base, the Borrower shall make an immediate prepayment, subject to the provisions of this Agreement, including but without limitation Section 2.25 of such excess, together with accrued interest thereon.

(c)  The notice of prepayment under this Section 2.08 shall set forth the prepayment date and the principal amount of the Loan being prepaid and shall be irrevocable and shall commit the Borrower to prepay such Loan by the amount and on the date stated therein.  All prepayments shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment. Each prepayment under this Section 2.08 shall be applied first towards unpaid interest on the amount being prepaid and then towards the principal in whole or partial prepayment of Loans as specified by the Borrower.  In the absence of such specification, amounts being prepaid shall be applied to LIBOR Rate Loans in the order of the nearest expiration of their Interest Periods.

**SECTION 2.09.  The Term Loan and Line of Credit/Term Loan**.  (a) The Bank hereby agrees on the date of this Agreement, and on the terms and conditions and in reliance upon the representations and warranties of the Borrower hereinafter set forth in this Agreement, to make a Term Loan to the Borrower in the principal amount of Five Million and 00/100 Dollars ($5,000,000.00) and the Borrower agrees to borrow such amount by executing and delivering to the Bank, the Term Loan Note.  The Term Loan shall be a Fixed Rate Loan. The Bank may at its option make any LIBOR Rate Loan by causing a foreign branch or affiliate to make such Loan, provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of the Notes. The Borrower hereby authorizes and directs the Bank  to

20

deposit $1,500,000.00 of the Term Loan into a blocked deposit account number 1001607818 maintained at the Bank ("Term Loan Escrow Account"). Said monies in the Term Loan Escrow Account shall be advanced by the Bank to the Borrower upon submission to the Bank of such invoices and other information as may be required by the Bank to substantiate the utilization of such proceeds as required by Section 2.15 of hereof.

(b)　　The Bank hereby agrees on the date of this Agreement, and on the terms and conditions and in reliance upon the representations and warranties of the Borrower hereinafter set forth in this Agreement, to make a Line of Credit/Term Loan to the Borrower during the Line of Credit/Term Loan Drawdown Period in an aggregate principal amount not to exceed Five Million and 00/100 Dollars ($5,000,000.00) and the Borrower agrees to borrow such amount by executing and delivering to the Bank, the Line of Credit/Term Loan Note. The Line of Credit/Term Loan shall be (i) during the Line of Credit/ Term Loan Drawdown Period a LIBOR loan, (ii) and after the Line of Credit/Term Loan conversion date a Fixed Rate Loan. The Bank may at its option make any LIBOR Rate Loan by causing a foreign branch or affiliate to make such Loan, provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of the Notes, shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of the Notes.

**SECTION 2.10.  INTENTIONALLY OMITTED**

**SECTION 2.11.  Term Loan Note and the Line of Credit/Term Loan Note**.  (a) The Term Loan shall be evidenced by the Term Loan Note.  The Term Loan Note shall be dated the Closing Date and shall mature on the Term Loan Maturity Date, at which time the entire outstanding principal balance and all interest thereon shall be due and payable.  The Term Loan Note shall be entitled to the benefits and subject to the provisions of this Agreement.

(b)　　The Line of Credit/Term Loan shall be evidenced by the Line of Credit/Term Loan Note.  The Line of Credit/Term Loan Note shall be dated the Closing Date and shall mature on the Line of Credit/Term Loan Maturity Date, at which time the entire outstanding principal balance and all interest thereon shall be due and payable.  The Line of Credit/Term Loan Note shall be entitled to the benefits and subject to the provisions of this Agreement.

**SECTION 2.12.  Repayment of Term Loan Note and the Line of Credit/Term Loan Note**.  (a) The Term Loan shall be repaid in sixty (60) installments of principal plus interest beginning on the first Business Day of the second calendar month following the Closing Date, or the first day of the next calendar month following the Closing Date if the Term Loan closes on the first day of a month, and continuing on the first day of each month thereafter.  The first fifty-nine (59) monthly installments shall consist of equal principal installments in the amount of $83,333.33 plus interest.  The final monthly installment, due and payable on the Term Loan Maturity Date, shall equal the then outstanding principal balance of the Term Loan Note, together with all accrued and unpaid interest.

21

(b)     During the Line of Credit/Term Loan Drawdown Period, interest only shall be due and payable with respect to the Line of Credit/Term Loan, which payments shall occur on an Interest Payment Date. After the Line of Credit/Term Loan Conversion Date, the Line of Credit/Term Loan shall be repaid In sixty (60) installments of principal plus interest beginning on the first Business Day of the first calendar month following the Line of Credit/Term Loan Conversion Date, and continuing on the first Business Day of each month thereafter. The first fifty-nine (59) monthly installments of principal shall consist of equal monthly principal installments equal to principal amount outstanding under the Line of Credit/Term Loan on the Line of Credit/Term Loan Conversion Date divided by sixty (60) (rounded to the nearest cent) plus interest.. The final monthly installment, due and payable on the Line of Credit/Term Loan Maturity Date shall equal the then outstanding principal balance of the Line of Credit/ Term Loan Note, together with all accrued and unpaid interest.

**SECTION 2.13.   Payment of Interest on the Term Loan Note and the Line of Credit/Term Loan Note**.  (a) In the case of the Line of Credit/Term Loan during the Line of Credit/Term Loan Drawdown Period, with respect to each advance, interest shall be payable at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the higher of (i) the LIBOR Rate plus 3.50% or (ii) 3.60%.  Such interest shall be payable to the Bank on each Interest Payment Date, commencing with the first Interest Payment Date after the date of such LIBOR Rate Loan, on each Interest Determination Date and at the conclusion of the Line of Credit/Term Loan Drawdown Period.

(b)  In the case of the Term Loan and/or the Line of Credit/Term Loan is a Fixed Rate Loan, interest shall be payable as set forth in Section 2.12 above, and shall be computed on the basis of the actual number of days elapsed over a year of 360 days.

**SECTION 2.14.  INTENTIONALLY OMITTED**

**SECTION 2.15.  Use of Proceeds Term Loan and Line of Credit/Term Loan.**  The proceeds of the Term Loan shall be used by the Borrower to finance existing equipment (limited to 80% of the cost of the equipment (exclusive of the soft costs, including transportation and installation) as evidenced by invoices dated six months or less) and leasehold improvements. The proceeds of the Line of Credit/Term Loan shall be used exclusively to finance new equipment and shall be limited to 80% of invoice purchase price (exclusive of soft costs, including transportation and installation).

**SECTION 2.16.  Prepayment of Term Loan and Line of Credit/Term Loan**.

(a)  LIBOR Rate Loans. During the Line of Credit/Term Loan Drawdown Period, the Borrower shall have the right at any time and from time to time, subject to the provisions hereof and of Section 2.25, to prepay any part of the Line of Credit/Term Loan, in whole or in part, on three (3) Business Days prior irrevocable written notice to the Bank, provided, however, that such prepayment

shall be in an aggregate minimum principal amount of $100,000.00 and in increased integral multiples of $50,000.00.

(b) <u>Fixed Rate Loans</u>.  (a)Upon 90-day notice, the Term Loan may be prepaid as follows:

Full or partial (in the minimum amount of $50,000.00) prepayment of the Term Loan is permitted provided the Borrower pays to the Bank together with the prepayment the following prepayment premiums:

| Month of Prepayment (the month following the Closing Date being Month 1) | | Applicable <u>Percentage</u> |
|---|---|---|
| (a) | 1-12 | 3% |
| (b) | 13-24 | 2% |
| (c) | 25-36 | 1% |
| (d) | 37-48 | 1% |
| (e) | 49 until sixty (60) days prior to the Term Loan Maturity Date | 1% |

Notwithstanding anything contained herein to the contrary, Term Loan may be prepaid up to 10% of the outstanding principal amount one time each year without a prepayment premium upon five (5) Business days' prior written notice.

All sums payable pursuant to this Section 2.16 shall also be due and payable by Borrower upon demand in the event of any involuntary prepayments or any acceleration of the Term Loan.  In addition, if the Term Loan Maturity Date occurs as a result of a an Event of Default and the Borrower tenders payment of the Term Loan or any part thereof to the Bank, such tender shall constitute an evasion of the prepayment provisions and shall be deemed to be a voluntary prepayment which shall require the payment by the Borrower of the premium prescribed herein.

(c) After the Line of Credit/Term Loan Conversion Date, upon 90-days' notice, the Line of Credit/Term Loan may be prepaid as follows:

Full or partial (in the minimum amount of $50,000.00) prepayment of the Line of Credit/Term Loan is permitted provided the Borrower pays to the Bank together with the prepayment the following prepayment premiums:

| Month of Prepayment (the month following the Line of Credit/Term Loan Conversion Date) | Applicable <u>Percentage</u> |
|---|---|

#11855908.1(161627.644)

| (a) | 1-12 | 3% |
| (b) | 13-24 | 2% |
| (c) | 25-36 | 1% |
| (d) | 37-48 | 1% |
| (e) | 49 until sixty (60) days prior to the Line of Credit/Term Loan Maturity Date | 1% |

Notwithstanding anything contained herein to the contrary, Line of Credit/Term Loan may be prepaid up to 10% of the outstanding principal amount one time each year without a prepayment premium upon five (5) Business days' prior written notice.

All sums payable pursuant to this Section 2.16 shall also be due and payable by Borrower upon demand in the event of any involuntary prepayments or any acceleration of the Line of Credit/Term Loan. In addition, if the Line of Credit/Term Loan Maturity Date occurs as a result of a an Event of Default and the Borrower tenders payment of the Line of Credit/Term Loan or any part thereof to the Bank, such tender shall constitute an evasion of the prepayment provisions and shall be deemed to be a voluntary prepayment which shall require the payment by the Borrower of the premium prescribed herein.

(d) The notice of prepayment under this Section 2.16 shall set forth the prepayment date and the principal amount of the Loan being prepaid and shall be irrevocable and shall commit the Borrower to prepay such Loan by the amount and on the date stated therein. All prepayments shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment. Each prepayment under this Section 2.16 shall be applied first towards unpaid interest on the principal amount being prepaid and then towards the principal in whole or partial prepayment of Loans by the Borrower. All prepayments shall be applied first to LIBOR Rate Loans outstanding in the order of the nearest expiration of their Interest Periods. All partial prepayments of the Term Loan and the Line of Credit/Term Loan shall be applied to installments of principal of the Term Loan and the Line of Credit/Term Loan in the inverse order of maturity.

**SECTION 2.17.  Authorization to Debit Borrower's Account.**  The Bank is hereby authorized to debit the Borrower's account maintained with the Bank for (i) all scheduled payments due from the Borrower of principal and/or interest and/or commissions or fees under the Notes or this Agreement, (ii) the Unused Facility Fee, and (iii) all other amounts due hereunder; all such debits to be made on the days such payments are due in accordance with the terms hereof.

**SECTION 2.18.  Late Charges, Default Interest.**  (a) In the event that any payment shall become overdue for a period of ten (10) days (other than at maturity), a late charge of five percent (5%) of the payment so overdue may be charged by the Bank for the purpose of defraying the expense incident to handling such delinquent payment.

24

(b) Upon the occurrence and during the continuation of an Event of Default, the Borrower shall pay to the Bank, interest on all Loans (after as well as before judgment) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to five (5.00%) percent plus the interest rate which would then be in otherwise effect.

**SECTION 2.19.  Payments.** All payments by the Borrower hereunder or under the Notes shall be made in U.S. dollars in immediately available funds at the office of the Bank by 1:00p.m. on the date on which such payment shall be due.  Interest on each Note shall accrue from and including the date of each Loan to but excluding the date on which such Loan is paid in full.

**SECTION 2.20.   Interest Adjustments.**  (a) If the provisions of this Agreement or the Notes would at any time otherwise require payment by the Borrower to the Bank of any amount of interest in excess of the maximum amount then permitted by applicable law the interest payments shall be reduced to the extent necessary so that the Bank shall not receive interest in excess of such maximum amount.  To the extent that, pursuant to the foregoing sentence, the Bank shall receive interest payments hereunder or under the Notes in an amount less than the amount otherwise provided, such deficit (hereinafter called the "Interest Deficit") will cumulate and will be carried forward (without interest) until the termination of this Agreement. Interest otherwise payable to the Bank hereunder and under the Notes for any subsequent period shall be increased by such maximum amount of the Interest Deficit that may be so added without causing the Bank to receive interest in excess of the maximum amount then permitted by applicable law.

(b) The amount of the Interest Deficit shall be treated as a prepayment penalty and paid in full at the time of any optional prepayment by the Borrower to the Bank of all outstanding Loans.  The amount of the Interest Deficit relating to the Notes at the time of any complete payment of the Notes at that time outstanding (other than an optional prepayment thereof) shall be cancelled and not paid.

**SECTION 2.21. Eurocurrency Reserve Requirement**.  It is understood that the cost to the Bank of making or maintaining LIBOR Rate Loans may fluctuate as a result of the applicability of, or change in, the Eurocurrency Reserve Requirement.  The Borrower agrees to pay to the Bank from time to time, as provided in Section 2.22 below, such amounts as shall be necessary to compensate the Bank for the portion of the cost of making or maintaining any LIBOR Rate Loans made by it resulting from any change in the Eurocurrency Reserve Requirement, it being understood that the rates of interest applicable to LIBOR Rate Loans hereunder have been determined on the basis of the Eurocurrency Reserve Requirement in effect at the time of determination of the LIBOR Rate and that such rates do not reflect costs imposed on the Bank in connection with any change to the Eurocurrency Reserve Requirement.  It is agreed that for purposes of this paragraph the LIBOR Rate Loans made hereunder shall be deemed to constitute Eurocurrency Liabilities as defined in Regulation D and to be subject to the reserve requirements of Regulation D without benefit or credit of proration, exemptions or offsets which might otherwise be available to the Bank from time to time under Regulation D.

25

**SECTION 2.22. Increased Costs**. If, after the date of this Agreement, the adoption of, or any change in, any applicable law, regulation, rule or directive, or any interpretation thereof by any authority charged with the administration or interpretation thereof:

        (i)      subjects the Bank to any tax with respect to its Commitment, the Loans, the Notes or on any amount paid or to be paid under or pursuant to this Agreement, the Loans or the Notes (other than any tax measured by or based upon the overall net income of the Bank);

        (ii)     changes the basis of taxation of payments to the Bank of any amounts payable hereunder (other than any tax measured by or based upon the overall net income of the Bank);

        (iii) imposes, modifies or deems applicable any reserve, capital adequacy or deposit requirements against any assets held by, deposits with or for the account of, or loans made by, the Bank; or

        (iv) imposes on the Bank any other condition affecting its Commitment, the Loans, its Note or this Agreement;

        and the result of any of the foregoing is to increase the cost to the Bank of maintaining this Agreement or the Commitment, making the Loans, or to reduce the amount of any payment (whether of principal, interest or otherwise) receivable by the Bank or to require the Bank to make any payment on or calculated by reference to the gross amount of any sum received by them, in each case by an amount which the Bank, in its sole, reasonable judgment deems material, then and in any such case:

        (a) the Bank above shall notify the Borrower, together with the date thereof, the amount of such increased cost or reduction or payment and the way in which such amount has been calculated; and

        (b) the Borrower shall pay to the Bank, within ten (10) days after the advice referred to in subsection (a) hereinabove, such an amount or amounts as will compensate the Bank for such additional cost, reduction or payment for so long as the same shall remain in effect.

        The determination of the Bank as to additional amounts payable pursuant to this Section 2.22 shall be conclusive evidence of such amounts absent manifest error. The provisions of this Section 2.22 shall survive the termination of this Agreement and the payment of the Loans and all other amounts due hereunder.

**SECTION 2.23. Capital Adequacy**. If the Bank shall have reasonably determined that, subsequent to the date hereof, any change in the applicability of any law, rule, regulation or guideline, or the adoption after the date hereof of any other law, rule, regulation or guideline regarding capital adequacy, or any change in any of the foregoing or in the interpretation or administration of any of the foregoing by any governmental authority, central bank or comparable

26

agency charged with the interpretation or administration thereof, or compliance by the Bank (or any lending office of the Bank) or the Bank's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's capital or on the capital of the Bank's holding company, if any, as a consequence of its obligations hereunder to a level below that which the Bank or the Bank's holding company could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies and the policies of the Bank's holding company with respect to capital adequacy) by an amount deemed by the Bank to be material, then from time to time:

(a) the Bank shall notify the Borrower of such event, together with the date thereof, the amount of such reduced rate of return and the way in which such amount has been calculated; and

(b) the Borrower shall pay to the Bank within ten (10) days after the advice referred to in subsection (a) hereinabove, such an amount or amounts as will compensate the Bank for such reduced rate of return for so long as such reduction shall remain in effect.

**SECTION 2.24.    Change in Legality**.  (a) Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any change after the date hereof in law, rule, regulation, guideline or order, or in the interpretation thereof by any governmental authority charged with the administration thereof, shall make it unlawful for the Bank to make or maintain any LIBOR Rate Loan or to give effect to its obligations as contemplated hereby with respect to a LIBOR Rate Loan, then, by written notice to the Borrower, the Bank shall:

(i)    declare that LIBOR Rate Loans will not thereafter be made by the Bank hereunder, whereupon the Borrower shall be prohibited from requesting LIBOR Rate Loans from the Bank hereunder unless such declaration is subsequently withdrawn; and

(ii)    require that, subject to the provisions hereof, all outstanding LIBOR Rate Loans made by the Bank be converted to a Loan bearing interest at the rate per annum of Prime Rate plus .50%, with a floor of 3.60% whereupon all of such LIBOR Rate Loans shall be automatically converted to such a Loan as of the effective date of such notice as provided in paragraph (b) below.

(b) For purposes of this Section 2.24, a notice to the Borrower by the Bank pursuant to paragraph (a) above shall be effective, for the purposes of paragraph (a) above, if lawful, and if any LIBOR Rate Loans shall then be outstanding, on the last day of the then current Interest Period; otherwise, such notice shall be effective on the date of receipt by the Borrower.

**SECTION 2.25.  Funding Losses**.  The Borrower agrees to compensate the Bank for any loss or expense which the Bank may sustain or incur as a consequence of (a) default by the Borrower in payment or prepayment when due of the principal amount of or interest on any LIBOR Rate Loan, (b) default by the Borrower in making a borrowing of, conversion into or continuation of LIBOR

27

Rate Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (c) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement, or (d) the making of a prepayment or conversion of LIBOR Rate Loans on a day which is not the last day of an Interest Period with respect thereto, including, without limitation, in each case, any such loss (including, without limitation, loss of margin) or expense arising from the reemployment of funds obtained by it or from amounts payable by the Bank to lenders of funds obtained by it in order to make or maintain such Loans. Such compensation may include an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so prepaid or converted, or not so borrowed, converted or continued, for the period from the date of such prepayment or conversion or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein, over (ii) the amount of interest (as reasonably determined by such Bank) which would have accrued to the Bank on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder. When claiming under this Section 2.25, the Bank shall provide to the Borrower a statement, signed by an officer of the Bank, explaining the amount of any such loss or expense (including the calculation of such amount), which statement shall, in the absence of manifest error, be conclusive with respect to the parties hereto.

**SECTION 2.26. <u>Change in LIBOR; Availability of Rates</u>**. (a) In the event, and on each occasion, that, on the day the interest rate for any LIBOR Rate Loan is to be determined, the Bank shall have determined (which determination, absent manifest error, shall be conclusive and binding upon the Borrower) that Dollar deposits in the amount of the principal amount of the requested LIBOR Rate Loan are not generally available in the interbank eurodollar market, or that the rate at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to the Bank of making or maintaining the principal amount of such LIBOR Rate Loan during such Interest Period, such LIBOR Rate Loan shall be unavailable. The Bank shall, as soon as practicable thereafter, give written notice of such determination of unavailability to the Borrower. Any request by the Borrower for an unavailable LIBOR Rate Loan shall be deemed to have been a request for a Loan bearing interest at a rate per annum of the Prime Rate plus .50% with a floor of 3.60%. After such notice shall have been given and until the Bank shall have notified the Borrower that the circumstances giving rise to such unavailability no longer exist, each subsequent request for an unavailable LIBOR Rate Loan shall be deemed to be a request for a Loan bearing interest at a rate per annum of the Prime Rate plus .50% with a floor of 3.60%.

(b) Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Bank determines (which determination shall be conclusive absent manifest error), or the Borrower notifies the Bank that the Borrower has determined that:

(i) adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period, including, without limitation, because the LIBOR

28

Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    the administrator of the LIBOR Rate or a Governmental Body having jurisdiction over the Bank has made a public statement identifying a specific date after which LIBOR or the LIBOR Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "Scheduled Unavailability Date"), or

(iii)    syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Bank or receipt by the Bank of such notice, as applicable, the Bank and the Borrower may amend this Agreement to replace LIBOR with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "LIBOR Successor Rate"), together with any proposed LIBOR Successor Rate Conforming Changes (as defined below) and any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Bank shall have posted such proposed amendment to the Borrower. Such LIBOR Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Bank, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Bank.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Bank will promptly so notify the Borrower. Thereafter, the obligation of the Bank to make or maintain LIBOR Rate Loans shall be suspended, (to the extent of the affected LIBOR Rate Loans or Interest Periods). Upon receipt of such notice, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of LIBOR Rate Loans (to the extent of the affected LIBOR Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a borrowing of a Loan, bearing interest at a rate per annum of the Prime Rate plus .50% with a floor of 3.60%. .

Notwithstanding any definition of the LIBOR Successor Rate, at no time shall the per annum rate of interest with respect to the Revolving Loan or the Line of Credit/ Term Loan during the Line of Credit/ Term Loan Drawdown period be less than 3.60% per annum.

For purposes hereof, "LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Interest Period, timing and frequency of determining rates, and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Bank in consultation with the Borrower, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Bank in a manner substantially consistent with market practice (or, if the Bank determines that adoption of any portion of such market practice is not administratively feasible or that no market

29

practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Bank determines is reasonably necessary in connection with the administration of this Agreement).

# ARTICLE III

## CONDITIONS OF LENDING

**SECTION 3.01.** **Conditions Precedent to the Making of the Initial Revolving Credit Loan and the Term Loan**.  The obligation of the Bank to make the initial Revolving Credit Loan, and make the Term Loan and the Line of Credit/Term Loan contemplated by this Agreement are each subject to the conditions precedent that the Bank shall have received from the Borrower and the Guarantors on or before the date of this Agreement the following, each dated such day, in form and substance satisfactory to the Bank and its counsel:

(a) The Revolving Credit Note, duly executed by the Borrower and payable to the order of the Bank.

(b) The Term Loan Note and the Line of Credit/Term Note, each duly executed by the Borrower and payable to the order of the Bank.

(c) A certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of the Borrower in form and substance satisfactory to Bank dated as of the date hereof which shall certify (i) copies of resolutions in form and substance reasonably satisfactory to Bank, of the board of directors (or other equivalent governing body, member or partner) of the Borrower authorizing (x) the execution, delivery and performance of this Agreement, the Notes and the other Loan Documents to which the Borrower is a party (including authorization of the incurrence of indebtedness, Revolving Credit Loans, the Term Loan and the Line of Credit/Term Loan), and (y) the granting by the Borrower of the security interests in and liens upon the Collateral to secure the obligations of the Borrower hereunder (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of the Borrower authorized to execute this Agreement and the Loan Documents, (iii) copies of the Organizational Documents of such Borrower as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of the Borrower in its jurisdiction of organization and each applicable jurisdiction required by the Bank where the conduct of the Borrower's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than 60 days prior to the date hereof, issued by the Secretary of State or other appropriate official of each such jurisdiction.

(d) A certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of the Corporate Guarantor in form and substance satisfactory to Bank dated as of the date hereof which shall certify (i) copies of resolutions in form and substance reasonably satisfactory to

30

Bank, of the board of directors (or other equivalent governing body, member or partner) of the Corporate Guarantor authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which the Corporate Guarantor is a party (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of each Corporate Guarantor authorized to execute this Agreement and the Loan Documents, (iii) copies of the Organizational Documents of each Corporate Guarantor as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of each Corporate Guarantor in its jurisdiction of organization and each applicable jurisdiction required by the Bank where the conduct of each Corporate Guarantor's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than 60 days prior to the date hereof, issued by the Secretary of State or other appropriate official of each such jurisdiction.

(e) An opinion of Rivkin Radler LLP, counsel for the Borrower and the Guarantors as to certain matters referred to in Article IV hereof and as to such other matters as the Bank or its counsel may reasonably request.

(f) From each of the Guarantors, an executed Guaranty.

(g) From the Borrower, an executed Security Agreement giving to the Bank a first priority security interest in the Collateral.

(h) From the Borrower, UCC-1 filings perfecting the Bank's first priority security interest in the Collateral.

(i) From the Corporate Guarantor, the Subordination Agreement.

(j) From the Borrower and the Corporate Guarantor, a list of all credit facilities with lenders, other than the Bank (other than credit agreements and facilities to be terminated at the Closing Date).

(k) From the Borrower, (i) the fees and expenses to be paid pursuant to this Agreement, and (ii) those other fees, charges and expenses as the Borrower and the Bank may mutually agree.

(l) Evidence that the Bank shall, prior to the date of this Agreement, have completed its due diligence reviews of the Borrower and Guarantors, the results of which shall be satisfactory to the Bank in its sole discretion.

(m) The following statements shall be true and the Bank shall have received a certificate signed by the President or Chief Financial Officer of the Borrower and each Corporate Guarantor dated the date hereof, stating that:

(i) The representations and warranties contained in Article IV of this Agreement and in

31

the Guaranties are true and correct on and as of such date; and

(ii) No Default or Event of Default has occurred and is continuing, or would result from the making of the Term Loan, the Line of Credit/Term Loan or the initial Revolving Credit Loan.

(n) All legal matters incident to this Agreement and the Loan transactions contemplated hereby shall be satisfactory to Wilentz, Goldman & Spitzer, P.A., counsel to the Bank.

(o)  Receipt by the Bank of such other approvals, opinions or documents as the Bank or its counsel may reasonably request.

**SECTION 3.02.  Conditions Precedent to All Revolving Credit Loans.**  The obligation of the Bank to make each Revolving Credit Loan (including the initial Revolving Credit Loan) shall be subject to the further conditions precedent that on the date of such Revolving Credit Loan:

(a) The following statements shall be true and each request for a Revolving Credit Loan shall be deemed to be a certification by the Borrower that:

(i) The representations and warranties contained in Article IV of this Agreement and in the Guaranties are true and correct on and as of such date as though made on and as of such date; and

(ii) No Default or Event of Default has occurred and is continuing, or would result from such Revolving Credit Loan;

(b) The Bank shall have received a Borrowing Base Certificate as described in Section 5.01(xiii) of this Agreement; and

(c) The Bank shall have received such other approvals, opinions or documents as the Bank may reasonably request.

**SECTION 3.03.  Conditions Precedent to Advances Under Line of Credit/Term Loan.**

The obligation of the Bank to make each advance Line of Credit/Term Loan (including the initial advance under the Line of Credit/Term Loan) shall be subject to the further conditions precedent that on the date of such Line of Credit/Term Loan:

(a) The following statements shall be true and each request for a Line of Credit/Term Loan shall be deemed to be a certification by the Borrower that:

(i) The representations and warranties contained in Article IV of this Agreement and in the Guaranties are true and correct on and as of such date as though made on and as of such date; and

(ii) No Default or Event of Default has occurred and is continuing, or would result from

32

such advance under Line of Credit/Term Loan.

(b) The Bank shall have received such other approvals, opinions or documents as the Bank may reasonably request.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**SECTION 4.01.  Representations and Warranties.**  On the Closing Date, and on each date that the Borrower requests a Revolving Credit Loan and Line of Credit/ Term Loan, the Borrower and each of the Guarantors represent and warrant as follows:

(a) On the date hereof, the only Subsidiaries of the Borrower or the Corporate Guarantor are those set forth on Schedule 4.01(a) annexed hereto, which Schedule accurately sets forth with respect to each such Subsidiary, its name and address, any other addresses at which it conducts business, its state of incorporation and each other jurisdiction in which it is qualified to do business and the identity and shareholdings of its stockholders.  Except as set forth on Schedule 4.01(a), all of the issued and outstanding shares of each Subsidiary which are owned by the Borrower or the Corporate Guarantor are owned by the Borrower or the Corporate Guarantor free and clear of any mortgage, pledge, lien or encumbrance. Except as set forth on Schedule 4.01(a), there are not outstanding any warrants, options, contracts or commitments of any kind entitling any Person to purchase or otherwise acquire any shares of common or capital stock or other equity interest of the Borrower, the Corporate Guarantor or any Subsidiary of the Borrower or a Corporate Guarantor, nor are there outstanding any securities which are convertible into or exchangeable for any shares of the common or capital stock of the Borrower, any Corporate Guarantor or any Subsidiary of the Borrower or the Corporate Guarantor.

(b) The Borrower is a corporation and Corporate Guarantor is a limited liability company, each duly organized, validly existing and in good standing under the laws of their respective jurisdictions of organization and each has the power to own its assets and to transact the business in which it is presently engaged and is duly qualified and is in good standing in all other jurisdictions where the character or nature of its business requires such qualification, except where the failure to so qualify would not have a Material Adverse Change  with respect to Borrower or Corporate Guarantor.

(c) The execution, delivery and performance by the Borrower and the Guarantor of the Loan Documents to which they are a party are within the Borrower's and the Corporate Guarantor's power and have been duly authorized by all necessary action and do not and will not (i) require any consent or approval of their respective equityholders which has not been obtained; (ii) do not contravene the

33

Borrower's or the Corporate Guarantor's organizational documents; (iii) violate any provision of or any law, rule, regulation, contractual restriction, order, writ, judgment, injunction, or decree, determination or award binding on or affecting the Borrower or any Guarantor; (iv) result in a breach of or constitute a default under any indenture or loan or credit agreement, or any other agreement, lease or instrument to which the Borrower or any Guarantor is a party or by which it or its properties may be bound or affected; and (v) result in, or require, the creation or imposition of any Lien (other than the Lien of the Loan Documents) upon or with respect to any of the properties now owned or hereafter acquired by the Borrower or any Guarantor.

(d) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Borrower or any Guarantor of any Loan Document to which it is a party, except authorizations, approvals, actions, notices or filings which have been obtained, taken or made, as the case may be.

(e) The Loan Documents when delivered hereunder will have been duly executed and delivered on behalf of the Borrower and the Guarantor, as the case may be, and will be legal, valid and binding obligations of the Borrower and the Guarantor, as the case may be, enforceable against the Borrower or such Guarantor in accordance with their respective terms.

(f) The financial statements of the Borrower and Corporate Guarantor for the fiscal year ended December 31, 2019, copies of which have been furnished to the Bank, fairly present the financial condition of the Borrower and Corporate Guarantor as at such date and the results of operations of the Borrower and Corporate Guarantor for the period ended on such date, all in accordance with GAAP, and since such date there has been (i) no material increase in the liabilities of the Borrower and Corporate Guarantor and (ii) no Material Adverse Change in the Borrower and Corporate Guarantor.

(g) The personal financial statements of the Individual Guarantor, prepared as of June 30, 2020,, copies of which have been furnished to the Bank, fairly reflect the financial condition of the Individual Guarantor and since the last day of such year there has been (i) no material increase in the liabilities of the Individual Guarantor and (ii) no Material Adverse Change in any of the Individual Guarantor.

(h) Except as set forth on Schedule 4.01(h), there is no pending or threatened action, proceeding or investigation affecting the Borrower, any Guarantor or any Subsidiary of the Borrower or Corporate Guarantor, before any court, governmental agency or arbitrator, which may either in one case or in the aggregate, result in a Material Adverse Change in the Borrower, any Guarantor or any such Subsidiary.

(i) The Borrower and Corporate Guarantor have filed all federal, state and local tax returns required to be filed and have paid all taxes, assessments and governmental charges and levies thereon to be due, including interest and penalties. The federal income tax liability of the Borrower and each

34

Corporate Guarantor has been finally determined and satisfied for all taxable years up to and including the taxable year ending December 31, 2019.

(j) The Borrower, Corporate Guarantor and each Subsidiary of the Borrower or Corporate Guarantor possess all licenses, permits, franchises, patents, copyrights, trademarks and trade names, or rights thereto, to conduct their respective businesses substantially as now conducted and as presently proposed to be conducted, and neither the Borrower, any Guarantor nor any such Subsidiary are in violation of any similar rights of others.

(k) Neither the Borrower nor Corporate Guarantor is a party to any indenture, loan or credit agreement or any other agreement, lease or instrument or subject to any charter or corporate restriction which could result in a Material Adverse Change in the Borrower or Corporate Guarantor.

(l) The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or in any other way which will cause the Borrower to violate the provisions of Regulations T, U or X.

(m) No proceeds of any Loan will be used to acquire any security in any transaction which is subject to Sections 13 or 14 of the Securities Exchange Act of 1934.

(n) The Borrower, Corporate Guarantor and each Subsidiary of the Borrower or Corporate Guarantor are in all material respects in compliance with all federal and state laws and regulations in all jurisdictions where the failure to comply with such laws or regulations could result in a Material Adverse Change in the Borrower, any of the Guarantors or any such Subsidiary.

(o) The Borrower, Corporate Guarantor, each Subsidiary of the Borrower or Corporate Guarantor and each ERISA Affiliate are in compliance in all material respects with all applicable provisions of ERISA. Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed nor has any Plan been terminated; no circumstances exist which constitute grounds under Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administrate, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower, Corporate Guarantor, any Subsidiary of the Borrower or Corporate Guarantor, nor any ERISA Affiliate has completely or partially withdrawn under Sections 4201 or 4204 of ERISA from a Multiemployer Plan; the Borrower, Corporate Guarantor, each Subsidiary of the Borrower or Corporate Guarantor and each ERISA Affiliate have met their minimum funding requirements under ERISA with respect to all of their Plans and the present fair market value of all Plan assets exceeds the present value of all vested benefits under each Plan, as determined on the most recent valuation date of the Plan in accordance with the provisions of ERISA for calculating the potential liability of the Borrower, Corporate Guarantor, any such Subsidiary or any ERISA Affiliate to PBGC or the Plan under Title IV of ERISA; and neither the Borrower, any Corporate Guarantor, any such Subsidiary nor any ERISA

35

Affiliate has incurred any liability to the PBGC under ERISA.

(p) The Borrower, the Guarantor and each Subsidiary of the Borrower or Corporate Guarantor are in compliance with all federal, state or local laws, ordinances, rules, regulations or policies governing Hazardous Materials in all material respects, and neither the Borrower, any Guarantor nor any such Subsidiary has used Hazardous Materials on, from, or affecting any property now owned or occupied or hereafter owned or occupied by the Borrower, any Guarantor or any such Subsidiary in any manner which violates federal, state or local laws, ordinances, rules, regulations or policies governing the use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of Hazardous Materials. To the Borrower's, Guarantors' and such Subsidiaries' knowledge, no prior owner of any such property or any tenant, subtenant, prior tenant or prior subtenant have used Hazardous Materials on, from or affecting such property in any manner which violates federal, state or local laws, ordinances, rules, regulations, or policies governing the use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of Hazardous Materials.

(q) The proceeds of the Revolving Credit Loans, the Term Loan and the Line of Credit/Term Loan shall be used exclusively for the purposes set forth in Section 2.05 and Section 2.15, respectively of this Agreement.

(r) The properties and assets of the Borrower and the Corporate Guarantor are not subject to any Lien other than those described in Section 5.02(a) hereof.

(s) Neither the business nor the properties of the Borrower, any Guarantor or any Subsidiary of the Borrower or Corporate Guarantor are affected by any fire, explosion, accident, strike, hail, earthquake, embargo, act of God or of the public enemy, or other casualty (whether or not covered by insurance), which could result in a Material Adverse Change in the Borrower, any Guarantor or any such Subsidiary.

(t) The Lien on the Collateral created by the Security Agreement constitutes a valid first priority perfected security interest in favor of the Bank.

(u) The liability of the Guarantors as a result of the execution of their respective Guaranties and the execution of this Agreement shall not cause the liabilities (including contingent liabilities) of each of the Guarantors to exceed the fair saleable value of their respective assets.

(v) The Guarantors acknowledge they have derived or expect to derive a financial or other advantage from the Loans obtained by the Borrower from the Bank.

(w) Schedule 5.02 is a complete and correct list of all credit agreements, indentures, purchase agreements, guaranties, Capital Leases, and other investments, agreements and arrangements, each providing for or relating to extensions of credit (including agreements and arrangements for the issuance of letters of credit or for acceptance financing) in respect of which the Borrower or

Corporate Guarantor are in any manner directly or contingently obligated, and the maximum principal or face amounts of the credit in question, outstanding or to be outstanding, are correctly stated, and all Liens of any nature given or agreed to be given as security therefor are correctly described or indicated in such Schedule, other than credit agreements and facilities which will be terminated at the Closing Date.

(x)  As of the date hereof, the Borrower and Corporate Guarantor have no commercial tort claims.

(y)  As of the date hereof, the Borrower and Corporate Guarantor have no letter of credit rights.

(z)  To the extent applicable, Borrower and Corporate Guarantor have obtained all Permits, or has contracted with third parties holding Permits, necessary for compliance with all laws, including Healthcare Laws and the FDCA, and for the research, development, testing, manufacturing, packaging, labeling, handling, storage, advertising, promoting, marketing, distribution, and communication of the Products, and all such Permits are current.

(aa) To the extent applicable, Borrower and Corporate Guarantor have been operating in compliance with all Healthcare Laws, including reporting to the FDA of device malfunctions and/or device-related serious injuries or deaths pursuant to 21 C.F.R. § 803 and reporting to FDA of corrections or removals pursuant to 21 C.F.R. § 806.

(bb)  Except as set forth on Schedule 4.01(bb), neither Borrower nor Corporate Guarantor has received any written notice that any governmental authority including, without limitation, the FDA, the Office of the Inspector General of HHS, or the United States Department of Justice has commenced or threatened to initiate any action against Borrower or Corporate Guarantor, any action to enjoin Borrower, Corporate Guarantor, or its officers, directors, employees, shareholders, or their agents and affiliates, from conducting their businesses at any facility owned or used by them or for any material civil penalty, injunction, seizure, or criminal action, to the extent applicable.

(cc)  To the extent applicable, except as set forth on Schedule (cc), neither Borrower nor Corporate Guarantor have received from the FDA at any time since April 3, 2016, a warning letter, Form 483, "Untitled Letter," other correspondence or notice setting forth allegedly objectionable observations or alleged violations of laws and regulations enforced by the FDA or DEA, including but not limited to the FDCA, or any comparable correspondence from any state or local authority responsible for regulating medical device products, drug products and establishments, or any comparable correspondence from any foreign counterpart of the FDA or DEA, or any comparable correspondence from any foreign counterpart of any state or local authority with regard to any Product or the development, manufacture, processing, distribution, packing, or holding thereof.

(dd)  Except as set forth on Schedule 4.01(dd), Borrower and Corporate Guarantor have not engaged in any Recalls or other forms of product retrieval from the marketplace of any Products since January 1, 2016.

37

(ee)    Except as set forth on Schedule 4.01(ee), Borrower and Corporate Guarantor are in compliance with (a) the Federal Health Care Program requirements applicable to Borrower and Corporate Guarantor, and (b) federal and state reporting obligations applicable to Borrower or Corporate Guarantor, including, without limitation, any state law reporting obligations relating to sales and marketing to healthcare professionals, any price reporting obligations pursuant to the Medicaid Drug Rebate program, the Medicare program, and any other federal or state programs (including, without limitation, the 340B Drug Pricing program).

(ff)    Neither Borrower, nor Corporate Guarantor and any of their officer, manager, director, employee or agent, nor any other person or entity acting on behalf of Borrower or Corporate Guarantor, acting alone or together, have directly or indirectly (i) made any illegal or unethical contribution, gift, bribe, rebate, payoff, commissions, promotional allowances, influence payment, kickback, or other payment or economic benefit to any person or entity, private or public, regardless of what form, whether in money, property, or services; (ii) established or maintained any fund or asset that has not been recorded in the books and records of Borrower; (iii) engaged in any business practices or conducted any dealings that are materially contrary to accepted industry standards; or (iv) aided, abetted, caused (directly or indirectly), participated in, or otherwise conspired with, any person or entity to violate the terms of any judgment, sentence, order, or decree of any court or governmental authority.

(gg)    Since January 1, 2010, neither Borrower nor Corporate Guarantor and any of their affiliates, directors, members, employees, agents, officers, or managers:

   i.    has been convicted of or charged with any violation of any law related to any Federal Health Care Programs, as defined in 42 U.S.C. § 1320a-7b(f);

   ii.    has been convicted of any crime or engaged in any conduct for which debarment is mandated by 21 U.S.C. Section 335a(a) or authorized by 21 U.S.C. Section 335a(b);

   iii.    has made an untrue statement of material fact or fraudulent statement to the FDA or failed to disclose a material fact required to be disclosed to the FDA, committed an act, made a statement, or failed to make a statement that could reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," set forth in 56 Fed. Regulation 46191 (September 10, 1991);

   iv.    has been convicted of, charged with, or investigated for any violation of law related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances; or

   v.    has been excluded, suspended, or debarred from participation, or are otherwise ineligible to participate, in (i) any Federal Health Care Programs, or in Federal procurement or non-procurement programs; or (ii) any other federal or state government programs or activities, including, without limitation, the FDA; or (iii) have committed any

38

violation of law that is reasonably expected to serve as the basis for any such exclusion, suspension, debarment, or other ineligibility.

(hh)  With respect to Products:

i.  each Product is not adulterated or misbranded within the meaning of the FDCA;

ii.  each Product is not an article prohibited from introduction into interstate commerce under the provisions of the FDCA or any state law;

iii.  each Product has been and/or shall be manufactured, labeled, imported, possessed, owned, warehoused, marketed, promoted, sold, labeled, furnished, distributed, and marketed in accordance with all applicable Permits and Healthcare Laws, including but not limited to the FDCA;

iv.  each Product has been and/or shall be developed, designed and manufactured in accordance with Good Manufacturing Practices;

v.  with respect to any Product being tested or manufactured by Borrower or Corporate Guarantor, Borrower or Corporate Guarantor has received and shall be in compliance with, and such Product shall be the subject of, all Permits needed in connection with the testing or manufacture of such Product as such testing is currently being conducted by or on behalf of Borrower or Corporate Guarantor, and Borrower and Corporate Guarantor has not received any notice from any applicable government authority, specifically including the FDA, that such government authority is conducting an investigation or review of (A) Borrower's or Corporate Guarantor's manufacturing facilities and processes for such Product which have disclosed any material deficiencies or violations of laws (including Healthcare laws) and/or the Permits related to the manufacture of such Product, or (B) any such Permit or that any such Permit has been revoked or withdrawn, nor has any such governmental authority issued any order or recommendation stating that the development, testing, and/or manufacturing of such Product by Borrower or Corporate Guarantor should cease;

vi.  all studies conducted or being conducted with respect to any of the Products of the Borrower or Corporate Guarantor have been, and are being, conducted in material compliance with the applicable requirements of all regulations and guidances that relate to the conduct of clinical studies issued by the FDA, DEA, or any other applicable governmental authority.

vii.  with respect to any Product marketed or sold by Borrower or Corporate Guarantor, Borrower and Corporate Guarantor shall have received, and such Product shall be the subject of, all Permits needed in connection with the marketing and sales of such Product as currently being marketed or sold by Borrower or Corporate Guarantor, and Borrower and Corporate Guarantor has not received any notice from any applicable governmental authority, specifically including the FDA, that such governmental authority is conducting an investigation or review of any such Permit or approval or that any such Permit has been revoked or withdrawn, nor has any such governmental authority issued any order or recommendation

39

stating that such marketing or sales of such Product cease or that such Product be recalled from the marketplace; and

        viii.   each Product that is not a "new drug," as that term is defined in 21 U.S.C. Section 321(p), is generally recognized by qualified experts as safe and effective for its intended uses as those terms have been interpreted by FDA and the United States Supreme Court.

# ARTICLE V

## COVENANTS OF THE BORROWER

    **SECTION 5.01.**  **Affirmative Covenants.**  So long as (i) any amount shall remain outstanding under any Note, or (ii) the Commitment shall remain in effect, the Borrower and the Guarantors will, unless the Bank shall otherwise consent in writing:

    (a) <u>Compliance with Laws, Etc.</u>  Comply, and cause each Subsidiary of the Borrower or the Corporate Guarantor to comply, in all material respects with all applicable laws, rules, regulations and orders, where the failure to so comply could result in a Material Adverse Change in the Borrower, the Corporate Guarantor or any such Subsidiary.

    (b) <u>Reporting Requirements.</u>  Furnish to the Bank: (i) <u>Annual Financial Statements.</u> As soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of the Borrower, a copy of the financial statements of the Borrower for such year, including balance sheets with related statements of income and retained earnings and statements of cash flows, all in reasonable detail and setting forth in comparative form the figures for the previous fiscal year, prepared on an audited basis by independent certified public accountants selected by the Borrower and satisfactory to the Bank, all such financial statements to be prepared in accordance with GAAP;

    (ii) <u>Quarterly Financial Statements.</u> (1) As soon as available and in any event within sixty (60) days after the end of each quarterly fiscal period of the Borrower, a copy of the financial statements of the Borrower for such quarterly fiscal period, including a balance sheet with related statements of income and retained earnings and a statement of cash flows, all in reasonable detail and setting forth in comparative form the figures for the comparable quarterly fiscal period for the previous fiscal year, prepared by management, all such financial statements to be prepared in accordance with GAAP, subject to year-end adjustments;

    (iii) <u>Semi-annual Financial Statements</u>. Furnish to the Bank as soon as available and in any event within sixty (60) days after the end of each semi-annual fiscal period of the Borrower, a copy of Management prepared consolidated and consolidating financial statements to be submitted by the Borrower and the Corporate Guarantor;

    (iv) <u>Management Letters.</u>  Promptly upon receipt thereof, copies of any reports submitted to the Borrower or Corporate Guarantor by independent certified public accountants in connection with

examination of the financial statements of the Borrower and the Corporate Guarantor made by such accountants;

(v) <u>Certificate of No Default</u>. Simultaneously with the delivery of the financial statements referred to in Section 5.01(b)(i) and (ii), a Compliance Certificate of the President, the Chief Financial Officer, or a Vice President of the Borrower (1) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and the action which is proposed to be taken with respect thereto; and (2) with computations demonstrating compliance with the covenants contained in Section 5.03.

(vi) <u>Notice of Litigation</u>. Promptly after the commencement thereof, but in any event within 10 days thereafter, notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, affecting the Borrower, Corporate Guarantor or any Subsidiary of the Borrower or Corporate Guarantor which, if determined adversely to the Borrower, the Corporate Guarantor or any such Subsidiary could result in a Material Adverse Change in the Borrower, Corporate Guarantor or any such Subsidiary.

(vii) <u>Notice of Defaults and Events of Default</u>. As soon as possible and in any event within five (5) days after the occurrence of each Default or Event of Default, a written notice setting forth the details of such Default or Event of Default and the action which is proposed to be taken by the Borrower with respect thereto.

(viii) <u>ERISA Reports</u>. Promptly after the filing or receiving thereof, but in any event within 10 days thereafter, copies of all notices which the Borrower, Corporate Guarantor and any Subsidiary of the Borrower or Corporate Guarantor, receives from the PBGC or the U.S. Department of Labor under ERISA; and as soon as possible after the Borrower, Corporate Guarantor or any such Subsidiary knows or has reason to know that any Reportable Event or Prohibited Transaction has occurred with respect to any Plan or that the PBGC or the Borrower, Corporate Guarantor or any such Subsidiary has instituted or will institute proceedings under Title IV of ERISA to terminate any Plan, the Borrower or the Corporate Guarantor will deliver to the Bank a certificate of the President, the Chief Financial Officer, or a Vice President of the Borrower or the Corporate Guarantor setting forth details as to such Reportable Event or Prohibited Transaction or Plan termination and the action the Borrower or the Corporate Guarantor proposes to take with respect thereto;

(ix) <u>Reports to Other Creditors</u>. Promptly after the furnishing thereof by the Borrower or the Corporate Guarantor, copies of any statement or report furnished to any other party pursuant to the terms of any indenture, loan, or credit or similar agreement and not otherwise required to be furnished to the Bank pursuant to any other clause of this Section 5.01(b).

(x) <u>Proxy Statements, Etc.</u> To the extent applicable, promptly after the sending or filing thereof, copies of all proxy statements, financial statements and reports which the Borrower or the Corporate Guarantor sends to its stockholders, and copies of all regular, periodic, and special reports,

41

and all registration statements which the Borrower or the Corporate Guarantor files with the Securities and Exchange Commission or any governmental authority which may be substituted therefor, or with any national securities exchange.

(xi) <u>Accounts Receivable Aging.</u>  As soon as available, but in any event within 15 days after the end of each calendar month, a summary of accounts receivable of the Borrower aged to show the number of days each such account has been outstanding from its invoice date, in form reasonably satisfactory to the Bank.

(xii) <u>Accounts Payable Aging.</u>  As soon as available, but in any event within 15 days after the end of each calendar month, a summary of accounts payable of the Borrower aged to show the number of days each such account has been outstanding from its invoice date.

(xiii) <u>Borrowing Base Certificate.</u>  As part of each request for a Revolving Loan and as soon as available, but in any event within 15 days after the end of each calendar month, a "Borrowing Base Certificate,"(accompanied by an account receivable aging and inventory report) in a form, to be provided hereafter by the Bank, accompanied by a statement signed by the Borrower's President, Chief Financial Officer, or a Vice President to the effect that such certificate is true, correct and complete.

(xiv) <u>Statements of Individual Guarantors.</u>  As soon as available and in any event within 120 days after the end of each calendar year, a copy of the financial statement of the each of the Individual Guarantors for such year, prepared on the Bank's standard form or such other form as is reasonably satisfactory to the Bank.

(xv) <u>Tax Returns.</u> As soon as available and in any event within 30 days after filing, copies of the Guarantor's annual tax returns.

(xvi) <u>General Information.</u>  Such other information respecting the condition or operations, financial or otherwise, of the Borrower, any Guarantor or any Subsidiary of the Borrower or the Corporate Guarantor as the Bank may from time to time reasonably request.

(c) <u>Taxes.</u>  Pay and discharge, and cause its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges upon it or them, its' or their income and its or their properties prior to the dates on which penalties are attached thereto, unless and only to the extent that (i) such taxes shall be contested in good faith and by appropriate proceedings by the Borrower, any Guarantor or any such Subsidiary, as the case may be, and (ii) there be adequate reserves therefor in accordance with GAAP entered on the books of the Borrower, the Corporate Guarantor or any such Subsidiary.

(d) <u>Entity Existence.</u>  Preserve and maintain, and cause its Subsidiaries to preserve and maintain, their entity existence and good standing in the jurisdiction of their incorporation and the rights, privileges and franchises of the Borrower, the Corporate Guarantor and each such Subsidiary in each case where failure to so preserve or maintain could result in a Material Adverse Change in

the Borrower, Corporate Guarantor or such Subsidiary.

(e) <u>Maintenance of Properties and Insurance.</u> (i) Keep, and cause any Subsidiaries to keep, the respective properties and assets (tangible or intangible) that are useful and necessary in its business, in good working order and condition, reasonable wear and tear excepted; and (ii) maintain, and cause any Subsidiaries to maintain, insurance with financially sound and reputable insurance companies or associations in such amounts and covering such risks as are usually carried by companies engaged in similar businesses and owning properties doing business in the same general areas in which the Borrower, Corporate Guarantor and any such Subsidiaries operate.

(f) <u>Books of Record and Account.</u> Keep and cause any Subsidiaries to keep, adequate records and proper books of record and account in which complete entries will be made in a manner to enable the preparation of financial statements in accordance with GAAP, reflecting all financial transactions of the Borrower, the Corporate Guarantor, and any such Subsidiaries.

(g) <u>Visitation; Field Audit/Exam.</u> At any reasonable time, and from time to time, permit and cooperate with the Bank or any agents or representatives thereof, to examine and make copies of and abstracts from the books and records of, and visit the properties of, the Borrower or Corporate Guarantor and to discuss the affairs, finances and accounts of the Borrower or any Guarantor with any of the respective officers or directors of the Borrower or Corporate Guarantor or the Borrower's or Corporate Guarantor's independent accountants, and once during each period of twelve (12) consecutive months or, if an Event of Default has occurred and is continuing, at any time that the Bank requests, Borrower will permit, , the Bank to conduct a Field Audit/ Exam, including an examination of the Collateral included in the Borrowing Base. Borrower shall cooperate with the Bank in connection with the such Field Audit/ Exam and the expense of such Field Audits/ Exam shall be at the cost and expense of the Borrower.

(h) <u>Performance and Compliance with Other Agreements.</u> Perform and comply with each of the provisions of each and every agreement the failure to perform or comply with which could result in a Material Adverse Change in the Borrower, any Guarantor or any Subsidiary.

(i) <u>Continued Perfection of Liens and Security Interest.</u> Record or file or rerecord or refile the Loan Documents or a financing statement or any other filing or recording or refiling or rerecording in each and every office where and when necessary to preserve and perfect the security interests of the Loan Documents.

(j) <u>Pension Funding.</u> Comply with the following and cause each ERISA Affiliate of the Borrower, the Corporate Guarantor or any Subsidiary of the Borrower or the Corporate Guarantor to comply with the following:

(i) engage solely in transactions which would not subject any of such entities to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Internal Revenue Code in either case in an amount in excess of $25,000.00;

43

#11855908.1(161627.644)

(ii) make full payment when due of all amounts which, under the provisions of any Plan or ERISA, the Borrower, Corporate Guarantor, any such Subsidiary or any ERISA Affiliate of any of same is required to pay as contributions thereto;

(iii) all applicable provisions of the Internal Revenue Code and the regulations promulgated thereunder, including but not limited to Section 412 thereof, and all applicable rules, regulations and interpretations of the Accounting Principles Board and the Financial Accounting Standards Board;

(iv) not fail to make any payments in an aggregate amount greater than $25,000.00 to any Multiemployer Plan that the Borrower, Corporate Guarantor, any such Subsidiary or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or

(v) not take any action regarding any Plan which could result in the occurrence of a Prohibited Transaction.

(k) <u>Licenses.</u>  Maintain at all times, and cause each Subsidiary to maintain at all times, all licenses or permits necessary to the conduct of its business or as may be required by any governmental agency or instrumentality thereof.

(l) <u>New Subsidiaries.</u>  Cause any Subsidiary of the Borrower formed after the date of this Agreement to become a Guarantor of all Debts and other obligations of the Borrower under this Agreement.

(m)  <u>Privacy Matters.</u>  (i) Borrower and Corporate Guarantor shall take reasonable commercial efforts to ensure that (x) the Computer Systems and all operations and businesses conducted thereon remain in compliance with all Privacy Laws, (y) commercially reasonable technical, administrative and physical controls are employed to protect the integrity and function of the Computer Systems; and (z) no Malware is placed or permitted to be placed on any Computer Systems.

(ii) Borrower and Corporate Guarantor shall establish and maintain a system, including using appropriate technologies, to monitor and endeavor to assure continued compliance with all applicable Privacy Laws which system shall include periodic reviews by experts in cyber security of such compliance.

(iii) In the event Borrower and Corporate Guarantor becomes aware or receives notice of any Cyber Attack, Data Breach or threat of Cyber Attacks or Data Breach, and notification is required to be made to any Person or third party under any contract, agreement, Privacy Law, or applicable law, Borrower shall, within one (1) Business Day of such notification to any Person or third party, give written notice of same to the Bank detailing facts and circumstances of such Cyber Attack, Data

44

Breach or threat of Cyber Attacks or Data Breach.

(iv) Borrower and Corporate Guarantor shall defend and indemnify the Bank and hold the Bank and its employees, agents, directors and officers harmless from and against all loss, liability, damage and expense, claims, costs, fines and penalties, including reasonable attorney's fees, suffered or incurred by Bank under or on account of Borrower's and Corporate Guarantor's violation of any Privacy Laws; provided that Borrower and Corporate Guarantor shall not be liable for any portion of such loss, liability, damage, expenses, claims, costs, fines, fees or penalties resulting from the Bank's or such other indemnitee's gross negligence or willful misconduct..

(o) <u>Banking Relationship</u>.   The Borrower shall maintain at all times its banking and depository relationship, including its primary operating accounts, with the Bank, commencing not later than sixty (60) days from the date hereof.  In the event that the Borrower fails, in the reasonable judgment of the Bank to maintain its banking and depository relationship, including its primary operating accounts, with the Bank, the interest rate applicable to each of the Notes shall, at the Bank's option be increased by one percent (1.00%) per annum until such time as the Borrower resumes the maintenance of such  primary banking and depository relationship with the Bank.

(p) <u>Management Fee</u>. (i) Cause the payment of all management fees of the Corporate Guarantor be subordinated in all respect to the payment of the Term Loan.

(ii) In accordance with the Subordination Agreement, Bank shall be notified if Management Fee exceeds One Million Dollars ($1,000,000.00) a month.

(q) In connection with the research, development, testing, manufacture, processing, handling, packaging, labeling, storage, advertising, promoting, marketing, distribution or sale of each and any Product by Borrower or Corporate Guarantor, to the extent applicable, Borrower and the Corporate Guarantor, in all material respect, shall comply fully and completely in all respects with all applicable NDAs, BLAs, ANDAs, all Healthcare Laws and all laws and Permits at all times issued by any government authority, specifically including the FDA, with respect to such development, testing, manufacture, marketing, or sales of such Product by Borrower as such activities are at any such time being conducted by Borrower.

**SECTION 5.02.  <u>Negative Covenants.</u>**  So long as (i) any amount shall remain outstanding under any Note, or (ii) the Commitment shall remain in effect, neither the Borrower nor the Corporate Guarantor will, without the written consent of the Bank:

(a) <u>Liens, Etc.</u>  Create, incur, assume or suffer to exist, any Lien, upon or with respect to any of its properties, now owned or hereafter acquired, except:

(i) Liens in favor of the Bank securing Debt permitted by Section 5.02(b)(i) hereof;

(ii) Liens for taxes or assessments or other government charges or levies if not yet due

45

and payable or if due and payable if they are being contested in good faith by appropriate proceedings and for which appropriate reserves are maintained;

(iii) Liens imposed by law, such as mechanics', materialmen's, landlords', warehousemen's, and carriers' Liens, and other similar Liens, securing obligations incurred in the ordinary course of business which are not past due or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established;

(iv) Liens under workers' compensation, unemployment insurance, Social Security, or similar legislation;

(v) Liens, deposits, or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases (permitted under the terms of this Agreement), public or statutory obligations, surety, stay, appeal, indemnity, performance or other similar bonds, or other similar obligations arising in the ordinary course of business;

(vi) Liens described in Schedule 5.02, provided that no such Liens shall be renewed, extended or refinanced;

(vii) Judgment and other similar Liens arising in connection with court proceedings (other than those described in Section 6.01(f)), provided the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings;

(viii) Easements, rights-of-way, restrictions, and other similar encumbrances which, in the aggregate, do not materially interfere with the Borrower's or Corporate Guarantor's occupation, use and enjoyment of the property or assets encumbered thereby in the normal course of its business or materially impair the value of the property subject thereto;

(ix) Purchase money Liens on any property hereafter acquired or the assumption of any Lien on property existing at the time of such acquisition, or a Lien incurred in connection with any conditional sale or other title retention agreement or a Capital Lease, provided that:

(1) Any property subject to any of the foregoing is acquired by the Borrower or the Corporate Guarantor in the ordinary course of its respective business and the Lien on any such property is created contemporaneously with such acquisition;

(2) Each such Lien shall attach only to the property so acquired and fixed improvements thereon; and

(3) The obligation secured by such Lien is not prohibited by the provisions of Section 5.02(b).

#11855908.1(161627.644)

(b) <u>Debt</u>.  Create, incur, assume, or suffer to exist, any Debt, except:

(i) Debt of the Borrower under this Agreement or the Notes;

(ii) Debt described in Schedule 5.02;

(iii) Subordinated Debt;

(iv) Accounts payable to trade creditors for goods or services and current operating liabilities (other than for borrowed money), in each case incurred in the ordinary course of business and paid within the specified time, unless contested in good faith and by appropriate proceedings;

(v) Debt of the Borrower or Corporate Guarantor secured by purchase money Liens permitted by Section 5.02(a)(ix), provided that the aggregate amount of all such debt, outstanding at any time, shall not exceed $500,000.00.

(vi) Debt incurred in connection with Borrower's purchase of Abbreviated New Drug Applications ("ANDAs") and/or Drug Master File ("DMFs"), provided that the aggregate amount of all such debt, outstanding at any time, shall not exceed $1,000,000.00 per annum.

(c) <u>Lease Obligations</u>.  Create, incur, assume, or suffer to exist any obligation as lessee for the rental or hire of any personal property, except (i) Capital Leases permitted by Section 5.02(a); (ii) leases existing on the date of this Agreement and any replacements, extensions or renewals thereof; and (iii) leases (other than Capital Leases) which do not in the aggregate require the Borrower or Corporate Guarantor to make payments (including taxes, insurance, maintenance, and similar expenses which the Borrower or Corporate Guarantor is required to pay under the terms of any lease) in any fiscal year of the Borrower or Corporate Guarantor in excess of $100,000.

(d) <u>Merger.</u>  Merge into, or consolidate with or into, or have merged into it, any Person; and, for the purpose of this subsection (d), the acquisition or sale by the Borrower or a Guarantor by lease, purchase or otherwise, of all, or substantially all, of the common stock or the assets of any Person or of it shall be deemed a merger of such Person with the Borrower or a Guarantor;

(e) <u>Sale of Assets, Etc.</u>  Sell, assign, transfer, lease or otherwise dispose of any of its assets, (including a sale-leaseback transaction) with or without recourse, except for (i) inventory disposed of in the ordinary course of business; (ii) the sale or other disposition of assets no longer used or useful in the conduct of its business,  (iii) so long as no Default or Event of Default shall exist at the time, or shall result therefrom, Borrower and the Corporate Guarantor may sell ANDAs and DMFs in the ordinary course of business consistent with past practices; and (iv) so long as no Default or Event or Default shall exist at the time, or shall result therefrom, the Individual Guarantor may, for estate planning purposes, cause the Corporate Guarantor to transfer non-income producing assets or investments, or interests in such assets or investments, to trusts formed for the benefit of lineal descendants of the Individual Guarantor, provided (A) any such trusts become Guarantors under this

47

Agreement, and execute and deliver such guaranties, agreements and satisfy such terms and conditions, as may reasonably be required by the Bank and (B) the Individual Guarantor remains in compliance with Section 5.02(p) and (q) hereof.

(f) <u>Investments, Etc.</u>  Make any Investment other than (i) Permitted Investments and (ii) so long as no Default or Event of Default shall exist at the time, or shall result therefrom,  the Borrower and Corporate Guarantor may (A) purchase  ANDAs and DMFs in the ordinary course of business consistent with past practice,(B) the Corporate Guarantor may make additional Investments in entities in which it has existing control or ownership of at least 40% of the voting equity securities consistent with past practices; provided that the aggregate amount of all such Investments in new entities shall not exceed more than $1,000,000 in any fiscal year and (C) Borrower or the Corporate Guarantor may make other Investments of not more than $1,000,000 in the aggregate in any fiscal year.

(g) <u>Transactions with Affiliates.</u>  Except in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's, a Corporate Guarantor's or a Subsidiary's business and upon fair and reasonable terms no less favorable to the Borrower, or the Corporate Guarantor or the Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate, enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate except that so long as no Default of Event or Default shall exist at this time, or shall result therefrom, Borrower may continue to pay management and research and development fees to the Corporate Guarantor, and the Corporate Guarantor may continue to pay research and development fees to the to the Borrower, in both cases consistent with past practice, provided that the aggregate amount of all management fees paid by the Borrower to the Corporate Guarantor shall not exceed $12,000,000.00 a year.

(h) <u>Prepayment of Outstanding Debt.</u>  Pay, in whole or in part, any outstanding Debt (other than Debt owing to the Bank) of the Borrower or the Corporate Guarantor, which by its terms is not then due and payable.

(i) <u>Guarantees.</u>  Guaranty, or in any other way become directly or contingently obligated for any Debt of any other Person (including any agreements relating to working capital maintenance, take or pay contracts or similar arrangements) other than (i) the endorsement of negotiable instruments for deposit in the ordinary course of business, (ii) guarantees existing on the date hereof and set forth in Schedule 5.02 annexed hereto, or (iii) guarantees in the ordinary course of business consistent with past practice not exceeding $1,000,000 in any fiscal year.  .

(j) <u>Change of Business.</u>  Neither Borrower nor the Corporate Guarantor may materially alter the nature of its business, but for avoidance of doubt, the Corporate Guarantor may make investments as described in Section 5.02(f) in connection with its business as a research and development company consistent with past practice.

(k) <u>Fiscal Year.</u>  Change the ending date of its fiscal year from the calendar year.

48

(l) <u>Losses.</u>  Incur a net annual post-tax loss for any fiscal year.

(m) <u>Accounting Policies.</u>  Change any accounting policies, except as permitted by GAAP.

(n) <u>Change of Tax Status.</u>  Change its tax reporting status as a corporation, without the prior written consent of the Bank.

(o) <u>Dividends, Etc.</u>  Declare or pay any dividends, purchase, redeem, retire or otherwise acquire for value any of its capital stock now or hereafter outstanding, or make any distribution of assets to its stockholders as such, whether in cash, assets, or in obligations of the Borrower or the Corporate Guarantor; or allocate or otherwise set apart any sum for the payment of any dividend or distribution on, or for the purchase, redemption or retirement of any shares of its capital stock; or make any other distribution by reduction of capital or otherwise in respect of any share of its capital stock.  Notwithstanding the foregoing, for any fiscal year during which Borrower or the Corporate Guarantor is an electing S corporation for federal income tax purposes, it may declare and pay cash dividends out of its net income for the current or preceding fiscal year, provided however that no such dividend may be paid which would result in the Borrower and the Corporate Guarantor failing to meet the requirements of Section 5.03 hereof.

(p) <u>Change in Ownership.</u>  Permit (i) the Corporate Guarantor to fail or cease owning less than 90% of all voting stock of Borrower  or (ii) the Individual Guarantor, directly or indirectly, to fail or cease owning  less  than 51% of the voting membership interest of the Corporate Guarantor, provided that the remaining ownership of the Corporate Guarantor shall be owned by Trusts formed for behalf of the linear descendants of the Individual Guarantor for estate planning purposes, and the Borrower and Corporate Guarantor  provide all information necessary in order for the Bank to ensure that they are in compliance with Section 7.12 and any other Anti-Terrorism and Customer Due Diligence/ Know Your Customer requirements applicable to the Bank.

(q) <u>Management.</u>  Fail to the retain Individual Guarantor in a reasonably active full time capacity in the management of the Borrower and the Corporate Guarantor.

(r) <u>Hazardous Material</u>.  The Borrower, the Guarantor and each Subsidiary of the Borrower or Corporate Guarantor shall not cause or permit any property owned or occupied by the Borrower, the Guarantor or any such Subsidiary to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Materials, except in compliance with all applicable federal, state and local laws or regulations nor shall the Borrower, any Guarantor or any such Subsidiary cause or permit, as a result of any intentional or unintentional act or omission on the part of the Borrower, the Guarantor or any such Subsidiary or any tenant or subtenant, a release of Hazardous Materials onto any property owned or occupied by the Borrower, the Guarantor or any such Subsidiary or onto any other property.  The Borrower, the Guarantor and each such Subsidiary shall not fail to comply with all applicable federal, state and local laws, ordinances, rules and regulations, whenever and by whomever triggered, and shall not fail to obtain and comply with, any

49

and all approvals, registrations or permits required thereunder. The Borrower and the Guarantor shall execute any documentation reasonably required by the Bank in connection with the representations, warranties and covenants contained in this paragraph and Section 4.01 of this Agreement.

**SECTION 5.03.  Financial Requirements.**  So long as (i) any amount shall remain outstanding under any Note, or (ii) the Commitment shall remain in effect:

(a).  Debt Service Coverage Ratio. The Borrower shall not permit the Debt Service Coverage Ratio to be less than 1.25 to 1.0 for any fiscal year, fiscal quarter or semi-annual period. "Debt Service Coverage Ratio" shall mean the ratio of EBITDA minus taxes for such period, divided by the sum of the Borrower's CPLTD (for such fiscal period immediately preceding the current fiscal period), plus interest expense. EBITDA shall not include any gains or losses, non-reoccurring items, or non-cash income or expenses outside ordinary course of business.

(b).  Fixed Charge Coverage Ratio. The Borrower shall not permit the Fixed Charge Coverage Ratio to be less than 1.10 to 1.0 for any fiscal year, fiscal quarter or semi-annual period. "Fixed Charge Coverage Ratio" shall mean the ratio of EBITDA minus taxes, distributions, and unfunded capex for such period, divided by the sum of the Borrower's CPLTD (for such fiscal period immediately preceding the current fiscal period), plus interest expense. EBITDA shall not include any gains or losses, non-reoccurring items, or non-cash income or expenses outside ordinary course of business.

(c).  Total Funded Debt to EBITDA. The Borrower shall not permit total Funded Debt to EBITDA to be more than 2.75 to 1.0 for any fiscal year, fiscal quarter or semi-annual period, EBITDA shall not include any gains or losses, non-reoccurring items, or non-cash income or expenses outside ordinary course of business.

(d).  No Net Loss. Borrower shall not incur a net annual post-tax loss in any fiscal year.

## ARTICLE VI

## EVENTS OF DEFAULT

**SECTION 6.01.  Events of Default.**  The occurrence of any one or more of the following events shall be an "Events of Default" hereunder:

(a) The Borrower shall fail to pay any installment of principal of, or interest on, any Note when due or any fees or other amounts owed in connection with this Agreement; or

50

(b) Any representation or warranty made by the Borrower or any Guarantor herein or in the Loan Documents or which is contained in any certificate, document, opinion, or financial or other statement furnished at any time under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

(c) (i) The Borrower shall fail to meet any of the financial covenants set forth in Section 5.03 hereof; or

(ii)  The Borrower or any Guarantor shall fail to perform any term, covenant, or agreement contained in this Agreement (other than the financial covenants set forth in Section 5.03 hereof) or in any other Loan Document (other than the Notes) on its part to be performed or observed within fifteen (15) days after notice of such failure is sent by the Bank to the Borrower or such Guarantor, as the case may be; or

(d) The Borrower, any Guarantor, or any Subsidiary of the Borrower shall (i) fail to pay any Debt (excluding Debt evidenced by the Notes) of the Borrower, any Guarantor or any such Subsidiary (as the case may be), or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt, or (ii) any other default under any agreement or instrument relating to any such Debt, or any other event shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if in either of such case, the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(e) The Borrower, any Guarantor or any Subsidiary of the Borrower shall generally not pay its Debts as such Debts become due, or shall admit in writing its inability to pay its Debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower, any Guarantor or any such Subsidiary seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its Debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and if instituted against the Borrower, any Guarantor or any such Subsidiary shall remain undismissed for a period of 30 days; or the Borrower, any Guarantor or any such Subsidiary shall take any action to authorize any of the actions set forth above in this subsection (e); or

(f) Any judgment or order or combination of judgments or orders for the payment of money, in excess of $100,000.00 in the aggregate, which sum shall not be subject to full, complete and effective insurance coverage, shall be rendered against the Borrower, any Guarantor or any Subsidiary of the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 30 consecutive days

#11855908.1(161627.644)

during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g)  Any Guarantor shall fail to perform or observe any term or provision of its Guaranty or any representation or warranty made by any Guarantor (or any of its officers or partners) in connection with such Guarantor's Guaranty shall prove to have been incorrect in any material respect when made; or

(h)  Any of the following events occur or exist with respect to the Borrower, Corporate Guarantor, any Subsidiary of the Borrower, or any ERISA Affiliate: (i) any Prohibited Transaction involving any Plan; (ii) any Reportable Event with respect to any Plan; (iii) the filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan; (iv) any event or circumstance that might constitute grounds entitling the PBGC to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution of the PBGC of any such proceedings; (v) complete or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization insolvency, or termination of any Multiemployer Plan; and in each case above, such event or condition, together with all other events or conditions, if any, could in the opinion of the Bank subject the Borrower, any Corporate Guarantor, any such Subsidiary or any ERISA Affiliate to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise (or any combination thereof) which in the aggregate exceeds or may exceed $50,000.00; or

(i)  This Agreement or any other Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect or shall be declared to be null and void, or the validity or enforceability of any document or instrument delivered pursuant to this Agreement shall be contested by the Borrower, any Guarantor or any party to such document or instrument or the Borrower, any Guarantor or any party to such document or instrument shall deny that it has any or further liability or obligation under any such document or instrument; or

(j)  A Material Adverse Change shall have occurred with respect to the Borrower or any Guarantor;

(k)  An event of default specified in any Loan Document other than this Agreement shall have occurred and be continuing; or

(l)  Any injunction, whether temporary or permanent, or any instruction by the FDA, to the extent applicable, that the Borrower or Corporate Guarantor or any of its Subsidiaries cease or suspend manufacture, marketing or sale of any Product, which cessation or suspension could have a Material Adverse Change on the ability of the Borrower or the Corporate Guarantor to perform its obligations under the Loan Documents, and which such cessation or suspension lasting more than 90 consecutive calendar.

**SECTION 6.02.  Remedies on Default.** Upon the occurrence and continuance of an Event

of Default the Bank may, by notice to the Borrower, (i) terminate the Commitment, (ii) declare the Notes, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Commitment shall be terminated, the Notes, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower and (ii) proceed to enforce its rights whether by suit in equity or by action at law, whether for specific performance of any covenant or agreement contained in this Agreement or any Loan Document, or in aid of the exercise of any power granted in either this Agreement or any Loan Document or proceed to obtain judgment or any other relief whatsoever appropriate to the enforcement of its rights, or proceed to enforce any other legal or equitable right which the Bank may have by reason of the occurrence of any Event of Default hereunder or under any Loan Document, provided, however, upon the occurrence of an Event of Default referred to in Section 6.01(e), the Commitment shall be immediately terminated, the Notes, all interest thereon and all other amounts payable under this Agreement shall be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower. Any amounts collected pursuant to action taken under this Section 6.02 shall be applied to the payment of, first, any reasonable costs incurred by the Bank in taking such action, including but without limitation reasonable attorney's fees and expenses, second, to payment of the accrued interest on the Notes, and third, to payment of the unpaid principal of the Notes.

**SECTION 6.03.  Remedies Cumulative.**  No remedy conferred upon or reserved to the Bank hereunder or in any Loan Document is intended to be exclusive of any other available remedy, but each and every such remedy shall be cumulative and in addition to every other remedy given under this Agreement or any Loan Document or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Bank to exercise any remedy reserved to it in this Article VI, it shall not be necessary to give any notice, other than such notice as may be herein expressly required in this Agreement or in any Loan Document.

**SECTION 6.04.  Grace Provision.**  If the Borrower shall fail to perform any of the terms, covenants, provisions or conditions of this Agreement or any Loan Document and if the default is of such nature that it cannot be cured by the payment of a sum of money, only then the Borrower shall have a period of fifteen (15) days, where no time period is provided for performance (or such other number of days for performance as may be elsewhere provided in this Agreement or any Loan Document) to cure such default.  However, if such non-monetary default cannot reasonably be cured within such fifteen (15) day period (or such other number of days for performance as may be elsewhere provided in this Agreement or any Loan Document) and the Borrower shall have commenced to cure such default within such fifteen (15) day period (or such other number of days for performance as may be elsewhere provided in this Agreement or any Loan Document) and thereafter diligently and expeditiously proceeds to cure the same, such fifteen (15) day period (or such other number of days for performance as may be elsewhere provided in this Agreement or any

53

Loan Document) shall be extended for so long as it shall require the Borrower, in the expeditious exercise of due diligence, to cure such default, it being understood that no extension shall be for a period beyond fifteen (15) days (i.e., sixty (60) days in the aggregate); provided, however, that the extension of the grace period provided in this sentence shall not be applicable to the delivery of any financial statements or information required pursuant to this Agreement or upon the breach of any of the provisions in Sections 5.02 and 5.03 of this Agreement.

## ARTICLE VII

## MISCELLANEOUS

**SECTION 7.01.  Amendments. Etc.**  Except as otherwise expressly provided in this Agreement, any provision of this Agreement may be amended or modified only by an instrument in writing signed by the Borrower, the Guarantors and the Bank, and any provision of this Agreement may be waived by the Borrower (if such provision requires performance by the Bank) or by the Bank (if such provision requires performance by the Borrower); provided that no amendment, modification or waiver shall, unless by an instrument signed by the Bank: (a) increase or extend the term of the Commitment or the Loans, (b) extend the date fixed for the payment of principal of or interest on any Loan, (c) reduce the amount of any payment of principal thereof or the rate at which interest is payable thereon or any fee payable hereunder, (d) alter the terms of this Section 7.01, (e) change the fees payable to the Bank except as otherwise provided herein, (f) permit the Borrower to transfer or assign any of its obligations hereunder or under the other Loan Documents, (g) give any payment priority to any Person (including the Bank) over amounts due in connection with the Loans, or (h) release any Collateral (other than as permitted by a security agreement). No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**SECTION 7.02.  Notices, Etc.**  Any notice or request hereunder may be given to the Borrower, the Guarantor and the Bank at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section.  Any notice, request, demand, direction or other communication (for purposes of this Section 7.02 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail")) or by setting forth such Notice on a website to which Borrowers are directed (an "Internet Posting") if Notice of such Internet Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 7.2 in accordance with this Section 7.2.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 7.2 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 7.2.

Any Notice shall be effective:

54

(a)    In the case of hand-delivery, when delivered;

(b)    If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)    In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, an Internet Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)    In the case of electronic transmission, when actually received and notice by another method has become effective;

(e)    In the case of an Internet Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(f)    If given by any other means (including by overnight courier), when actually received.

(i)    If to the Bank at:

INVESTORS BANK

101 JFK Parkway
Short Hills, New Jersey 07078
Attention:    Commercial Banking
Telephone:    _____
Email:

with a copy to:

Wilentz, Goldman & Spitzer P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Attention:    Peter R. Herman, Esq.
Telephone:    (732) 855- 6046
Email:        pherman@wilentz.com

(ii)    If to the Borrower, Corporate Guarantor or Individual Guarantor (as the case may be):

NOSTRUM LABORATORIES, INC
1370 Hamilton Street

#11855908.1(161627.644)

Somerset, New Jersey 08873
Attention:     Nirmal Mulye, Ph.D.
Telephone:  609-306-7862
Email:  nirmal@nostrumpharma.com

Nostrum Pharmaceuticals, LLC
1370 Hamilton Street
Somerset, New Jersey 08873
Attention:     Rohinton Toddywala, Ph.D.
Telephone:  908-334-0624
Email:  ronnie@nostrumpharma.com

      (iv)     If to Individual Guarantor

Nirmal Muyle, Ph.D.

1000 Biscayne Boulevard
Miami, FL  33132
Telephone:  (609) 306-7862
Email:  nirmal@nostrumpharma.com

in each case, with a copy to:

Law Offices of Carlton R. Asher, Jr.
110 Est 59th Street, Suite 2200
New York, NY  10022
Attention:  Carlton R. Asher, Jr.
Telephone:  (212) 308-7171
Email:  asherlaw@att.net

**SECTION 7.03.  <u>No Waiver, Remedies.</u>**  No failure on the part of the Bank to exercise, and no delay in exercising, any right, power or remedy under any Loan Document, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

**SECTION 7.04.  <u>Costs, Expenses and Taxes.</u>**  The Borrower agrees to pay on demand all costs and expenses of the Bank in connection with the preparation, execution, delivery and administration of this Agreement, the Notes and any other Loan Documents, including, without limitation, the fees and expenses of counsel for the Bank with respect thereto and with respect to advising the Bank as to its rights and responsibilities under this Agreement, and all costs and

56

expenses, if any (including counsel fees and expenses), of the Bank in connection with the enforcement of this Agreement, the Notes and any other Loan Documents. The Borrower shall at all times protect, indemnify, defend and save harmless the Bank from and against any and all claims, actions, suits and other legal proceedings, and liabilities, obligations, losses, damages, penalties, judgments, costs, expenses or disbursements which the Bank may, at any time, sustain or incur by reason of or in consequence of or arising out of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. The Borrower acknowledges that it is the intention of the parties hereto that this Agreement shall be construed and applied to protect and indemnify the Bank against any and all risks involved in the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, all of which risks are hereby assumed by the Borrower, including, without limitation, any and all risks of the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto government or governmental authority, provided that the Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Bank's gross negligence or willful misconduct. The provisions of this Section 7.04 shall survive the payment of the Notes and the termination of this Agreement.

**SECTION 7.05.** **Right of Set-off.** Upon the occurrence and during the continuance of any Event of Default, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Bank or any Affiliates of the Bank to or for the credit or the account of the Borrower or the Corporate Guarantor against any and all of the obligations of the Borrower or the Corporate Guarantor now or hereafter existing under this Agreement and the Notes, irrespective of whether or not the Bank shall have made any demand under this Agreement or the Notes and although such obligations may be unmatured. The rights of the Bank under this Section are in addition to all other rights and remedies (including, without limitation, other rights of set-off) which the Bank may have.

**SECTION 7.06.** **Binding Effect.** This Agreement shall become effective when it shall have been executed by the Borrower, the Guarantors and the Bank and thereafter it shall be binding upon and inure to the benefit of the Borrower, the Guarantors and the Bank and their respective successors and assigns, except that neither the Borrower nor any Guarantor shall have any right to assign its rights hereunder or any interest herein without the prior written consent of the Bank.

**SECTION 7.07.** **Further Assurances.** The Borrower and the Guarantor agree at any time and from time to time at its expense, upon request of the Bank or its counsel, to promptly execute, deliver, or obtain or cause to be executed, delivered or obtained any and all further instruments and documents and to take or cause to be taken all such other action the Bank may deem desirable in obtaining the full benefits of this Agreement or any other Loan Document.

**SECTION 7.08.** **Section Headings, Severability, Entire Agreement.** Section and subsection headings have been inserted herein for convenience only and shall not be construed as part of this Agreement. Every provision of this Agreement and each other Loan Document is

#11855908.1(161627.644)

intended to be severable; if any term or provision of this Agreement, any other Loan Document, or any other document delivered in connection herewith or therewith shall be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby. All exhibits and schedules to this Agreement shall be annexed hereto and shall be deemed to be part of this Agreement. This Agreement and the exhibits and schedules attached hereto embody the entire agreement and understanding between the Borrower, the Guarantors, the Bank and supersede all prior agreements and understandings relating to the subject matter hereof.

**SECTION 7.09.  Governing Law.**  This Agreement, Notes and all other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of New Jersey.

**SECTION 7.10.  Successors and Assigns.**  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Borrower may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Bank.

(b) The Bank may at any time grant to one or more banks or other institutions (each a "Participant") participating interests in its Commitment or any or all of its Loans. In the event of any such grant by the Bank of a participating interest to a Participant, whether or not upon notice to the Borrower, the Bank shall remain responsible for the performance of its obligations hereunder, and the Borrower shall continue to deal solely and directly with the Bank in connection with its rights and obligations under this Agreement. Any agreement pursuant to which the Bank may grant such a participating interest shall provide that the Bank shall retain the sole right and responsibility to enforce the obligations of the Borrower hereunder including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement; provided that such participation agreement may provide that the Bank will not agree to any modification, amendment or waiver of this Agreement described in Section 7.01 hereof without the consent of such Participant. The Borrower agrees that each Participant shall, to the extent provided in its participation agreement, be entitled to the benefits of this Article VII and Article III hereof with respect to its participating interest. An assignment or other transfer which is not permitted by subsection (c) or (d) below shall be given effect for purposes of this Agreement only to the extent of a participating interest granted in accordance with this subsection (b).

(c) The Bank may at any time assign to one or more banks or other institutions (each an "Assignee") all, or a proportionate part of all, of its rights and obligations under this Agreement and the Notes, and such Assignee shall assume such rights and obligations.

(d)  The Bank may at any time assign all or any portion of its rights under this Agreement and its Note to a Federal Reserve Bank or the Federal Home Loan Bank of New York. No such assignment shall release the transferor Bank from its obligations hereunder.

58

(e) Borrower and the Guarantor authorizes the Bank to disclose to any transferee and any prospective transferee any and all financial information (including, without limitation, any tax returns) in the Bank's possession concerning such obligor which has been delivered to the Bank by or on behalf of such obligor pursuant to this Agreement or in connection with the Bank's credit evaluation of such obligor; subject to the Bank entering into a confidentiality agreement with such transferee or prospective transferee.

**SECTION 7.11.  Waiver of Jury Trial.**  The Borrower, the Guarantor and the Bank waive all rights to trial by jury on any cause of action directly or indirectly involving the terms, covenants or conditions of this Agreement or any Loan Document.

**SECTION 7.12.  Anti-Terrorism Laws.**

(a)  The Borrower represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)  The Borrower covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Revolving Credit Loans and the Term Loan to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws and (v) the Borrowers shall promptly notify the Bank in writing upon the occurrence of a Reportable Compliance Event.

**SECTION 7.13.  Execution in Counterparts; Electronic Signatures.**  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  A manually signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  The Bank is also entitled to rely on all ancillary and supporting documentation delivered by electronic transmission.

**[Signature Page to Follow]**

#11855908.1(161627.644)

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

NOSTRUM LABORATORIES, INC.,  Borrower

By: _____

Nirmal Mulye, Ph.D.
Chairman and Chief Executive Officer

NOSTRUM PHARMACEUTICALS LLC,
Corporate Guarantor

By: _____

Nirmal Mulye, Ph.D.
President

Individual Guarantor

_____

NIRMAL MULYE, Ph.D., Individually

## ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA      :
                                  :        ss
COUNTY OF Monroe                  :

**BE IT REMEMBERED,** that on this 29 day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the Commonwealth of Pennsylvania, personally appeared NIRMAL MULYE, PH.D. who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed the attached document; and

(b) signed, sealed, and delivered this document as his or her act and deed.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
TRICIA MARIA DIAZ, Notary Public
Monroe County
My Commission Expires September 5, 2023
Commission Number 1357241

[SIGNATURE PAGE TO LOAN AGREEMENT]
[Additional Signature Page to Follow]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

INVESTORS BANK

By:_____

Robert J. Christmas
Senior Vice President

## ACKNOWLEDGMENT

STATE OF NEW JERSEY    :
                            :     ss
COUNTY OF _____    :

**BE IT REMEMBERED,** that on this __ day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the State of New Jersey, personally appeared ROBERT J. CHRISTMAS who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

    (a) is named in and personally signed the attached document; and

    (b) signed, sealed, and delivered this document as his or her act and deed.

_____

Notary Public

[SIGNATURE PAGE TO LOAN AGREEMENT]

#11855908.1(161627.644)

**Schedule 4.01(a)**

Subsidiaries of the Borrower and the Corporate Guarantor, setting forth with respect to each such Subsidiary, name and address, any other addresses at which it conducts business, its state of incorporation and each other jurisdiction in which it is qualified to do business and the identity and shareholdings of its stockholders.

[See the attached Excel spreadsheet]

**Schedule 4.01(a)**

### Nostrum Pharmaceuticals,LLC ("NPLLC") & Nostrum Laboratories, Inc ("NLI") Subsidiaries- Equity Ownership

| Entity | NPLLC % Ownership | Other Shareholders % Ownership | % Ownership | Business Address | State of Incorporation |
|---|---|---|---|---|---|
| Dealer Credit Services,Inc. | 40% | Brittanie Greenbach | 40% | 112 N. 12th Street,Suite 1114 , Tampa ,Florida 33602 | Florida |
| Gene Biotherapeutics, Inc. | 80.2% | Various  Other shareholders | 19.8% | 11230 Sorrento Valley Rd, Suite 220,San Diego, California 92121 | Delaware |
| InspiRx,Inc. | 84.42% | Various Affiliated Officers, Executives, Board Members, Advisors | 15.58% | 1370 Hamilton Street,Somerset, New Jersey 08873 | New Jersey |
| Nostrum Energy, LLC | 60% | 2010 Mulye Family Trust ( Grantor Trust) | 40% | Nirmal Mulye- Grantor,1000 Biscayne Boulevard,Miami, Florida 33132 | Nirmal Mulye- Grantor |
| Nostrum Hamilton Realty ,LLC | 100% | NA | NA | 1370 Hamilton Street,Somerset, New Jersey 08873 | New Jersey |
| Nostrum Laboratories,Inc. | 100% | NA | NA | 1370 Hamilton Street,Somerset, New Jersey 08873 | New Jersey |

### Nostrum Laboratories, Inc ("NLI")  Subsidiaries- Equity Ownership

| Entity | NLI % Ownership | Other Shareholders % Ownership | % Ownership | Business Address |
|---|---|---|---|---|
| NLI Healthcare India Pvt Ltd | 100% | NA | NA | Behind Mittal Estate Bldg No 5,Mumbai, Maharashtra 400059 India | India |

**Schedule 4.01(h)**

Pending or threatened action, proceeding or investigation affecting the Borrower, any Guarantor or any Subsidiary of the Borrower or Corporate Guarantor.

*In Re: Zantac (Ranitidine) Products Liability Litigation MDL,* MDL No 2924, Case No, 20-MD-2924. This multi-district litigation consolidates various cases, involving product liability and related claims, for pre-trial purposes, and concerns the ranitidine medication. It is currently pending in United States District Court for the Southern District of Florida, before Hon. Robin L. Rosenberg. Nostrum Laboratories, Inc. ("Nostrum") has received a series of letter demands for indemnity from distributors and retailers, including, Cardinal Health, Publix Supermarkets, Walmart, and AmerisourceBergen, who claim to have supplied Nostrum's briefly marketed ranitidine product. The legal defense relating to this matter is being provided by the Chubb Group of Insurance Companies.

Nostrum is currently responding to a Department of Justice Civil Investigative Demand ("CID"), which requests basic documents and information regarding a pending dispute between the Centers for Medicare & Medicaid Services and Nostrum, regarding one of Nostrum's products, Nitrofurantoin Oral Suspension ("Nitro OS"). This CID was issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, and concerns allegations that Nostrum knowingly underpaid Medicaid rebate amounts owed due to Nostrum's participation in the Medicaid Drug Rebate Program for the drug Nitro OS, in violation of the False Claims Act.

**Schedule 4.01(bb)**

Notice from the FDA, the Office of the Inspector General of HHS, or the United States Department of Justice has commenced or threatened to initiate any action against Borrower or Corporate Guarantor, of any action to enjoin Borrower, Corporate Guarantor, or its officers, directors, employees, shareholders, or their agents and affiliates, from conducting their businesses.

None

**Schedule 4.01(cc)**

Warning letters, Form 483, "Untitled Letter," other correspondence or notice of objectionable observations or alleged violations of laws and regulations enforced by the FDA or DEA since April 3, 2016.

None

**Schedule 4.01(dd)**

Recalls or other forms of product retrievals from the marketplace.

Since January 1, 2016 there were no FDA or other Recalls mandated by a Governmental Body. The Borrower did withdraw the following three Products from the market on a voluntary basis.

Recall D-1059-2020
- Product Name: Theophylline ER Tablets 400mg
- Lot Recalled: THE190501
- Packaging Presentation: 100 count bottle
- This recall was initiated because a rejected batch was compressed, packaged and labeled with an incorrect lot number
- Status of Product in Distribution: Material was returned to our facility and was destroyed by a reverse distributor
- Dates of Recall: Initiation 3/16/2020 Termination: Requested 6/23/2020
- Investigation Number: INV20-0004

Recall D-0067-2021
Product Name: Metformin HCL ER Tablet USP
Lots Recalled:
    Metformin HCl ER Tablet USP 750 mg: MET200101 and MET200301
    Metformin HCl ER Tablet USP 500 mg: MET100201 and MET100401
- Packaging Presentation: 100 count bottle
- This recall was initiated because testing of NDMA in packaged product exceeded the acceptable intake level of 96ng/day on recalled batches
- Status of Product in Distribution: Recall is active
- Dates of Recall: Initiation 10/23/2020 Recall Status is active
- Investigation Number: INV20-0023

Recall D-0473-2018
Product Name: Calcium Acetate Capsules
Lot Recalled: CAL173502
    Packaging Presentation: 200 count bottle
- This recall was initiated because a bottle of calcium acetate contained one tablet of venlafaxine in it.
- Status of Product in Distribution: Recall is closed
- Dates of Recall: Initiation 02/2018 Recall Status is closed
- Investigation Number: PC18-005

## Schedule 4.01(ee)

Non-compliance with (a) the Federal Health Care Program requirements applicable to Borrower and Corporate Guarantor, and (b) federal and state reporting obligations applicable to Borrower or Corporate Guarantor, relating to sales and marketing to healthcare professionals or any price reporting obligations, etc.

**None.**

## Schedule 5.02

List of all credit agreements, guaranties, Capital Leases, and other agreements and arrangements providing for or relating to (a) extensions of credit, (b) Liens and (c) existing Debt.

[See the attachements]

5082083 v1

(a) Extensions of Credit

Noatrum Laboratories, Inc.
Schedule 5.02

| Sr. No | Creditor | Nature of Agreement | Amount of Credit | Liens Securing Credit | Principal Outstanding | Property Subject to Lien |
|---|---|---|---|---|---|---|
| 1 | Leaf Capital Funding LLC | Equipment Finance | $ 126,725 | $ 126,725 | $ 10,178 | O'Hara Laboost M10 Tablet Coating System |
| 2 | Leaf Capital Funding LLC | Equipment Finance | $ 83,830 | $ 83,830 | $ 11,962 | G140 capsule Filer Change Parts |
| 3 | M-Theory 1 (Royal Bank America Leasing L.P. | Equipment Finance | $ 110,677 | $ 110,677 | $ 16,050 | 460 Vac System |
| 4 | Commercial Capital Company LLC | Equipment Finance | $ 230,000 | $ 230,000 | $ 42,005 | Kilan Synthesis 500 |
| 5 | EMC/De Lage Landen Financial Services, Inc | Equipment Finance | $ 532,554 | $ 532,554 | $ 126,671 | Network upgrade components |
| 6 | Commercial Capital Company LLC | Equipment Finance | $ 176,571 | $ 176,571 | $ 38,245 | Videojet Imprints Serialization Uocrade Kit for sym500 707290 |
| 7 | Commercial Capital Company LLC | Equipment Finance | $ 248,554 | $ 248,554 | $ 75,645 | ICP-OES with Chiler, IQ/OQ/PQ, on-site training & Consumables Inline Certificate IF duct fan molded Housing/two brakets Two Pipetter with tips 2 Switching Valve- one for torch, one for purge Spetrum Two FTIR  & TGA 4000 Multiwave Pro 60hz package 24HV150 & ROTOR 8 NXF100 |
| 8 | Commercial Capital Company LLC | Equipment Finance | $ 58,995 | $ 58,995 | $ 29,555 | ICH-01HD 10 x18 Stabilty Chamber |
| 9 | Commercial Capital Company LLC | Equipment Finance | $ 419,320 | $ 419,320 | $ 219,737 | Videojet Imprints Serialization Solution |
| 10 | Commercial Capital Company LLC | Equipment Finance | $ 76,154 | $ 76,154 | $ 39,959 | CMX Professional Floating Server- calibration |
| 11 | Mercedes-Benz Financial Services | Auto Loan | $ 51,676 | $ 51,676 | $ 26,207 | Auto C300W4 SN: 55SWF4KB0JU263699 |
| 12 | Commercial Capital Company LLC | Equipment Finance | $ 380,315 | $ 380,315 | $ 242,779 | Seono Model SM-600 High SpeedShear-Granulator |
| 13 | Commercial Capital Company LLC | Equipment Finance | $ 37,500 | $ 37,500 | $ 14,775 | Fryma VME-50 with all accessories |
| 14 | Commercial Capital Company LLC | Equipment Finance | $ 87,079 | $ 87,079 | $ 59,692 | Kaye Labwatch Pro Monitoring System |
| 15 | Commercial Capital Company LLC | Equipment Finance | $ 19,929 | $ 19,929 | $ 13,459 | Compressor Change Out |
| 16 | GE HFS, LLC | Equipment Finance | $ 188,678 | $ 188,678 | $ 138,594 | SP Sepharose Fast Flow AKTA Pilot System Tricorn 10/200 Column |
| 17 | Commercial Capital Company LLC | Equipment Finance | $ 57,838 | $ 57,838 | $ 39,653 | Cam Track Synthesis 500 |
| 18 | Commercial Capital Company LLC | Equipment Finance | $ 76,235 | $ 76,235 | $ 51,072 | Mini DeBee 30 High Pressure Homogenizer |
| 19 | Commercial Capital Company LLC | Equipment Finance | $ 35,770 | $ 35,770 | $ 15,134 | Software |
| 20 | Commercial Capital Company LLC | Equipment Finance | $ 203,065 | $ 203,065 | $ 142,333 | Drying Machine Fitzpatrick Roler Compactor Granulation stack |
| 21 | Commercial Capital Company LLC | Equipment Finance | $ 70,200 | $ 70,200 | $ 58,616 | Febtech Technoloces Modular Clean Room panels |
| 22 | HPEFS | Equipment Finance | $ 118,780 | $ 118,780 | $ 48,928 | StorageCraft |
| 23 | Commercial Capital Company LLC | Equipment Finance | $ 327,760 | $ 327,760 | $ 213,682 | (2) 400 Ton Carrier Chiler |
| 24 | Mercedes-Benz Financial Services | Auto Loan | $ 66,064 | $ 66,064 | $ 50,049 | Auto 2020  4JGFB4KB7LA058191 |
| 25 | Mercedes-Benz Financial Services | Auto Loan | $ 61,490 | $ 61,490 | $ 51,240 | Auto 2020 GLC300W4 WDC0G8EB0LF738798 |
| 26 | Lamborghini Financial Services | Auto Loan | $ 233,770 | $ 233,770 | $ 205,065 | ZPBUA1ZL4LLA08020 |
| 27 | Onset Financial Inc | Equipment Finance | $ 363,946 | $ 363,946 | $ 296,878 | Tablet Press |
| 28 | Commercial Capital Company LLC | Equipment Finance | $ 1,129,191 | $ 1,129,191 | $ 982,908 | Tablet Coater |
| 29 | Commercial Capital Company LLC | Equipment Finance | $ 698,984 | $ 698,984 | $ 647,752 | Upgrades G140-6148 |
| 30 | Bank of America | Equipment Finance | $ 1,068,688 | $ 1,068,688 | $ 1,018,629 | (2) Check Weighers 7 (2) Tablet Capsule Filing Lines |
| 31 | Bank of America | Equipment Finance | $ 430,861 | $ 430,861 | $ 410,678 | Phase 1 new server for 6 LC's 1290 HPLC Refurished 1260 HPLC's |
| 32 | Bank of America | Equipment Finance | $ 275,889 | $ 275,889 | $ 271,592 | Fette 3200 Tablet Press De-Duster Checker UPLC System (Ohio) |
| 33 | Bank of America | Equipment Finance | $ 1,227,885 | $ 1,227,885 | $ 1,227,885 | 3090 Tablet Press w/ 61 station "B" turret 551676 Thermo Scientific Q Mass Spectometer w/Dionex Ultimate 3000 UPLC UV Light System PM-1000 Blender |
| 34 | Waterford Bank | Term Loan | $ 150,000 | $ 150,000 | $ 134,293 | Roof Refurbishment |
| 35 | Waterford Bank | Construction & Permanent Loan | $ 1,500,000 | $ 1,500,000 | $ 1,497,388 | Construction & Permanent Note - Warehouse Expansion |
| 36 | Waterford Bank | Open-End Mortgage | $ 350,000 | $ 350,000 | | Building (not utalized yet) |
| 37 | Wells Fargo Bank | Auto Loan | $ 33,906 | $ 33,906 | $ 16,866 | Auto 2017 Chev Malibu Hybrid |
| 38 | Bank Of India | Line of Credit | $ 6,000,000 | $ 6,000,000 | $ 5,983,254 | Account Receivable, Inventory, Fixed Assets |
| 39 | Mylan Pharmaceuticals, LLC | APA | $ 4,000,000 | $ 4,000,000 | 4,000,000 | Sucralfate Tab 1g, 100/500ont (ANDA # 074415) Theophyline ER Tab 400 & 600mg (ANDA # 040560) Piroxcam Cap 10/20mg (ANDA # 074116) Carbamazepine ER Cap 100/200/300mg (ANDA# 076697) |
| 40 | Mylan Pharmaceuticals, LLC | Settlement Agreement | $ 10,000,000 | $ 10,000,000 | 10,000,000 | Sucralfate Tab 1g, 100/500ont (ANDA # 074415) Theophyline ER Tab 400 & 600mg (ANDA # 040560) Piroxcam Cap 10/20mg (ANDA # 074116) Carbamazeone ER Cap 100/200/300mg (ANDA# 076697) |
| | Total | | $ 31,306,881 | $ 31,306,881 | $ 28,473,319 | |

**NOSTRUM LABORATORIES INC.**
**NOSTRUM PHARMACEUTICALS, LLC**
**NIRMAL MUYLE**

**(b)  Existing Liens and Security Interests**

| Debtor | Secured Party | UCC Filing Number/ Filing Date | Collateral |
|---|---|---|---|
| Nirmal Muyle Patriot Act Search (FL SOS) | No Records. | | |
| Nostrum Laboratories Inc. [1] | Hitachi Capital America Corp. | 51604875<br><br>3/29/2016 | Items of personal property leased pursuant to Lease Agreement including equipment. |
| Nostrum Laboratories Inc. | Commercial Capital Company, LLC<br>Corefirst Bank & Trust | 53801542<br><br>1/14/2020 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Bank of America, N.A. | 54268203<br><br>6/26/2020 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Leaf Capital Funding, LLC and/or Its Assigns | 51576622<br><br>3/10/2016 | Specific equipment.<br><br>Collateral change relating to items of equipment. |
| Nostrum Laboratories Inc. | Wells Fargo Vendor Financial Services, LLC | 52796193<br><br>5/23/2018 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Western Equipment Finance, Inc. | 51811082<br><br>8/9/2016 | Specific equipment. |

---

[1] Search results from New Jersey Department of Treasury.

| Debtor | Secured Party | UCC Filing Number/ Filing Date | Collateral |
|---|---|---|---|
| Nostrum Laboratories Inc. | Community First Bank Commercial Capital Company, LLC and/or Its Assigns | 52340482<br><br>7/31/2017 | Specific equipment. |
| Nostrum Laboratories Inc. | Corefirst Bank Commercial Capital Company LLC | 52842405<br><br>6/18/2018 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Royal Bank America Leasing, LP | 51732644<br><br>6/17/2016 | Specific equipment. |
| Nostrum Laboratories Inc. | Community First Bank Commercial Capital Company, LLC | 53146731<br><br>12/18/2018 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Bank of America, N.A. | 54268210<br><br>6/26/2020 | Specific equipment. |
| Nostrum Laboratories Inc. | GE HFS, LLC | 52905256<br><br>7/23/2018 | Specific equipment. |
| Nostrum Laboratories Inc. | DE Lage Landen Financial Services, Inc. | 51808822<br><br>8/8/2016 | Specific equipment.<br><br>Collateral change relating to items of equipment. |
| Nostrum Laboratories Inc. | Commercial Capital Company LLC Community First Bank | 53834283<br><br>2/4/2020 | Specific equipment. |
| Nostrum Laboratories Inc. | Bank of America, N.A. | 54737554<br><br>8/31/2020 | Specific equipment. |

| Debtor | Secured Party | UCC Filing Number/ Filing Date | Collateral |
|---|---|---|---|
| Nostrum Laboratories Inc. | Commercial Capital Company, LLC and/or Its Assigns | 52354801<br><br>8/9/2017 | Specific equipment.<br><br>Assigned to Community First Bank. |
| Nostrum Laboratories Inc. | Community First Bank Commercial Capital Company, LLC | 53149103<br><br>12/19/2018 | Specific equipment. |
| Nostrum Laboratories Inc. | Bank of America, N.A. | 54840153<br><br>10/15/2020 | Specific equipment. |
| Nostrum Laboratories Inc. | Corporation Service Company, as Representative First Guaranty Bank | 53855161<br><br>2/13/2020 | Specific leased equipment.<br><br>Assigned to First Guaranty Bank. Restated Collateral. |
| Nostrum Laboratories Inc. | Mylan Pharmaceuticals Inc. | 53728861<br><br>12/3/2019 | List of abbreviated new drug applications. |
| Nostrum Laboratories Inc. | Community First Bank Commercial Capital Company, LLC | 52649484<br><br>2/22/2018 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Community First Bank Commercial Capital Company, LLC | 53266644<br><br>3/8/2019 | Specific equipment. |
| Nostrum Laboratories Inc. | Leaf Capital Funding, LLC and/or Its Assigns | 51632133<br><br>4/14/2016 | Specific equipment. |
| Nostrum Laboratories Inc. | Corefirst Bank & Trust Commercial Capital Company, LLC Community First Bank | 53801463<br><br>1/14/2020 | Specific leased equipment.<br><br>Added party – Corefirst Bank & Trust. |

| Debtor | Secured Party | UCC Filing Number/ Filing Date | Collateral |
|---|---|---|---|
| Nostrum Laboratories Inc. | Commercial Capital Company, LLC<br>Community First Bank | 52649497<br><br>2/22/2018 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Canon Financial Services, Inc. | 53193995<br><br>1/18/2019 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Community First Bank<br>Commercial Capital Company, LLC | 53333881<br><br>4/16/2019 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Western Equipment Finance, Inc. | 51901295<br><br>10/11/2016 | Specific equipment. |
| Nostrum Laboratories Inc. | NBKC Bank | 51830582<br><br>8/23/2016 | Specific leased equipment. |
| Nostrum Laboratories Inc. | Commercial Capital Company, LLC<br>Community First Bank | 53146762<br><br>12/18/2018 | Specific leased equipment. |
| Nostrum Pharmaceuticals, LLC [2] | Americorp Financial, LLC<br>Leaf Capital Funding, LLC | 20197956175<br><br>11/12/2019 | Specific equipment.<br><br>Assigned to Leaf Capital Funding, LLC |
| Nostrum Pharmaceuticals, LLC | Thermo Fisher Financial Services, Inc. | 20201711029<br><br>3/9/2020 | Specific leased equipment. |

---

[2] Search results from Delaware Secretary of State.

| Debtor | Secured Party | UCC Filing Number/ Filing Date | Collateral |
|---|---|---|---|
| Nostrum Pharmaceuticals, LLC | Thermo Fisher Financial Services, Inc. | 202004531556<br><br>6/30/2020 | Specific equipment. |

(c) Existing Debt

Nostrum Laboratories, Inc.
Schedule 5.03

| Sr. No | Creditor | Nature of Agreement | Amount of Credit | Liens Securing Credit | Principal Outstanding | Property Subject to Lien |
|---|---|---|---|---|---|---|
| 1 | Leaf Capital Funding LLC | Equipment Finance | $ 126,725 | $ 126,725 | 10,179 | O'Hara Labcoat M10 Tablet Coating System |
| 2 | Leaf Capital Funding LLC | Equipment Finance | $ 83,630 | $ 83,630 | 11,962 | G140 Capsule Filer Chance Parts |
| 3 | M-Theory 1 (Royal Bank America Leasing L.P | Equipment Finance | $ 110,677 | $ 110,677 | 16,050 | 460 Vac System |
| 4 | Commercial Capital Company LLC | Equipment Finance | $ 230,000 | $ 230,000 | 42,005 | Kilian Synthesis 500 |
| 5 | EMC/De Lage Landen Financial Services, Inc | Equipment Finance | $ 532,554 | $ 532,554 | 128,671 | Network upgrade components |
| 6 | Commercial Capital Company LLC | Equipment Finance | $ 176,571 | $ 176,571 | 38,245 | Videojet Incontrol Sensetization Uperade Kit for ern500 707290 |
| 7 | Commercial Capital Company LLC | Equipment Finance | $ 246,554 | $ 246,554 | 76,645 | ICP-OES with Chiller, IQ/OQ/PQ, on-site training & Consumables Inline Centrifugal 6" duct fan molded Housing/two brakets Two Pipetter with box 2 Switching Valve- one for torch, one for purge Soetrum Two FTIR  & TGA 4000 Multiwave Pro 60hz package 24HV150 & ROTOR 8 NXF100 |
| 8 | Commercial Capital Company LLC | Equipment Finance | $ 58,995 | $ 58,995 | 29,555 | ICM-G1HD 10 x18 Stability Chamber |
| 9 | Commercial Capital Company LLC | Equipment Finance | $ 419,320 | $ 419,320 | 219,737 | Videojet Incontrol Sensetization Solution |
| 10 | Commercial Capital Company LLC | Equipment Finance | $ 78,154 | $ 78,154 | 39,959 | CMX Professional Floating Server- calibration |
| 11 | Mercedes-Benz Financial Services | Auto Loan | $ 51,678 | $ 51,678 | 26,207 | Auto C300/V4 SN. 55SWF4KB0JU263699 |
| 12 | Commercial Capital Company LLC | Equipment Finance | $ 380,315 | $ 380,315 | 242,779 | Sesono Model SM-600 High SpeedShear-Granulator |
| 13 | Commercial Capital Company LLC | Equipment Finance | $ 37,500 | $ 37,500 | 14,775 | Fryma VME-50 with all accessories |
| 14 | Commercial Capital Company LLC | Equipment Finance | $ 87,079 | $ 87,079 | 59,692 | Keve Labwatch Pro Monitoring System |
| 15 | Commercial Capital Company LLC | Equipment Finance | $ 19,929 | $ 19,929 | 13,469 | Compressor Change Out |
| 16 | GE HFS, LLC | Equipment Finance | $ 188,678 | $ 188,678 | 136,594 | SP Sepharose Fast Flow AKTA Pilot System Tricorn 10/200 Column |
| 17 | Commercial Capital Company LLC | Equipment Finance | $ 57,838 | $ 57,838 | 30,653 | Cam Track Synthesis 500 |
| 18 | Commercial Capital Company LLC | Equipment Finance | $ 76,235 | $ 76,235 | 51,072 | Mex DeBee 30 High Pressure Homogenizer |
| 19 | Commercial Capital Company LLC | Equipment Finance | $ 35,770 | $ 35,770 | 15,134 | Software |
| 20 | Commercial Capital Company LLC | Equipment Finance | $ 203,065 | $ 203,065 | 142,233 | Drikng Machine Fitzpatrick Roller Compactor Granulation stack |
| 21 | Commercial Capital Company LLC | Equipment Finance | $ 70,200 | $ 70,200 | 58,616 | Febtech Technologoes Moduler Clean Room panels |
| 22 | HPEFS | Equipment Finance | $ 118,780 | $ 118,780 | 48,928 | StorageCraft |
| 23 | Commercial Capital Company LLC | Equipment Finance | $ 327,760 | $ 327,760 | 213,682 | (2) 400 Ton Carrier Chiller |
| 24 | Mercedes-Benz Financial Services | Auto Loan | $ 66,064 | $ 66,064 | 50,049 | Auto 2020 4JGFB4KB7LA058191 |
| 25 | Mercedes-Benz Financial Services | Auto Loan | $ 61,490 | $ 61,490 | 51,240 | Auto 2020 GLC300W4 WDC0G8EB0LF736796 |
| 26 | Lamborchini Financial Services | Auto Loan | $ 233,770 | $ 233,770 | 205,065 | ZPBUA1ZL4LLA08020 |
| 27 | Onset Financial Inc | Equipment Finance | $ 363,946 | $ 363,946 | 298,879 | Tablet Press |
| 28 | Commercial Capital Company LLC | Equipment Finance | $ 1,129,191 | $ 1,129,191 | 982,908 | Tablet Coater |
| 29 | Commercial Capital Company LLC | Equipment Finance | $ 698,984 | $ 698,984 | 647,752 | Uperades G140-6148 |
| 30 | Bank of America | Equipment Finance | $ 1,068,688 | $ 1,068,688 | 1,018,629 | (20 Check Weighers 7 (2) Tablet Capsule Filing Lines |
| 31 | Bank of America | Equipment Finance | $ 430,851 | $ 430,851 | 410,678 | Phase 1 new server for 8 LC's 1290 HPLC Refurbshed 1260 HPLC's |
| 32 | Bank of America | Equipment Finance | $ 275,889 | $ 275,889 | 271,592 | Fette 3200i Tablet Press De-Duster Checker UPLC System (Ohio) |
| 33 | Bank of America | Equipment Finance | $ 1,227,885 | $ 1,227,885 | 1,227,885 | 3090 Tablet Press w/ 61 station "B" turret 551876 Thermo Scientific Q Mass Spectrometer w/Dionex Ultimate 3000 UPLC UV Light System PM-1000 Blender |
| 34 | Waterford Bank | Term Loan | $ 150,000 | $ 150,000 | 134,283 | Roof Refurbishment |
| 35 | Waterford Bank | Construction & Permanent Loan | $ 1,500,000 | $ 1,500,000 | 1,497,388 | Construction & Permanent Note - Warehouse Expansion |
| 36 | Waterford Bank | Open-End Mortgage | $ 350,000 | $ 350,000 | | Bulding (not utilized yet) |
| 37 | Wells Fargo Bank | Auto Loan | $ 33,906 | $ 33,906 | 16,866 | Auto 2017 Chev Malbu Hybrd |
| 38 | Bank Of India | Line of Credit | $ 6,000,000 | $ 6,000,000 | 5,983,254 | Account Receivable, Inventory, Fixed Assets |
| 39 | Mylan Pharmaceuticals, LLC | APA | $ 4,000,000 | $ 4,000,000 | 4,000,000 | Sucralfate Tab 1g, 100/500cnt (ANDA # 074415) Theophylline ER Tab 400 & 600mg (ANDA # 040560) Pirracam Cap 10/20mg (ANDA # 074116) Carbamazepine ER Cap 100/200/300mg (ANDA# 076697) |
| 40 | Mylan Pharmaceuticals, LLC | Settlement Agreement | $ 10,000,000 | $ 10,000,000 | 10,000,000 | Sucralfate Tab 1g, 100/500cnt (ANDA # 074415) Theophylline ER Tab 400 & 600mg (ANDA # 040560) Pirracam Cap 10/20mg (ANDA # 074116) Carbamazepine ER Cap 100/200/300mg (ANDA# 076697) |
| | **Total** | | $ 31,306,881 | $ 31,306,881 | 26,473,319 | |

EXHIBIT A

REVOLVING CREDIT NOTE

$12,000,000                                                        December 31, 2020

FOR VALUE RECEIVED, on the Revolving Loan Maturity Date, NOSTRUM LABORATORIES, INC., a New Jersey corporation, having its principal place of business at 1370 Hamilton Street, Somerset, New Jersey 08873 ("Borrower"), promises to pay to the order of INVESTORS BANK ("Bank") at the office of the Bank located at 101 JFK Parkway, Short Hills, New Jersey 07078, the principal sum of the lesser of: (a) TWELVE MILLION DOLLARS ($12,000,000); or (b) the aggregate unpaid principal amount of all Revolving Credit Loans made by Bank to Borrower pursuant to the Agreement (as defined below).

Borrower shall pay interest on the unpaid principal balance of this Note from time to time outstanding, at said office, at the rates of interest, at the times and for the periods set forth in the Agreement.

All payments including prepayments on this Note shall be made in lawful money of the United States of America in immediately available funds. Except as otherwise provided in the Agreement, if a payment becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and interest shall be payable thereon at the rate herein specified during such extension.

Borrower hereby authorizes Bank to enter from time to time the amount of each Loan to Borrower and the amount of each payment on a Loan on the schedule annexed hereto and made a part hereof. Failure of Bank to record such information on such schedule shall not in any way effect the obligation of Borrower to pay any amount due under this Note.

This Note is the Revolving Credit Note referred to in that certain Loan Agreement among Borrower, certain Guarantors and the Bank of even date herewith (the "Agreement"), as such Agreement may be amended from time to time, and is subject to prepayment and its maturity is subject to acceleration upon the terms contained in said Agreement. All capitalized terms used in this Note and not defined herein shall have the meanings given them in the Agreement.

If any action or proceeding be commenced to collect this Note or enforce any of its provisions, Borrower further agrees to pay all costs and expenses of such action or proceeding and reasonable attorneys' fees and expenses and further expressly waives any and every right to interpose any counterclaim in any such action or proceeding. Borrower hereby submits to the jurisdiction of the Superior Court of the State of New Jersey and agrees with Bank that personal jurisdiction over Borrower shall rest with the Superior Court of the State of New Jersey for purposes of any action on

#11855908.1(161627.644)

or related to this Note, the liabilities, or the enforcement of either or all of the same. Borrower hereby waives personal service by manual delivery and agrees that service of process may be made by certified mail, return receipt requested, directed to the Borrower at the Borrower's address set forth above or at such other address as may be designated in writing by the Borrower to Bank in accordance with Section 7.02 of the Agreement, and that upon mailing of such process such service shall be effective with the same effect as though personally served.

**Borrower hereby expressly waives any and every right to a trial by jury in any action on or related to this Note, the liabilities hereunder or the enforcement of either or all of the same.**

Subject to the provisions of the Agreement, Bank may transfer this Note to a transferee or transferees, who shall thereupon become vested with all the powers and rights above given to Bank in respect thereto, and Bank shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect to any matters occurring after the date of such transfer. The failure of any holder of this Note to insist upon strict performance of each and/or all of the terms and conditions hereof shall not be construed or deemed to be a waiver of any such term or condition.

Borrower and all endorsers and guarantors hereof waive presentment and demand for payment, notice of non-payment, protest, and notice of protest.

This Note shall be construed in accordance with and governed by the laws of the State of New Jersey.

**[Signature Page to Follow]**

#11855908.1(161627.644)

**IN WITNESS WHEREOF**, the party hereto have caused this Note to be executed by its respective officer thereunto duly authorized, as of the date first above written.

NOSTRUM LABORATORIES, INC.

By: _____

Nirmal Mulye, Ph.D.
Chairman and Chief Executive Officer

## ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA          :
                                      :          ss
COUNTY OF Monroe                      :

**BE IT REMEMBERED**, that on this 29 day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the Commonwealth of Pennsylvania, personally appeared NIRMAL MULYE, PH.D. who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed the attached document; and

(b) signed, sealed, and delivered this document as his or her act and deed.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
TRICIA MARIA DIAZ, Notary Public
Monroe County
My Commission Expires September 5, 2023
Commission Number 1357241

[SIGNATURE PAGE TO REVOLVING CREDIT NOTE]

Schedule of Revolving Credit Loans

| Making Date | Amount of Loan | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Name of Person Making Notation |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT B

TERM LOAN NOTE

$5,000,000                                                          December 31, 2020

          FOR VALUE RECEIVED, NOSTRUM LABORATORIES, INC., a New Jersey corporation, having its principal place of business at 1370 Hamilton Street, Somerset, New Jersey 08873 ("Borrower"), promises to pay to the order of INVESTORS BANK ("Bank") at the office of the Bank located at 101 JFK Parkway, Short Hills, New Jersey 07078, the principal sum of FIVE MILLION DOLLARS ($5,000,000.00).

          Borrower shall pay interest on the unpaid balance of this Note from time to time outstanding at said office, at the rates of interest, at the times and for the periods as set forth in the Agreement (as defined below).

          Borrower shall pay the principal balance of this Note from time to time outstanding in the manner set forth in the Agreement (as defined below).

          All payments including prepayments on this Term Loan Note shall be made in lawful money of the United States of America in immediately available funds. Except as otherwise provided in the Agreement, if a payment becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and interest shall be payable thereon at the rate herein specified during such extension.

          This Term Loan Note is the Term Loan Note referred to in that certain Loan Agreement among Borrower, certain Guarantors and Investors Bank of even date herewith (the "Agreement"), as such Agreement may be amended from time to time, and is subject to prepayment and its maturity is subject to acceleration upon the terms contained in said Agreement. All capitalized terms used in this Term Loan Note and not defined herein shall have the meanings given them in the Agreement.

          If any action or proceeding be commenced to collect this Term Loan Note or enforce any of its provisions, Borrower further agrees to pay all costs and expenses of such action or proceeding and reasonable attorneys' fees and expenses and further expressly waives any and every right to interpose any counterclaim in any such action or proceeding. Borrower hereby submits to the jurisdiction of the Superior Court of the State of New Jersey and agrees with Bank that personal jurisdiction over Borrower shall rest with the Superior Court of the State of New Jersey for purposes of any action on or related to this Term Loan Note, the liabilities, or the enforcement of either or all of the same. Borrower hereby waives personal service by manual delivery and agrees that service of process may be made by post-paid certified mail, return receipt requested, directed to Borrower at Borrower's address designated in the Agreement or at such other address as may be designated in

#11855908.1(161627.644)

writing by Borrower to Bank in accordance with Section 7.02 of the Agreement, and that upon mailing of such process such service be effective with the same effect as though personally served.

**Borrower hereby expressly waives any and every right to a trial by jury in any action on or related to this Term Loan Note, the liabilities or the enforcement of either or all of the same.**

Subject to the provisions of the Agreement, Bank may transfer this Term Loan Note and may deliver the security or any part thereof to the transferee or transferees, who shall thereupon become vested with all the powers and rights above given to Bank in respect thereto, and Bank shall thereafter be forever relieved and fully discharged from any liability or responsibility in the matter. The failure of any holder of this Term Loan Note to insist upon strict performance of each and/or all of the terms and conditions hereof shall not be construed or deemed to be a waiver of any such term or condition.

Borrower and all endorsers and Guarantors hereof waive presentment and demand for payment, notice of non-payment, protest, and notice of protest.

This Term Loan Note shall be construed in accordance with and governed by the laws of the State of New Jersey.

**[Signature Page to Follow]**

**IN WITNESS WHEREOF**, the party hereto have caused this Note to be executed by its respective officer thereunto duly authorized, as of the date first above written.

NOSTRUM LABORATORIES, INC.

By: _____
     Nirmal Mulye, Ph.D.
     Chairman and Chief Executive Officer

## ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA    :
                                   :    ss
COUNTY OF Monroe                   :

**BE IT REMEMBERED**, that on this 29 day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the Commonwealth of Pennsylvania, personally appeared NIRMAL MULYE, PH.D. who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

    (a) is named in and personally signed the attached document; and

    (b) signed, sealed, and delivered this document as his or her act and deed.

_____
                        Notary Public

> Commonwealth of Pennsylvania - Notary Seal
> TRICIA MARIA DIAZ, Notary Public
> Monroe County
> My Commission Expires September 5, 2023
> Commission Number 1357241

[SIGNATURE PAGE TO TERM LOAN NOTE]

EXHIBIT C

LINE OF CREDIT/TERM LOAN NOTE

$5,000,000                                                                                    December 31, 2020

        FOR VALUE RECEIVED, NOSTRUM LABORATORIES, INC., a New Jersey corporation, having its principal place of business at 1370 Hamilton Street, Somerset, New Jersey 08873 ("Borrower"), promises to pay to the order of INVESTORS BANK ("Bank") at the office of the Bank located at 101 JFK Parkway, Short Hills, New Jersey 07078, the principal sum of FIVE MILLION DOLLARS ($5,000,000.00).

        Borrower shall pay interest on the unpaid balance of this Note from time to time outstanding at said office, at the rates of interest, at the times and for the periods as set forth in the Agreement (as defined below).

        Borrower shall pay the principal balance of this Note from time to time outstanding in the manner set forth in the Agreement (as defined below).

        All payments including prepayments on this Line of Credit/Term Loan Note shall be made in lawful money of the United States of America in immediately available funds. Except as otherwise provided in the Agreement, if a payment becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and interest shall be payable thereon at the rate herein specified during such extension.

        This Line of Credit/Term Loan Note is the Line of Credit/Term Loan Note referred to in that certain Loan Agreement among Borrower, certain Guarantors and Investors Bank of even date herewith (the "Agreement"), as such Agreement may be amended from time to time, and is subject to prepayment and its maturity is subject to acceleration upon the terms contained in said Agreement. All capitalized terms used in this Line of Credit/Term Loan Note and not defined herein shall have the meanings given them in the Agreement.

        If any action or proceeding be commenced to collect this Line of Credit/Term Loan Note or enforce any of its provisions, Borrower further agrees to pay all costs and expenses of such action or proceeding and reasonable attorneys' fees and expenses and further expressly waives any and every right to interpose any counterclaim in any such action or proceeding. Borrower hereby submits to the jurisdiction of the Superior Court of the State of New Jersey and agrees with Bank that personal jurisdiction over Borrower shall rest with the Superior Court of the State of New Jersey for purposes of any action on or related to this Line of Credit/Term Loan Note, the liabilities, or the enforcement of either or all of the same. Borrower hereby waives personal service by manual delivery and agrees that service of process may be made by post-paid certified mail, return receipt requested, directed to Borrower at Borrower's address designated in the Agreement or at such other

#11855908.1(161627.644)

address as may be designated in writing by Borrower to Bank in accordance with Section 7.02 of the Agreement, and that upon mailing of such process such service be effective with the same effect as though personally served.

**Borrower hereby expressly waives any and every right to a trial by jury in any action on or related to this Line of Credit/Term Loan Note, the liabilities or the enforcement of either or all of the same.**

Subject to the provisions of the Agreement, Bank may transfer this Line of Credit/Term Loan Note and may deliver the security or any part thereof to the transferee or transferees, who shall thereupon become vested with all the powers and rights above given to Bank in respect thereto, and Bank shall thereafter be forever relieved and fully discharged from any liability or responsibility in the matter. The failure of any holder of this Line of Credit/Term Loan Note to insist upon strict performance of each and/or all of the terms and conditions hereof shall not be construed or deemed to be a waiver of any such term or condition.

Borrower and all endorsers and Guarantors hereof waive presentment and demand for payment, notice of non-payment, protest, and notice of protest.

This Line of Credit/Term Loan Note shall be construed in accordance with and governed by the laws of the State of New Jersey.

**[Signature Page to Follow]**

#11855908.1(161627.644)

**IN WITNESS WHEREOF**, the party hereto have caused this Note to be executed by its respective officer thereunto duly authorized, as of the date first above written.

NOSTRUM LABORATORIES, INC.

By: _____

Nirmal Mulye, Ph.D.
Chairman and Chief Executive Officer

## ACKNOWLEDGEMENT

COMMONWEALTH OF PENNSYLVANIA    :
                                                            :    ss
COUNTY OF Monroe                             :

**BE IT REMEMBERED**, that on this 29 day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the Commonwealth of Pennsylvania, personally appeared NIRMAL MULYE, PH.D. who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed the attached document; and

(b) signed, sealed, and delivered this document as his or her act and deed.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
TRICIA MARIA DIAZ, Notary Public
Monroe County
My Commission Expires September 5, 2023
Commission Number 1357241

[SIGNATURE PAGE TO LINE OF CREDIT/TERM LOAN NOTE]

# EXHIBIT B

# INDIVIDUAL GUARANTY AGREEMENT

This Guaranty Agreement ("Guaranty") is made as of December 31, 2020, by, NIRMAL MUYLE, a resident of Florida (the "Guarantor"), in favor of **INVESTORS BANK**, as Lender (the "Lender").

## R E C I T A L S

A.    Pursuant to the terms of that certain Loan Agreement dated as of December 31, 2020 (the "Loan Agreement"), between the NOSTRUM LABORATORIES, INC, a New Jersey corporation (the "Borrower"), and Lender, the Lender have agreed to loan to Borrower one or more loans in an aggregate principal sum of TWENTY TWO MILLION DOLLARS AND NO/100THS ($22,000,000.00) (collectively, the "Loan") for the purposes specified in the Loan Agreement.  Capitalized terms which are not otherwise defined in this Agreement shall have the meaning as set forth in the Loan Agreement.

B.    The Loan Agreement provides that the Loan shall be evidenced by promissory notes made by Borrower payable to the order of Lender in the principal amount of the Loan.

THEREFORE, to induce the Lender to enter into the Loan Agreement, and in consideration thereof, Guarantor unconditionally guarantees and agrees as follows:

1.    <u>GUARANTY</u>.

(a)    The Guarantor hereby guarantees and promises to pay to the Lender, for the benefit of the Lender, or order, on demand, in lawful money of the United States, in immediately available funds, the following obligations (collectively, the "Guaranteed Obligations"):  (i) the principal sum of TWENTY TWO MILLION DOLLARS AND NO/100THS ($22,000,000.00) or so much thereof as may be due and owing under the Loan Agreement or any of the other Loan Documents, (ii) all accrued but unpaid interest payable under the Loan Agreement, any of the other Loan Documents or any related documents (collectively, the "Documents"), (iii) all expenses, fees and costs associated with the issuance of the Loan and any costs incurred in the maintenance or collection of amounts under the Loan, this Guaranty, and the Documents, (iv) all amounts due and owing pursuant to Section 1(b) hereof, and (v) includes any and all advances, debt, obligations and liabilities of Guarantor heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and whether Guarantor may be liable individually or jointly with others, or whether recovery upon such Guaranteed Obligations may be or hereafter becomes unenforceable.

(b)    The definition of "Guaranteed Obligations" herein includes, without limitation, all liability of Borrower whether liquidated or unliquidated, defined,

contingent, conditional or of any other nature whatsoever, and performance of all other obligations, including but not limited to: (i) those obligations arising under or in connection with any "swap agreement" (as defined in 11 U.S.C. Section 101) between Borrower and Bank, or any affiliate of Bank; and (ii) those obligations, arising under any commercial card or other similar transaction or arrangement (howsoever described or defined), and whether Borrower or such other party may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

(c)     Guarantor hereby guarantees and promises to perform all terms, conditions and covenants which Guarantor is obligated to perform under Documents until payment in full of the Guaranteed Obligations.

2.     <u>REMEDIES</u>.  If the Guarantor fails to promptly perform its obligations under this Guaranty, the Lender may from time to time, and without first requiring performance by Borrower or exhausting any or all security for the Loan, bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action claims for all loss, cost, damage, injury and expense sustained or incurred by the Lender as a direct or indirect consequence of the failure of Guarantor to perform its obligations together with interest thereon at the Default Rate (as defined in the Documents). All remedies afforded to the Lender, and its successors or assigns, by reason of this Guaranty and the Documents are separate and cumulative remedies, and no one of such remedies, whether exercised by the Lender, or its successors or assigns, or not, shall be deemed an exclusion of any of the other remedies available to the Lender, or its successors or assigns, at law, in equity, by statute, under the Documents, hereunder or otherwise, and shall in no way limit or prejudice any such other remedies which the Lender, or its successors or assigns, may have. Guarantor further waives any requirement that the Lender demand or seek payment or performance by Borrower or by any other party of the amounts owing or the covenants to be performed under the Documents as a condition precedent to bringing any action against Guarantor upon this Guaranty, it being agreed that a failure to pay, comply with or perform the obligations, terms, covenants and conditions herein guarantied beyond the expiration of any applicable notice and cure period, shall, without further act, make Guarantor liable as herein set forth. All payments made by Borrower, by Guarantor or by any other party, and/or the proceeds of any security, may be applied by the Lender upon any items of indebtedness owed by Borrower as set forth in the Documents, whether the same be due or not.

3.     <u>RIGHTS OF LENDER</u>.  Guarantor authorizes the Lender, without giving notice to Guarantor or obtaining Guarantor's consent and without affecting the liability of Guarantor, from time to time to: (a) renew or extend all or any portion of Borrower's obligations under the Documents; (b) declare all sums owing to the Lender under the Loan, the Loan Agreement or to the Lender pursuant to the other Documents due and payable upon the occurrence of an Event of Default under the Documents; (c) make non-material changes in the dates specified for payments of any sums payable in periodic installments under the Loan, the Loan Agreement or any of the Documents; (d) otherwise modify the terms of any of the Documents; (e) take and hold security for the performance of Borrower's obligations under the Loan, the Loan Agreement or the other Documents and exchange, enforce, waive and release any such security, and perfect or fail to perfect its lien on or security interest thereon or therein; (f) apply such security and direct the

order or manner of sale thereof as the Lender in its discretion may determine (except as expressly required by the Documents); (g) release, substitute or add any one or more guarantor of Borrower's obligations under the Loan Agreement or the other Documents; (h) apply payments received by the Lender from Borrower to any obligations of Borrower to the Lender, in such order as the Lender shall determine in its sole discretion (except as expressly required by the Documents), whether or not any such obligations are covered by this Guaranty; (i) assign this Guaranty in whole or in part; and (j) assign, transfer or negotiate all or any part of the indebtedness guaranteed by this Guaranty.

4.    GUARANTOR'S WAIVERS.  Guarantor waives:  (a) any defense based upon any legal disability or other defense of Borrower, any other guarantor or other person, or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment of all sums payable and performance of all of its obligations under the Loan Agreement or any of the other Documents; (b) any defense based upon any lack of authority of the officers, directors, managers, partners or agents acting or purporting to act on behalf of Borrower or any principal of Borrower or any defect in the formation of Borrower or any principal of Borrower; (c) any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to the Lender or intended or understood by the Lender or Guarantor; (d) any and all rights and defenses arising out of an election of remedies by the Lender even though that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against the principal; (e) any defense based upon the Lender's failure to disclose to Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable, or perform all of its obligations, under the Loan Agreement or any of the other Documents; (f) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal; (g) any defense based upon the Lender's election, in any proceeding instituted under the Federal the Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute; (h) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code; (i) any right of subrogation, any right to enforce any remedy which Lender may have against Borrower and any right to participate in, or benefit from, any security for the Loan Agreement or the other Documents now or hereafter held by any of them; (j) presentment, demand, protest and notice of any kind; and (k) the benefit of any statute of limitations affecting the liability of Guarantor hereunder or the enforcement hereof.  Finally, Guarantor agrees that the performance of any act or any payment which tolls any statute of limitations applicable to the Loan Agreement or any of the other Documents shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder.

5.    GUARANTOR'S WARRANTIES.  Guarantor warrants and acknowledges that: (a) the Lender would not advance the Loan and cause the making of the Loan but for this Guaranty; (b) there are no conditions precedent to the effectiveness of this Guaranty; (c) Guarantor has established adequate means of obtaining from sources other than the Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the Collateral and Borrower's activities relating thereto and the status of Borrower's performance of obligations under the Documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks

hereunder, and the Lender has not made any representation to Guarantor as to any such matters; (d) the most recent financial statements of the Guarantor previously delivered to the Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied (or other principles acceptable to the Lender) and fairly present the financial condition of the Guarantor as of the respective date thereof, and no material adverse change has occurred in the financial condition of Guarantor since the date thereof; and (e) Guarantor has not and will not, without the prior written consent of the Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, except as permitted by the Loan Agreement; (f) Guarantor is not and will not be, as a consequence of the execution and delivery of this Guaranty, impaired or rendered "insolvent," as that term is defined under applicable state law or Section 101 of the Federal Bankruptcy Code, or otherwise rendered unable to pay his debts as the same mature and will not have thereby undertaken liabilities in excess of the present fair value of his assets; and (g) (i) there are no legal proceedings, material claims or demands pending against, or to the knowledge of the Guarantor threatened against, the Guarantor or any of Guarantor's assets, (ii) Guarantor is not in breach or default of any obligation to pay money, and (iii) no event (including specifically Guarantor's execution and delivery of this Guaranty) has occurred which, with or without the lapse of time or action by a third party, constitutes or could constitute a material breach or material default under any document evidencing or securing any obligation to pay money or under any other contract or agreement to which Guarantor is a party.

6.    COVENANTS.  Guarantor agrees to comply with all provisions set forth in the Loan Agreement until final payment in full of the Guaranteed Obligations.

7.    FINANCIAL AND OTHER INFORMATION.  Guarantor shall deliver to the Lender all financial information described in the Loan Agreement and all such other information as the Lender may reasonably request from time to time, including without limitation, financial statements and information pertaining to Guarantor's financial condition.  Such information shall be true, complete, and accurate.

8.    ANNUAL FINANCIAL STATEMENTS.  INTENTIONALLY OMITTED

9.    PERIODIC FINANCIAL STATEMENTS.  INTENTIONALLY OMITTED

10.    INDIVIDUAL REPRESENTATIONS, WARRANTIES, AND COVENANTS: Guarantor represents and warrants that:

    a)    Guarantor has full power, authority and legal right to execute, deliver and comply with this Guaranty, all actions of Guarantor and other authorizations necessary or appropriate for the execution and delivery of and compliance with this Guaranty have been taken or obtained and this Guaranty constitutes the valid and legally binding obligation of Guarantor enforceable against Guarantor in accordance with its terms.

    b)    No consent, approval, or other authorization of or by any court, administrative agency, or other governmental authority is required in connection with Guarantor's execution and delivery of or compliance with this Guaranty.

#11845532.1

c)    The execution and delivery of and compliance with this Guaranty by Guarantor will not conflict with or result in a breach of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or of any agreement or other document or instrument to which Guarantor is a party, or by which Guarantor or any of Guarantor's property is bound, and such action by Guarantor will not result in the creation or imposition of any lien, charge or encumbrance upon any property of Guarantor in favor of anyone other than the Lender.

d)    There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or affecting Guarantor before or by any court, administrative agency or other governmental authority, or which brings into question the validity of the transactions contemplated hereby.

e)    Guarantor has not applied or consented to the appointment of a receiver, trustee, or liquidator of itself or any of Guarantor's property, has not admitted in writing Guarantor's inability to pay debts as they mature, has not made a general assignment for the benefit of creditors, been adjudicated a bankrupt, or insolvent or filed a voluntary petition in bankruptcy, nor has a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, and no action has been taken by Guarantor for the purpose of effecting any of the foregoing.  No order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of Guarantor or all or a substantial part of the assets of Guarantor, or appointing a receiver, sequestrator, trustee, or liquidator of any of Guarantor's property.

f)    On an annual basis, together with its financial reporting requirements, Guarantor shall cause Borrower to provide the Lender with an updated organizational chart listing all changes in percentage direct or indirect ownership in Borrower from the prior year, which shall be certified to by Guarantor. Any such updated organizational chart delivered by the Borrower to the Lender in accordance with this subsection shall automatically and immediately be deemed to amend and restate the prior version of such organizational chart previously delivered to the Lender, so long as such updates are not otherwise prohibited under the Loan Agreement.

g)    Guarantor shall maintain its percentage ownership interest in Corporate Guarantor as described in the Loan Agreement.

11.    <u>SUBORDINATION</u>.  Guarantor subordinates all present and future indebtedness owing by Borrower to Guarantor to the obligations at any time owing by Borrower to the Lender under the Loan Agreement and the other Documents. Guarantor assigns all such indebtedness to the Lender as security for this Guaranty, the Loan, the Loan Agreement and the other Documents. Without the Lender's consent, Guarantor will not make any claim for such indebtedness until all obligations of Borrower under the Loan Agreement and the other Documents have been fully discharged. Guarantor further agrees not to assign all or any part of such indebtedness unless the

Lender is given prior written notice and such assignment is expressly made subject to the terms of this Guaranty. If the Lender so requests, (a) all instruments evidencing such indebtedness shall be duly endorsed and delivered to the Lender, (b) all security for such indebtedness shall be duly assigned and delivered to the Lender, (c) such indebtedness shall be enforced, collected and held by Guarantor as trustee for the Lender and shall be paid over to the Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, and (d) Guarantor shall execute, file and record such documents and instruments and take such other action as the Lender deems necessary or appropriate to perfect, preserve and enforce its rights in and to such indebtedness and any security therefor. If Guarantor fails to take any such action, the Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of the Guarantor without Guarantor's signature. The foregoing power of attorney is coupled with an interest and cannot be revoked.

12.  BANKRUPTCY OF BORROWER. In any bankruptcy or other proceeding in which the filing of claims is required by law, Guarantor shall file all claims which Guarantor may have against Borrower relating to any indebtedness of Borrower to Guarantor and shall assign to the Lender all rights of Guarantor thereunder. If Guarantor does not file any such claim, the Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor or, in the Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of the Lender's nominee. The foregoing power of attorney is coupled with an interest and cannot be revoked. The Lender or its nominee shall have the right, in their reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the Lender the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to the Lender all of Guarantor's rights to any such payments or distributions; provided, however, Guarantor's obligations hereunder shall not be satisfied except to the extent that the Lender receives cash by reason of any such payment or distribution. If the Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty. Guarantor hereby grants to the Lender a security interest in all property so delivered. In the event of the occurrence of any default by Guarantor under this Guaranty, the Lender may realize upon said security interest in accordance with the provision of the Uniform Commercial Code and apply the proceeds to the indebtedness hereby guarantied. If all or any portion of the obligations guaranteed hereunder are paid or performed, the obligations of Guarantor hereunder shall continue and shall remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from the Lender as a preference, fraudulent transfer or otherwise under the Bankruptcy Code or other similar laws, irrespective of (a) any notice of revocation given by the Guarantor prior to such avoidance or recovery, or (b) full payment and performance of all of the indebtedness and obligations evidenced and secured by the Loan Documents. In addition to all other rights of the Lender to accelerate the indebtedness payment of which is hereby guaranteed, if (a) an Event of Default shall occur pursuant to the terms of the Loan Agreement, which would entitle the Lender to accelerate said indebtedness, but (b) there shall be filed with respect to Borrower a petition in bankruptcy or for similar relief under the United States Bankruptcy Code or any similar law, and by reason of such filing or as a result of any order of court, the Lender shall be prevented from accelerating or collecting said indebtedness, or, after such acceleration, if Borrower's right to

make monthly payments on said indebtedness shall be reinstated, then the Lender shall have the right to demand from the Guarantor payment in full of, and Guarantor shall pay in full, all indebtedness payment of which is guaranteed hereby, including all principal, interest, costs, expenses, fees and charges, whether or not then due and payable by Borrower.

13.    ASSIGNMENTS AND PARTICIPATIONS; DISCLOSURE OF INFORMATION. Guarantor agrees that the Lender may elect, at any time, to sell, assign, or grant participations in all or any portion of its rights and obligations under the Documents and this Guaranty, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at assignor's sole discretion, subject to the terms of the Loan Agreement. With the consent of the Guarantor which shall not be unreasonably withheld, subject to such persons entering into a confidentiality agreement with the Lender, Guarantor further agrees that the Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to the Lender with respect to: (a) any party connected with the Loan Agreement or the issuance of the Loan (including, without limitation, the Guarantor, Borrower, any partner, joint venturer, manager or member of Borrower, any constituent partner, joint venturer, manager or member of Borrower, any other guarantor and any non-borrower trustor); and/or (b) any lending relationship other than the Loan Agreement which the Lender may have with any party connected with the Loan Agreement. In the event of any such sale, assignment or participation, the Lender, and the parties to such transaction shall share in the rights and obligations of the Lender as set forth in the Documents only as and to the extent they agree among themselves. In connection with any such sale, assignment or participation, Guarantor further agrees that the Guaranty shall be sufficient evidence of the obligations of the Guarantor to each purchaser, assignee, or participant, and upon written request by the Lender, Guarantor shall consent to such amendments or modifications to the Documents as may be reasonably required in order to evidence any such sale, assignment, or participation.

Anything in this Guaranty to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Agreement, including this Section, the Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Documents to a Federal Reserve Bank; provided that no such pledge or assignment shall release the Lender from its obligations thereunder.

14.    ADDITIONAL, INDEPENDENT AND UNSECURED OBLIGATIONS. This Guaranty is a continuing guaranty of payment and performance and not of collection and cannot be revoked by Guarantor, and until it is indefeasibly paid in full, shall continue to be effective with respect to any indebtedness referenced in Section 1 hereof arising or created after any attempted revocation hereof. The obligations of Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified or revoked in writing. This Guaranty is independent of the obligations of Borrower under the Loan Agreement and the Documents. The Lender may bring a separate action to enforce the provisions hereof against the Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.

15.    ATTORNEYS' FEES; ENFORCEMENT.  If any attorney is engaged by the Lender to enforce or defend any provision of this Guaranty, or any of the other Documents, or as a consequence of any Event of Default under the Loan Agreement, with or without the filing of any legal action or proceeding, Guarantor shall pay to the Lender immediately upon demand all attorneys' fees and costs incurred by the Lender in connection therewith, together with interest thereon from the date of such demand until paid at the Default Rate.  In the event of any legal proceedings, court costs and attorneys' fees shall be set by the court and not by a jury and shall be included in any judgment obtained by the Lender.

16.    RULES OF CONSTRUCTION.  The word "Borrower" as used herein shall include the named Borrower and any other person at any time assuming or otherwise becoming primarily liable for all or any part of the obligations of the named Borrower under the Documents.  The term "person" as used herein shall include any individual, corporation, company, trust or other legal entity of any kind whatsoever. When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural and vice versa.  All headings appearing in this Guaranty are for convenience only and shall be disregarded in construing this Guaranty.

17.    CREDIT REPORTS.  Each legal entity and individual obligated on this Guaranty hereby authorizes the Lender to order and obtain, from a credit reporting agency of its choice, a third party credit report on such legal entity and individual.

18.    GOVERNING LAW.  This Guaranty shall be governed by, and construed in accordance with, the laws of the State of New Jersey (the "State"), except to the extent preempted by federal laws.  The Guarantor and all persons and entities in any manner obligated to the Lender under this Guaranty consent to the jurisdiction of any federal or state court within the State having proper venue and also consent to service of process by any means authorized by State or federal law.

19.    MISCELLANEOUS.  The provisions of this Guaranty will bind and benefit the successors and assigns of the Guarantor and the Lender. The liability of all persons and entities who are in any manner obligated hereunder shall be joint and several and are irrevocable. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty.

20.    ENFORCEABILITY.    Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature, and (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter, and (c) as part of the Lender's consideration for entering into this transaction, it has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to the Lender that the Guarantor is fully informed

regarding, and that the Guarantor does thoroughly understand: (i) the nature of all such possible defenses, and (ii) the circumstances under which such defenses may arise, and (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses.  Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by the Lender, and that the Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

21.     WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS GUARANTY, AND BY THEIR ACCEPTANCE HEREOF HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS GUARANTY AND/OR THE DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY AND/OR THE DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS GUARANTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

22.     ATTORNEYS' FEES.  Whenever referred to in this Guaranty, "attorneys' fees and costs" shall mean reasonable attorneys' fees and costs.

23.     SECURITY INTEREST AND RIGHT TO SETOFF.  In addition to all liens upon and rights of setoff arising by law, Guarantor pledges and grants to the Lender as security for Guarantor's obligations to the Lender (excluding any consumer obligations subject to the Federal Truth In Lending Act), a security interest and lien upon all monies, securities, securities accounts, brokerage accounts, deposit accounts and other property of Guarantor now or hereafter in the possession of or on deposit with the Lender or any affiliate of Lender, whether held in a general or special account or deposit or for safekeeping or otherwise, excluding however all IRA and Keogh accounts and Covered Funds.  "Covered Funds" means covered funds that are described in 12 USC Part 1851, as amended from time to time, that are advised, offered, organized, managed, or sponsored by the Lender or an affiliate thereof (as the term affiliate is defined in Subpart A Definitions section of 12 USC Part 1851, as amended from time to time). No security interest, lien or right of setoff will be deemed to have been waived by any act or conduct on the part of the Lender, or by any neglect to exercise such right, or by any delay in so doing, and every right of setoff, lien and security interest will continue in full force and effect until specifically waived or released by the Lender in writing. Guarantor agrees to sign additional documentation at any time at the Lender's request to perfect and enforce the Lender's security interests.

24.    FACSIMILE AND COUNTERPARTS.  This Guaranty may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document.    An electronic transmission or other facsimile of this document or any related document shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

25.    EXECUTION OF DOCUMENTS, CONSULTATION WITH COUNSEL.    The Guarantor acknowledges and agrees that it has had an opportunity to review and consider the terms and provisions of this Guaranty and each related Document, to consult with counsel of its choice, if desired, and to suggest changes to the structure and terms of the agreements.    The Guarantor warrants and agrees that its execution of this Guaranty and any related Documents is made voluntarily and with full knowledge of the significance and effect of such agreements.

26.    DOCUMENT DELIVERY AND ELECTRONIC TRANSMISSION OF DOCUMENTS. Each party or person signing this Guaranty (referred to in this paragraph as "you") agrees that the Lender may, in its sole discretion, rely upon any document, report, financial statement, tax return, agreement or other communication ("Communication") physically delivered to the Lender by mail, hand delivery or delivery service which the Lender in good faith believed was sent by you or any of your representatives or employees.    Similarly, the Lender may, in its sole discretion, rely upon any Communication sent by email, facsimile or other electronic means to the Lender which the Lender in good faith believed was sent by you or any of your representatives or employees.    The Lender may treat the Communication as genuine and authorized to the same extent as if it was an original document validly executed or authenticated as genuine by you.    The Lender may from time to time in its sole discretion reject any such Communication and require a signed original, or require you to provide acceptable authentication of any such Communication before accepting or relying on same.    You understand and acknowledge that there is a risk that Communications sent by electronic means may be viewed or received by unauthorized persons, and you agree that by sending Communications by electronic means, you shall be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

*(Signature page follows)*

**IN WITNESS WHEREOF**, the Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

**INDIVIDUAL GUARANTOR,**

_____

NIRMAL MUYLE, Phd., Individually

Address:      1000 Biscayne Boulevard
Miami, Florida 33132
Telephone:(609) 306-7862
Email:  nirmal@nostrumpharma.com

**ACKNOWLEDGEMENT**

COMMONWEALTH OF PENNSYLVANIA    :
    :      ss
COUNTY OF Monroe    :

**BE IT REMEMBERED**, that on this 29 day of December, 2020, before me, the subscriber, an officer duly authorized to take acknowledgments for use in the Commonwealth of Pennsylvania, personally appeared NIRMAL MULYE, PH.D. who came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed the attached document; and

(b) signed, sealed, and delivered this document as his or her act and deed.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
TRICIA MARIA DIAZ, Notary Public
Monroe County
My Commission Expires September 5, 2023
Commission Number 1357241

[SIGNATURE PAGE TO INDIVIDUAL GUARANTY AGREEMENT]

# EXHIBIT C

# STRADLEY RONON

**Stradley Ronon Stevens & Young, LLP**

2005 Market Street

Suite 2600

Philadelphia, PA 19103

Telephone  215.564.8000

Fax  215.564.8120

www.stradley.com

**Gretchen M Santamour**

Partner

gsantamour@stradley.com

215.564.8523

June 2, 2022

**<u>VIA OVERNIGHT COURIER</u>**

Nostrum Laboratories, Inc.                     Nirmal Muyle
1370 Hamilton Street                            1000 Biscayne Blvd
Somerset, New Jersey 08873                   Miami, FL 33132
Attn: Nirmal Muyle

Nostrum Pharmaceuticals, LLC
1370 Hamilton Street
Somerset, New Jersey 08873
Attn: Nirmal Muyle

> **Re:**  **Loans from Citizens Bank, N.A., successor by merger to Investors Bank (the "Bank") to Nostrum Laboratories, Inc. (the "Borrower") Notice of Default and Reservation of Rights and Notice of Change of Address Pursuant to Section 7.02 of the Loan Agreement (as defined below)**

Dear Mr. Muyle:

This firm represents the Bank in connection with that certain (a) revolving line of credit from Bank to Borrower in the original principal amount in $12,000,000.00, (b) line of credit/term loan from Bank to Borrower in the original principal amount of $5,000,000.00, and (c) term loan from Bank to Borrower in the original principal amount of $5,000,000.00 (together, the "**Loans**").

Reference is made to that certain Loan Agreement by and between Borrower, Nirmal Mulye ("**Individual Guarantor**"), Nostrum Pharmaceuticals, LLC ("**Corporate Guarantor**", and together with Individual Guarantor, the "**Guarantors**") and the Bank dated as of December 31, 2020 (as the same has been amended, modified, supplemented and/or restated from time to time, the "**Loan Agreement**"). The obligations of the Borrower to the Bank under the Loan Agreement are further evidenced by, *inter alia*, (1) that certain Revolving Credit Note from Borrower to Bank dated December 31, 2020, in the maximum principal amount of $12,000,000.00, (2) that certain Line of Credit/Term Loan Note from Borrower to Bank dated

December 31, 2020, in the maximum principal amount of $5,000,000.00, and (3) that certain Term Loan Note from Borrower to Bank dated December 31, 2020, in the maximum principal amount of $5,000,000.00 (collectively, as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Notes**").

The obligations of the Borrower to the Bank under the Loan Agreement and the Notes are secured by, among other things, (a) that certain Security Agreement by Borrower to Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Security Agreement**"), pursuant to which the Borrower granted to the Bank a first priority security interest in and to all of Borrower's Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Goods, Inventory, Equipment, Fixtures and Accessions, Trademarks, Contract Rights, Instruments, Investment Property, Money, Letters of Credit, Supporting Obligations, and products and proceeds thereof (as such terms are defined and are more particularly described in the Security Agreement, the "**Personal Property Collateral**"), which security interest is perfected by virtue of, among other things, the UCC-1 Financing Statement listing Borrower, as debtor, and Bank as secured party, recorded with the New Jersey Department of Treasury at Filing Number 54975457 (together with all amendments and/or continuations thereof, the "**UCC-1**"), (b) that certain Bond Pledge Agreement by and between the Borrower, the Bank and UMB Bank, N.A., as trustee, dated as of June 29, 2021 (as the same may be amended, modified, supplemented and/or restated from time to time, the "**Bond Pledge Agreement**"), pursuant to which Borrower pledged Bond No. 1 (as such term is defined in the Bond Pledge Agreement, the "**Bond Collateral**", and together with the Personal Property Collateral, the "**Collateral**") to the Bank as security for the obligations under the Loan Documents, (c) that certain Corporate Guaranty Agreement by Corporate Guarantor in favor of the Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Corporate Guaranty**"), (d) that certain Individual Guaranty Agreement by Individual Guarantor in favor of the Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Individual Guaranty**"), and (e) that certain Fee Subordination Agreement by and between Corporate Guarantor, as Manager, and the Bank, and acknowledged by Borrower (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Fee Subordination Agreement**", and together with the Loan Agreement, the Notes, the Security Agreement, the Bond Pledge Agreement, the Corporate Guaranty, the Individual Guaranty and any other document executed in connection with or otherwise evidencing the Loans, as the same may be amended, modified, supplemented and/or restated from time to time, the "**Loan Documents**").   Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Loan Agreement.

This letter shall serve as formal notice of the occurrence of certain Defaults and Events of Default under the Loan Agreement.

I.    <u>Notice of Defaults and Event of Default</u>

The following Events of Default have occurred under the Loan Documents: (a) failure of the Borrower to satisfy the minimum required Debt Service Coverage Ratio, Fixed Charge Coverage Ratio and Total Funded Debt to EBITDA ratio as of the fiscal year ending December 31, 2021, in violation of Section 5.03 of the Loan Agreement (the "**Existing Events of**

**Default**").    Moreover, the following defaults have occurred under the terms of the Loan Documents: (a) failure of Borrower to deliver annual audited financial statements in violation of Section 5.01(b)(i) of the Loan Agreement, (b) failure of Borrower to deliver the semi-annual management prepared consolidated and consolidating financial statements by the Corporate Guarantor for the semi-annual periods ending December 31, 2020, June 30, 2021 and December 31, 2021, in violation of Section 5.01(b)(iii) of the Loan Agreement, (c) failure of Borrower to deliver a Certificate of No Default and Compliance Certificate in violation of Section 5.01(b)(v) of the Loan Agreement, (d) failure of Borrower to deliver a Borrowing Base  Certificate within fifteen (15) days of month end for the month ending April 30, 2022, in violation of Section 5.01(b)(xiii), (e) failure of Individual Guarantor to deliver a personal financial statement for the years ending December 31, 2020, and December 31, 2021, in violation of Section 5.01(b)(xiv) of the Loan Agreement, and (f) failure of Individual Guarantor to deliver tax returns for the 2020 and, if filed for 2021, in accordance with Section 5.01(b)(xv) of the Loan Agreement (collectively, the "**Existing Defaults**").   Pursuant to Section 6.01(c)(ii) of the Loan Agreement, failure of the Borrower and Guarantors to cure the Existing Defaults by delivering the information required within fifteen (15) days of the date of this notice shall result in the Existing Defaults becoming Events of Default under the Loan Documents without further notice or demand by the Bank.

This letter is not an attempt to enumerate all Defaults or Events of Default that may now be outstanding under the Loan Documents and the failure to include any Default or Event of Default herein shall not be a waiver of any such Default or Event of Default or any of the Bank's rights and remedies arising as a result thereof.

II.    Reservation of Rights/Post-Default Advances

Pursuant to the Fee Subordination Agreement, Borrower is immediately to cease making any payment to Corporate Guarantor on account of any management, advisory, product research and development fee or any other compensation, which fees are all subordinated to the Borrower's obligations to the Bank pursuant to the Management/Fee Arrangements (as such term is described in the Fee Subordination Agreement).   Likewise, Corporate Guarantor shall cease accepting any such management, advisory, product research and development fee or any other compensation in connection with the Management/Fee Arrangements and/or hold any such fee or compensation received after the date of this letter in trust for the exclusive benefit of Bank as required under the Fee Subordination Agreement.   In addition to and without limitation of the foregoing, Borrower shall cease making any payments, making or declaring any dividend and making any other distribution of any kind to Corporate Guarantor, Individual Guarantor or any other Affiliate, except such payments or distributions expressly authorized in writing by the Bank.

As a result of the Existing Events of Default and the Existing Defaults which mature into Events of Defaults, the Bank may without any further notice or demand, terminate the Commitment, accelerate the indebtedness, implement the default rate of interest and commence the exercise of other remedies against the Borrower, the Guarantors and/or any of the Collateral, all at the Bank's sole discretion, whether under the Loan Documents, the Uniform Commercial Code, at law or in equity.   While the Bank has elected at this time not to implement the default rate of interest, it reserves the right to do so, including to implement the default retroactively,

without further notice or demand.  All such rights, remedies, privileges, powers and claims available to the Bank are expressly reserved and preserved in their entirety and may be exercised or pursued at any time and from time to time in the sole and absolute discretion of the Bank in accordance with the Loan Agreement and the other Loan Documents.  The exercise of any rights or remedies shall not constitute or be deemed to be a waiver of any other rights, remedies, or claims of the Bank or otherwise waive or affect the Existing Events of Default, the Existing Defaults or any other Defaults or Events of Default that may exist or hereafter arise.

As a result of the Existing Events of Default and Existing Defaults, Borrower cannot satisfy the conditions to obtaining Revolving Credit Loans or Line of Credit/Term Loan advances from Bank under the Loan Agreement, and Bank has no obligation to make additional Revolving Credit Loans or Line of Credit/Term Loan advances and the making of additional Revolving Credit Loans or Line of Credit/Term Loan advances is in the sole discretion of Bank.

Notwithstanding the Existing Events of Default and Existing Defaults, Borrower may continue to request that Bank make additional Revolving Credit Loans and Line of Credit/Term Loan advances under the Loan Agreement (the "**Post-Default Advances**"), in accordance with the terms of the Loan Agreement.  Bank, in its sole discretion, may elect to make such Post-Default Advances or any portion thereof. If made by Bank, each Post-Default Advance shall be treated for all purposes as a Revolving Credit Loan or Line of Credit/Term Loan advance, as applicable under the Loan Agreement.

The making of any additional Revolving Credit Loans or Line of Credit/Term Loan advances by Bank, including any Post-Default Advance:  (i) shall not constitute a waiver of any past, present or future violation, Default or Event of Default (including, without limitation, the Existing Defaults and Existing Events of Default) under the Loan Agreement or any of the other Loan Documents; (ii) shall not directly or indirectly, in any way whatsoever, impair, prejudice, or otherwise adversely affect Bank's right at any time to exercise any right, privilege, or remedy in connection with the Loan Agreement or any other Loan Document; (iii) shall not amend or alter the provisions of the Loan Agreement or any other Loan Document; and (iv) shall not constitute a course of dealing or other basis for altering any obligation of Borrower or any right, privilege, claim, or remedy of Bank under the Loan Agreement or any other Loan Document. Any agreement by Bank to make a Post-Default Advance shall be subject to satisfaction of each condition (other than the absence of any Default that is an Existing Default or any Event of Default that is an Existing Event of Default) of any Revolving Credit Loan or Line of Credit/Term Loan advance set forth in the Loan Agreement.

No action or inaction on the Bank's part will operate as a forbearance of any kind or a waiver of any right, power or remedy of the Bank, nor constitute a waiver of any other provision of, or default or Event of Default currently existing under, the Loan Agreement or any other Loan Document, including the Existing Defaults and Existing Events of Default.  Further, the Bank's reservation of its rights, claims and remedies shall not impair the Bank's abilities under the Loan Agreement or other Loan Documents to elect at any time to enforce any additional right, claim or remedy provided under the Loan Agreement or other Loan Documents or at law or in equity.

As of the date of this letter, there are no offers outstanding from the Bank to the Borrower nor are there any oral agreements among the Bank and the Borrower concerning the obligations of Borrower and Guarantors to the Bank or the Loan Documents. Rather, all agreements concerning such obligations are expressed only in the existing Loan Documents, and the respective duties and obligations of the Borrower and the Bank shall be only as set forth in the Loan Documents.

Borrower and Guarantors are responsible for the payment of all costs and expenses incurred by the Bank including, without limitation, fees and disbursements of legal counsel in connection with the Existing Defaults and Existing Events of Default and the Bank's exercise of rights and remedies, which shall be payable on demand.

III.    <u>Notice of Change of Address Under Section 7.02 of the Loan Agreement</u>.  This letter shall serve as notice of change of address pursuant to Section 7.02 of the Loan Agreement. Clause (i) of Section 7.02 of the Loan Agreement shall be deleted in full and replaced with the following:

       (i)     If to the Bank at:

Citizens Bank, N.A., successor by merger to Investors Bank
28 State Street
Boston, MA 02109
Attention: Erin Kane
Telephone: 401-644-4903
Email: erin.c.kane@citizensbank.com

With a copy to:

Stradley Ronon Stevens & Young, LLP
2005 Market Street
Suite 2600
Philadelphia, PA 19103
Attention: Gretchen M. Santamour, Esq.
           Julie M. Murphy, Esq.
Telephone:  215-564-8523 or 856-321-2409
Email: gsantamour@stradley.com
        jmmurphy@stradley.com

Should you have any questions regarding the foregoing, have your counsel contact me.

Respectfully,

*Gretchen M. Santamour*

Gretchen M. Santamour

cc:    Erin Kane (via email)
       Julie M. Murphy, Esq.
       Law Offices of Carlton R. Asher, Jr.
       110 E. 59th St., Suite 2200
       New York, NY 10022
       Attention: Carlton R. Asher, Jr. (by overnight mail and email)

| | |
|---|---|
| **From:** | UPS |
| **To:** | Carboni, Linda |
| **Subject:** | UPS Delivery Notification, Tracking Number 1ZA6T998A297513352 |
| **Date:** | Friday, June 3, 2022 9:44:41 AM |

# External Email - Think Before You Click



### Hello, your package has been delivered.

**Delivery Date:**   Friday, 06/03/2022
**Delivery Time:**   9:42 AM
**Signed by:**   BRU



| Set Delivery Instructions | Manage Preferences | View My Packages |
|---|---|---|

### STRADLEY RONON STEVENS & YOUNG

| | |
|---|---|
| **Tracking Number:** | **1ZA6T998A297513352** |
| **Ship To:** | NIRMAL MUYLE<br>1000 BISCAYNE BLVD.<br>MIAMI, FL 331321760<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 1.0 LBS |
| **Reference Number:** | 184880-0241 |
| **Reference Number:** | 1642 |

Download the UPS mobile app

© 2022 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email.

GRETCHEN SANTAMOUR
215.564.8000 8523
STRADLEY RONON STEVENS & YOUNG
2005 MARKET STREET
PHILADELPHIA PA 19103

**1.0 LBS LTR**　　**1 OF 1**

SHIP TO:
NIRMAL MUYLE
1000 BISCAYNE BLVD.
**MIAMI FL 33132-1760**

**FL 330 6-03**

**UPS NEXT DAY AIR**　　**1**
TRACKING #: 1Z A6T 998 A2 9751 3352

BILLING: P/P
ADULT SIGNATURE REQUIRED-MIN 21

Client-Matter #: 184880-0241
Timekeeper #: 1642

CS 22.8.00.　　WNTNV50 23.0A 05/2022*

™

FOLD HERE

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
1735 MARKET ST
PHILADELPHIA, PA 19103

UPS Access Point™
MEDICAL TOWER PHARMACY-AP488
255 S 17TH ST
PHILADELPHIA, PA 19103

UPS Access Point™
CVS STORE #10378
501 N 22ND ST
PHILADELPHIA, PA 19130

| | |
|---|---|
| **From:** | UPS |
| **To:** | Carboni, Linda |
| **Subject:** | UPS Delivery Notification, Tracking Number 1ZA6T998A293639733 |
| **Date:** | Friday, June 3, 2022 10:16:33 AM |

# External Email - Think Before You Click



## Hello, your package has been delivered.

**Delivery Date:** Friday, 06/03/2022
**Delivery Time:** 10:13 AM
**Signed by:** VJAY

## STRADLEY RONON STEVENS & YOUNG

| | |
|---|---|
| **Tracking Number:** | 1ZA6T998A293639733 |
| **Ship To:** | NOSTRUM LABORATORIES, INC.<br>1370 HAMILTON STREET<br>SOMERSET, NJ 088733341<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 1.0 LBS |
| **Reference Number:** | 184880-0241 |
| **Reference Number:** | 1642 |

### Discover more about UPS:

Visit www.ups.com

Sign Up For Additional E-Mail From UPS

Read Compass Online

 Download the UPS mobile app

© 2022 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.



**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
1735 MARKET ST
PHILADELPHIA, PA 19103

UPS Access Point™
CVS STORE
255 S 17TH ST
PHILADELPHIA, PA 19103

UPS Access Point™
CVS STORE # 10278
MEDICAL TOWER PHARMACY-AP488
901 N 22ND ST
PHILADELPHIA, PA 19130

FOLD HERE

GRETCHEN SANTAMOUR
215.564.8000 8523
STRADLEY RONON STEVENS & YOUNG
2005 MARKET STREET
PHILADELPHIA  PA 19103

**1.0 LBS LTR**          **1 OF 1**

SHIP TO:
NIRMAL MUYLE
NOSTRUM LABORATORIES, INC.
1370 HAMILTON STREET
**SOMERSET NJ 08873-3341**

**NJ 088 9-03**

**UPS NEXT DAY AIR**          **1**
TRACKING #: 1Z A6T 998 A2 9363 9733

BILLING: P/P
ADULT SIGNATURE REQUIRED-MIN 21

Client-Matter #: 184880-0241
Timekeeper #: 1642

CS 22.8.00.    WNTNV50 23.0A 05/2022*

| **From:** | UPS |
| **To:** | Carboni, Linda |
| **Subject:** | UPS Delivery Notification, Tracking Number 1ZA6T998A294229942 |
| **Date:** | Friday, June 3, 2022 12:57:44 PM |

## External Email - Think Before You Click



### Hello, your package has been delivered.

**Delivery Date:**   Friday, 06/03/2022
**Delivery Time:**   12:39 PM
**Signed by:**   CD DESk

## STRADLEY RONON STEVENS & YOUNG

| **Tracking Number:** | **1ZA6T998A294229942** |
| **Ship To:** | LAW OFFICES OF CARLTON R. ASHER, JR<br>110 E. 59TH STREET<br>SUITE 2200<br>NEW YORK, NY 100221304<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 1.0 LBS |
| **Reference Number:** | 184880-0214 |
| **Reference Number:** | 1642 |

### Discover more about UPS:

Visit www.ups.com

Sign Up For Additional E-Mail From UPS

Read Compass Online

 Download the UPS mobile app

© 2022 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

GRETCHEN M. SANTAMOUR
215.564.8000 8523
STRADLEY RONON STEVENS & YOUNG
2005 MARKET STREET
PHILADELPHIA  PA 19103

**1.0 LBS LTR**    **1 OF 1**

SHIP TO:
CARLTON R. ASHER, JR.
LAW OFFICES OF CARLTON R. ASHER, JR
SUITE 2200
110 E. 59TH STREET
**NEW YORK NY 10022-1304**

**NY 100 9-44**

**UPS NEXT DAY AIR**    **1**
TRACKING #: 1Z A6T 998 A2 9422 9942

BILLING: P/P
ADULT SIGNATURE REQUIRED-MIN 21

Client-Matter #: 184880-0214
Timekeeper #: 1642
CS 22.8.00.    WNTNV50 23.0A 05/2022*

FOLD HERE

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
**Customers with a Daily Pickup**
Your driver will pickup your shipment(s) as usual.

**Customers without a Daily Pickup**
Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
1735 MARKET ST
PHILADELPHIA, PA 19103

UPS Access Point™
MEDICAL TOWER PHARMACY-AP488
255 S 17TH ST
PHILADELPHIA, PA 19103

UPS Access Point™
CVS STORE #10378
501 N 22ND ST
PHILADELPHIA, PA 19130

# EXHIBIT D

 **Citizens Bank**

Erin Kane
Citizens Bank
28 State Street
Boston, MA 02109
Erin.c.kane@citizensbank.com

June 30, 2022

**VIA OVERNIGHT COURIER**

Nostrum Laboratories, Inc.
9 Veronica Avenue
Somerset, New Jersey 08873
Attn: Nirmal Mulye

Nirmal Mulye
1000 Biscayne Blvd
Miami, FL 33132

Nostrum Pharmaceuticals, LLC
9 Veronica Avenue
Somerset, New Jersey 08873
Attn: Nirmal Mulye

**Re:** Loan Agreement by and between Nostrum Laboratories, Inc. ("**Borrower**"),
Nirmal Mulye ("**Individual Guarantor**"), Nostrum Pharmaceuticals, LLC
("**Corporate Guarantor**", and together with Individual Guarantor, the
"**Guarantors**") and Investors Bank, a division of Citizens Bank, N.A., ("**Bank**"")
dated as of December 31, 2020 (as the same has been amended, modified,
supplemented and/or restated from time to time, the "**Loan Agreement**")

Dear Mr. Mulye:

Reference is made herein to the Loan Agreement. Capitalized terms used herein and not
otherwise defined shall have the meaning set forth in the Loan Agreement.

By letter dated June 2, 2022, Bank notified Borrower of the occurrence of certain Existing
Events of Default and Existing Defaults which Existing Defaults have matured into Events of
Default because of the failure to cure such Existing Defaults within 15 days of notice thereof, as
follows: (a) failure of the Borrower to satisfy the minimum required Debt Service Coverage Ratio,
Fixed Charge Coverage Ratio and Total Funded Debt to EBITDA ratio as of the fiscal year ending
December 31, 2021, in violation of Section 5.03 of the Loan Agreement; (b) failure of Borrower
to deliver annual audited financial statements in violation of Section 5.01(b)(i) of the Loan
Agreement, (c) failure of Borrower to deliver the semi-annual management prepared consolidated
and consolidating financial statements by the Corporate Guarantor for the semi-annual periods
ending December 31, 2020, June 30, 2021 and December 31, 2021, in violation of Section

5.01(b)(iii) of the Loan Agreement, and (d) failure of Borrower to deliver a Certificate of No Default and Compliance Certificate in violation of Section 5.01(b)(v) of the Loan Agreement (the foregoing occurrences (a) through (d) collectively, the "**Existing Events of Defaults**").

Further, pursuant to the Loan Agreement, the Revolving Credit Maturity Date is scheduled to occur on June 30, 2022, at which point, if not otherwise extended, the outstanding principal balance, all accrued and unpaid interest and all other costs and fees set forth in the Loan Documents (as such term is defined in the June 2, 2022 correspondence) with respect to each of the Loans shall be due and payable in full.

Borrower and Guarantors have requested that Bank extend the Revolving Credit Maturity Date to August 15, 2022. Bank is willing to extend the Revolving Credit Maturity date and to amend the Loan Agreement pursuant to the terms and conditions set forth in this letter agreement (this "**Agreement**"). This letter, when executed as indicated below, shall constitute the agreement by and among Borrower, Guarantor and Bank regarding the matters set forth herein.

1.    **Modified Definitions**. The following definitions in Section 1.01 of the Loan Agreement are hereby amended to read as follows:

"**Interest Payment Date**" means the first Business Day of each month.

"**Line of Credit/Term Loan Conversion Date**" means August 15, 2022, or such later date as agreed to by Bank in writing, without there being any obligation on the part of the Bank to extend the Line of Credit/Term Loan Conversion Date.

"**Line of Credit/Term Loan Drawdown Period**" means the period of time commencing on the Closing Date and ending effective June 15, 2022.

"**Revolving Credit Maturity Date**" means August 15, 2022, or such later date as agreed to by Bank in writing, without there being any obligation on the part of the Bank to extend the Revolving Credit Maturity Date.

2.    **Drawdown**.    Borrower acknowledges that it is no longer permitted to borrow further Line of Credit/Term Loans and Bank is not obligated to and shall not make additional Line of Credit/Term Loans to Borrower.

3.    **Interest Rates/Payment of Interest**.  All Loans shall be converted to Fixed Rate Loans effective July 1, 2022 and to that end the following sections of the Loan Agreement are hereby deleted in their entirety and amended to read as follows:

"**Section 2.01(b)** Each Revolving Credit Loan shall be a Fixed Rate Loan.

"**Section 2.02 Notice of Revolving Credit Loans**. The Borrower shall give the Bank irrevocable written notice at least one (1) Business Day prior to each Revolving Credit Loan. If a notice of borrowing is received by Bank after 12 p.m. on a Business Day, such notice shall be deemed to have been given on the next succeeding Business Day.

"**Section 2.04. Payment of Interest on Revolving Credit Note.** In the case of a Revolving Credit Loan, interest shall be payable at a rate per annum equal to 3.60% per annum and shall be computed on the basis of the actual number of days elapsed over a year of 360 days. Such interest shall be payable on the first day of each month and on the Revolving Credit Maturity Date.

"**Section 2.08(a)** The Borrower shall have the right at any time and from time to time, subject to the provisions of this Agreement, to prepay any Revolving Credit Loan, in whole or in part, provided, however, that each such prepayment shall be on a Business Day and shall be in an aggregate principal amount which is in the minimum amount of $100,000.00 and in increased integral multiples of $50,000.00.

"**Section 2.13. Payment of Interest on the Term Loan Note and the Line of Credit/Term Loan Note.** In the case of the Term Loan and the Line of Credit/Term Loan, interest shall be payable at a rate per annum equal to 3.60% per annum and shall be computed on the basis of the actual number of days elapsed over a year of 360 days. Interest on the Term Loan shall be payable as set forth in Section 2.12. Interest on the Line of Credit/Term Loan shall be payable on the first day of each month.

      4.    **Other LIBOR References**. Sentences in Sections 2.08, 2.09(a), 2.09(b) and 2.16(d) of the Loan Agreement referencing "LIBOR Rate Loan" or "LIBOR Rate Loans" are hereby deleted. Sections 2.16(a), 2.21, 2.24, 2.25, and 2.26 of the Loan Agreement, no longer have force or effect but shall continue to exist solely for historical and reference purposes and to the extent there are any indemnification or other obligations owed to Bank arising therefrom. The definitions of "Interest Determination Date", "Interest Period", "LIBOR Alternative Source", "LIBOR Rate", "LIBOR Rate Loan", and "LIBOR Successor Rate", as set forth in Section 1.10 of the Loan Agreement, no longer have force or effect but shall continue to exist solely for historical and reference purposes and to the extent there are any indemnification or other obligations owed to Bank arising therefrom.

      5.    **Acknowledgment of Defaults; No Waiver**. Borrower and Guarantors hereby acknowledge the existence and occurrence of the Existing Events of Default, and that nothing contained herein shall be deemed a waiver of, or forbearance with regard to, any such Existing Events of Default and Bank reserves all of its right and remedies under the Loan Documents, applicable law or otherwise, with regard thereto.

      6.    **Acknowledgment of Collateral**. Borrower and Guarantors hereby represent, warrant, acknowledge, confirm and agree that, in addition to all other Collateral set forth in the Loan Documents, Bank Indebtedness is and shall continue to be secured by the following security documents: a) the Security Agreement, b) the Bond Pledge Agreement, and c) the Guaranties. Borrower and Guarantors further represent, warrant, acknowledge and confirm that Bank's liens on the Collateral, and all interests in the Collateral which have been assigned to Bank, have been perfected and Bank's interests and liens in the Collateral are valid and effective, and are not subject to any defenses.

      7.    **Binding Effect of Documents**. Borrower and Guarantors hereby acknowledge, ratify, confirm and agree that: (a) each of the Loan Documents to which it is a party has been duly

executed and delivered to Bank by Borrower and Guarantors, as applicable, and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Borrower and Guarantors contained in such documents and in this Agreement constitute the legal, valid and binding obligations of Borrower and Guarantors, enforceable against them in accordance with their respective terms, and neither Borrower nor any Guarantor has any valid defense to the enforcement of such obligations and the Loan Documents or any claims or counterclaims against Bank, and (c) Bank is and shall be entitled to the rights, remedies and benefits provided for in this Agreement, the Loan Documents and applicable law.

8.      **No Waiver or Course of Dealing**.  Each Guarantor and the Borrower does hereby acknowledge and agree that effective as of the date hereof any waiver or implied waiver by Bank of any obligation or covenant of Borrower, Guarantors, or any of them, under the Loan Agreement and other Loan Documents is expressly terminated and rescinded  and that each Guarantor and the Borrower is obligated to, and is expected by Bank to, strictly perform and comply with all of such obligations and covenants as provided in the Loan Agreement and other Loan Documents.

9.      **Conditions Precedent**.  This Agreement shall become effective upon receipt by Bank of this Agreement, duly executed on behalf of Borrower and all Guarantors.

10.     **Representation, Warranties and Statements**.    Borrower and Guarantors represent and warrant to Bank that as of the date hereof, (i) the representations, warranties and statements of set forth in the Loan Documents are true and correct as if made on this date (except to the extent such representations and warranties expressly refer to an earlier date), (ii) there have been no liens, encumbrances, security interests, or claims filed against or created in any of the collateral or other assets of the Borrower other than liens in favor of Bank, other than any Permitted Liens, and (iii) no defaults exist under the Loan Agreement other than the Existing Events of Default.

11.     **Release**.  Borrower and each Guarantor hereby fully, finally and forever acquits, quitclaims, releases and discharges Bank and its officers, directors, employees, agents, successors and assigns of and from any and all obligations, claims, liabilities, damages, demands, or causes of action to, of or for the benefit (whether directly or indirectly) of Borrower or any Guarantor at law or in equity, known or unknown, contingent or otherwise, statutory, in contract or in tort, as well as any other kind or character of action now held, owned or possessed by Borrower or any Guarantor on account of, arising out of, related to or concerning, whether directly or indirectly, proximately or remotely, to the Loan, Loan Agreement, or other Loan Documents.

12.     **No Other Amendments**.  Except as expressly modified hereby, all terms and conditions of the Loan Agreement and the other Loan Documents shall remain unmodified and in full force and effect.

13.     **Counterparts**.  This Agreement and the following pages may be executed in counterparts, but all such counterparts shall together constitute one and the same agreement.

If acceptable to the Borrower and Guarantors please have this Agreement signed by no later than June 30, 2022.

INVESTORS BANK, a division of CITIZENS BANK, N.A.,

*Erin Kane*

By:_____
        **ERIN KANE**

5379806v.5

Each of the undersigned, intending to be legally bound, do hereby consent and agree to the above terms and conditions of this Agreement this _____ day of June, 2022.

**BORROWER**

**NOSTRUM LABORATORIES, INC.**

By:_____
        NIRMAL MULYE, Ph.D.
        President and CEO

**GUARANTORS**

**NOSTRUM PHARMACEUTICAL LLC**

By:_____
        NIRMAL MULYE, Ph.D., President

_____
**NIRMAL MULYE, Ph.D., Individually**

5379806v.5

# EXHIBIT E



Stradley Ronon Stevens & Young, LLP

2005 Market Street

Suite 2600

Philadelphia, PA 19103

Telephone 215.564.8000

Fax 215.564.8120

www.stradley.com

**Julie M. Murphy**

Partner

jmmurphy@stradley.com
856.321.2409

October 20, 2022

## VIA OVERNIGHT COURIER AND E-MAIL

Nostrum Laboratories, Inc.          Nirmal Mulye
9 Veronica Avenue                    1000 Biscayne Blvd
Somerset, New Jersey 08873           Miami, FL 33132
Attn: Nirmal Mulye

Nostrum Pharmaceuticals, LLC
9 Veronica Avenue
Somerset, New Jersey 08873
Attn: Nirmal Mulye

      **Re:**    Loan Agreement by and between Nostrum Laboratories, Inc. ("**Borrower**"), Nirmal Mulye ("**Individual Guarantor**"), Nostrum Pharmaceuticals, LLC ("**Corporate Guarantor**", and together with Individual Guarantor, the "**Guarantors**") and Investors Bank, a division of Citizens Bank, N.A., ("**Bank**"") dated as of December 31, 2020 (as the same has been amended, modified, supplemented and/or restated from time to time, the "**Loan Agreement**") **Notice of Additional Event of Default, Setoff and Reservation of Rights**

Dear Mr. Muyle:

As you know, this firm represents Bank in connection with the Loan Agreement. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Loan Agreement.

Reference is made herein to that certain Letter Agreement between Bank, Borrower and Guarantors, dated as of June 30, 2022 (the "**Letter Agreement**"). Pursuant to the Letter Agreement, the Revolving Credit Maturity Date was extended to August 15, 2022, whereupon the outstanding principal balance, all accrued and unpaid interest and all other costs and fees set forth in the Loan Documents became due and payable in full. To date, Borrower and Guarantors have failed to pay the Loans in full, which constitutes an additional Event of Default under the Loan Agreement (the "**Maturity Default**").

Philadelphia, PA • Malvern, PA • Cherry Hill, NJ • Wilmington, DE • Washington, DC • New York, NY • Chicago, IL
A Pennsylvania Limited Liability Partnership

MERITAS LAW FIRMS WORLDWIDE

5505671v.1

Pursuant to, among other things, our correspondence dated June 2, 2022, other Events of Default have also occurred and are continuing under the Loan Documents as a result of (a) failure of the Borrower to satisfy the minimum required Debt Service Coverage Ratio, Fixed Charge Coverage Ratio and Total Funded Debt to EBITDA ratio as of the fiscal year ending December 31, 2021, in violation of Section 5.03 of the Loan Agreement; (b) failure of Borrower to deliver annual audited financial statements in violation of Section 5.01(b)(i) of the Loan Agreement, (c) failure of Borrower to deliver the semi-annual management prepared consolidated and consolidating financial statements by the Corporate Guarantor for the semi-annual periods ending June 30, 2021 and June 30, 2022, in violation of Section 5.01(b)(iii) of the Loan Agreement, (d) failure of Borrower to deliver a Certificate of No Default and Compliance Certificate in violation of Section 5.01(b)(v) of the Loan Agreement, (e) failure of Borrower to deliver a Borrowing Base Certificate within fifteen (15) days of month end for the month ending August 30, 2022, in violation of Section 5.01(b)(xiii), (f) the existence of a tax lien in favor of the New Jersey Division of Taxation as of March 24, 2022, recorded at DJ 038005-22, TX00456622 in violation of Section 5.02(a), and (g) Borrower's failure to repay the amount by which Aggregate Outstandings exceed the Borrowing Base in accordance with Section 2.08(b) of the Loan Agreement (together with the Maturity default, collectively, the **"Existing Events of Default"**). This letter is not an attempt to enumerate all Defaults or Events of Default that may now be outstanding under the Loan Documents and the failure to include any Default or Event of Default herein shall not be a waiver or any such Default or Event of Default or any of Bank's rights and remedies arising as a result thereof.

Pursuant to Sections 5.01(g) and 7.04 of the Loan Agreement, Borrower is required to reimburse Bank for, among other things, field audits and attorneys' fees in connection with the administration and enforcement of the Loan Agreement. Despite repeated demands therefor, Borrower and Guarantors have failed to reimburse Bank for its field audit and attorneys' fees. As a result, as of the date hereof, Bank will exercise its right of set off under, among other things, Section 7.05 of the Loan Agreement, against Borrower's deposit account to reimburse those fees, incurred as of August 31, 2022, in the amount of $56,727.70.

As a result of the Existing Events of Default Bank may without any further notice or demand, implement the default rate of interest and commence the exercise of other remedies against the Borrower, the Guarantors and/or any of the Collateral, all at Bank's sole discretion, whether under the Loan Documents, the Uniform Commercial Code, at law or in equity. Bank reserves the right to implement the default rate of interest retroactively, without further notice or demand. All such rights, remedies, privileges, powers and claims available to Bank are expressly reserved and preserved in their entirety and may be exercised or pursued at any time and from time to time in the sole and absolute discretion of Bank in accordance with the Loan Agreement and the other Loan Documents. The exercise of any rights or remedies, including the exercise of Bank's right of set off as set forth herein, shall not constitute or be deemed to be a waiver of any other rights, remedies, or claims of Bank or otherwise waive or affect the Existing Events of Default or any other Defaults or Events of Default that may exist or hereafter arise.

The making of any additional Revolving Credit Loans or Line of Credit/Term Loan advances by Bank: (i) shall not constitute a waiver of any past, present or future violation, Default or Event of Default (including, without limitation, the Existing Events of Default) under the Loan Agreement or any of the other Loan Documents; (ii) shall not directly or indirectly, in

any way whatsoever, impair, prejudice, or otherwise adversely affect Bank's right at any time to exercise any right, privilege, or remedy in connection with the Loan Agreement or any other Loan Document; (iii) shall not amend or alter the provisions of the Loan Agreement or any other Loan Document; and (iv) shall not constitute a course of dealing or other basis for altering any obligation of Borrower or any right, privilege, claim, or remedy of Bank under the Loan Agreement or any other Loan Document.

No action or inaction on Bank's part will operate as a forbearance of any kind or a waiver of any right, power or remedy of Bank, nor constitute a waiver of any other provision of, or default or Event of Default currently existing under, the Loan Agreement or any other Loan Document, including the Existing Events of Default. Further, Bank's reservation of its rights, claims and remedies shall not impair Bank's abilities under the Loan Agreement or other Loan Documents to elect at any time to enforce any additional right, claim or remedy provided under the Loan Agreement or other Loan Documents or at law or in equity.

As of the date of this letter, there are no offers outstanding from Bank to the Borrower nor are there any oral agreements among Bank and the Borrower concerning the obligations of Borrower and Guarantors to Bank or the Loan Documents. Rather, all agreements concerning such obligations are expressed only in the existing Loan Documents, and the respective duties and obligations of the Borrower and Bank shall be only as set forth in the Loan Documents. While Bank has been negotiating the terms of a potential forbearance agreement with Borrower and Guarantors, no agreement has been reached on the terms thereof and, notwithstanding such negotiations, Bank has no obligation to forbear from exercising its rights and remedies under the Loan Documents, at law and/or in equity absent a forbearance agreement in form and substance acceptable to, and executed by, an authorized officer of Bank.

Borrower and Guarantors are responsible for the payment of all costs and expenses incurred by Bank including, without limitation, fees and disbursements of legal counsel in connection with the Existing Events of Default and Bank's exercise of rights and remedies, which shall be payable on demand.

Respectfully,

Julie M. Murphy

cc:    Erin Kane (via email)
       Julie M. Murphy, Esq.
       Law Offices of Carlton R. Asher, Jr.
       110 E. 59th St., Suite 2200
       New York, NY 10022
       Attention: Carlton R. Asher, Jr. (by overnight mail and email)

UPS CampusShip: View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
926 HADDONFIELD RD
CHERRY HILL ,NJ 08002

UPS Access Point™
ADVANCE AUTO PARTS STORE 8898
54 HADDONFIELD RD
CHERRY HILL ,NJ 08002

UPS Access Point™
CVS STORE # 764
18 W MAPLE AVE
MERCHANTVILLE ,NJ 08109

FOLD HERE



UPS CampusShip: View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.**  Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.**  Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | ADVANCE AUTO PARTS STORE 8898 | CVS STORE # 764 |
| 926 HADDONFIELD RD | 54 HADDONFIELD RD | 18 W MAPLE AVE |
| CHERRY HILL ,NJ 08002 | CHERRY HILL ,NJ 08002 | MERCHANTVILLE ,NJ 08109 |

FOLD HERE



UPS CampusShip: View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.**   Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.**   Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
| THE UPS STORE | ADVANCE AUTO PARTS STORE 8898 | CVS STORE # 764 |
| 926 HADDONFIELD RD | 54 HADDONFIELD RD | 18 W MAPLE AVE |
| CHERRY HILL ,NJ 08002 | CHERRY HILL ,NJ 08002 | MERCHANTVILLE ,NJ 08109 |

FOLD HERE



UPS CampusShip: View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.**  Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.**  Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

| UPS Access Point™ | UPS Access Point™ | UPS Access Point™ |
|---|---|---|
| THE UPS STORE | ADVANCE AUTO PARTS STORE 8898 | CVS STORE # 764 |
| 926 HADDONFIELD RD | 54 HADDONFIELD RD | 18 W MAPLE AVE |
| CHERRY HILL ,NJ 08002 | CHERRY HILL ,NJ 08002 | MERCHANTVILLE ,NJ 08109 |

FOLD HERE



# EXHIBIT F

EXECUTION VERSION

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (the "**Agreement**") is made this 31st day of October, 2022 (the "**Effective Date**"), by and among NOSTRUM LABORATORIES, INC., a New Jersey corporation with an address of 9 Veronica Avenue, Somerset, New Jersey (the "**Borrower**"), NOSTRUM PHARMACEUTICAL LLC, a Delaware limited liability company with an address of 9 Veronica Avenue, Somerset, New Jersey ("**Pharmaceutical**"), NIRMAL MULYE, an individual with an address of 1000 Biscayne Blvd., Miami Florida ("**Mulye**", and together with Pharmaceutical, the "**Guarantors**", and together with Borrower, each an "**Obligor**", together, collectively, the "**Obligors**") and Investors Bank, a division of Citizens Bank, N.A. (the "**Bank**").

**REFERENCES TO CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED SHALL HAVE THE MEANING SET FORTH IN SECTION 1 HEREOF.**

## BACKGROUND

A.    Pursuant to that certain Loan Agreement by and between Borrower, Guarantors and Bank dated as of December 31, 2020 (as the same has been amended, modified, supplemented and/or restated from time to time, including without limitation by that certain Letter Agreement by and between Obligors and Bank dated June 30, 2022, the "**Loan Agreement**"), Bank agreed to extend to Borrower three credit facilities: (1) that certain Line of Credit/Term Loan in the maximum principal amount of Five Million Dollars ($5,000,000) (the "**Line/Term Loan**"), (b) that certain Revolving Credit Loan in the maximum amount of Twelve Million Dollars ($12,000,000) (the "**RLOC**"), and (c) that certain Term Loan in the original principal amount of Five Million Dollars ($5,000,000) (the "**Term Loan**", and together with the Line/Term Loan and the RLOC, the "**Loans**").

B.    The Borrower's obligations to Bank under the Loan Agreement are evidenced by, among other things, (1) that certain Line of Credit/Term Loan Note by Borrower to Bank, dated as of December 31, 2020, in the maximum amount of $5,000,000 (as the same has been amended, modified, supplemented and/or restated from time to time, the "**Line/Term Note**"), (2) that certain Revolving Credit Note by Borrower to Bank, dated as of December 31, 2020, in the maximum principal amount of $12,000,000 (as the same has been amended, modified, supplemented and/or restated from time to time, the "**RLOC Note**"), and (c) that certain Term Loan Note by Borrower to Bank, dated as of December 31, 2020, in the original principal amount of $5,000,000 (the "**Term Note**", and together with the Line/Term Note and the RLOC Note, the "**Notes**").

C.    The obligations of the Borrower to the Bank under the Loan Agreement and the Notes are secured by, among other things, (a) that certain Security Agreement by Borrower to Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Security Agreement**"), pursuant to which the Borrower granted to the Bank a first priority security interest in and to all of Borrower's Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Goods, Inventory, Equipment, Fixtures and Accessions, Trademarks, Contract Rights, Instruments, Investment

Property, Money, Letters of Credit, Supporting Obligations, and products and proceeds thereof (as such terms are defined and are more particularly described in the Security Agreement, the "**Personal Property Collateral**"), which security interest is perfected by virtue of, among other things, the UCC-1 Financing Statement listing Borrower, as debtor, and Bank as secured party, recorded with the New Jersey Department of Treasury at Filing Number 54975457 (together with all amendments and/or continuations thereof, the "**UCC-1**"), (b) that certain Bond Pledge Agreement by and between the Borrower, the Bank and UMB Bank, N.A., as trustee, dated as of June 29, 2021 (as the same may be amended, modified, supplemented and/or restated from time to time, the "**Bond Pledge Agreement**"), pursuant to which Borrower pledged Bond No. 1 (as such term is defined in the Bond Pledge Agreement, the "**Bond Collateral**") to the Bank as security for the obligations under the Loan Documents, (c) that certain Corporate Guaranty Agreement by Corporate Guarantor in favor of the Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Corporate Guaranty**"), (d) that certain Individual Guaranty Agreement by Individual Guarantor in favor of the Bank, dated as of December 31, 2020 (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Individual Guaranty**", and together with the Corporate Guaranty, the "**Guaranties**"), and (e) that certain Fee Subordination Agreement by and between Corporate Guarantor, as Manager, and the Bank, and acknowledged by Borrower (as the same may have been amended, modified, supplemented and/or restated from time to time, the "**Fee Subordination Agreement**", and together with the Loan Agreement, the Notes, the Security Agreement, UCC-1, the Bond Pledge Agreement, the Corporate Guaranty, the Individual Guaranty and any other document executed in connection with or otherwise evidencing the Loans, as the same may be amended, modified, supplemented and/or restated from time to time, the "**Loan Documents**").

D.    As of July 30, 2022, the Aggregate Outstandings exceed the Borrowing Base by $5,430,005.67 (the "**Existing Overadvance**").

E.    Obligors are in default if their obligations under the Loan Documents as a result, *inter alia*, of the following: (a) failure of the Borrower to satisfy the minimum required Debt Service Coverage Ratio, Fixed Charge Coverage Ratio and Total Funded Debt to EBITDA ratio as of the fiscal year ending December 31, 2021, in violation of Section 5.03 of the Loan Agreement; (b) failure of Borrower to deliver annual audited financial statements in violation of Section 5.01(b)(i) of the Loan Agreement, (c) failure of Borrower to deliver the semi-annual management prepared consolidated and consolidating financial statements by the Corporate Guarantor for the semi-annual periods ending June 30, 2021 and June 30, 2022, in violation of Section 5.01(b)(iii) of the Loan Agreement, (d) failure of Borrower to deliver a Certificate of No Default and Compliance Certificate in violation of Section 5.01(b)(v) of the Loan Agreement, (d) failure of Borrower to deliver a Borrowing Base Certificate within fifteen (15) days of month end for the month ending August 30, 2022, in violation of Section 5.01(b)(xiii), (e) the existence of a tax lien in favor of the New Jersey Division of Taxation as of March 24, 2022, recorded at DJ 038005-22, TX00456622 (the "**State Tax Lien**") in violation of Section 5.02(a), (f) Borrower's failure to repay the Existing Overadvance in accordance with Section 2.08(b) of the Loan Agreement, and (g) Borrower's failure to repay the Loans in full on or before the Revolving Credit Maturity Date, which occurred August 15, 2022 (together, collectively, the "**Existing Defaults"**). As a result of the occurrence of the Existing Defaults, Bank may exercise

its rights and remedies against Obligors pursuant to any and all of the Loan Documents and under applicable law.

      F.     At Obligors' request, Bank has agreed to enter into this Agreement, inter alia, to (i) ratify and confirm the respective obligations and liability of Obligors to Bank under the Loan Documents, (ii) reaffirm, ratify and continue Bank's liens on, and security interests in, certain assets of Obligors, and (iii) set forth the terms and conditions under which Bank will forbear from exercising and enforcing the rights available to it under the Loan Documents.

      **NOW, THEREFORE,** in consideration of foregoing premises and intending to be legally bound hereby, the parties hereto agree as follows:

**TERMS**

    1.     **CAPITALIZED TERMS**.  For purposes of this Agreement:

      (a)     **"Bank Indebtedness"** shall have the meaning set forth in **Section 5** below.

      (b)     "**Cash Equivalents**" means any investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof with a maturity date of no more than one (1) year from the date of acquisition, (ii) commercial paper with a duration of not more than three (3) months rated at least A-1 by Standard & Poor's Ratings Service and P-1 by Moody's Investors Services, Inc., which is issued by a Person organized under the laws of any state of the United States or of the District of Columbia, (iii) time deposits, certificates of deposit and banker's acceptances with a duration of not more than three (3) months issued by any office located in the United States of any bank or trust company which is organized under the laws of the United States or any state thereof, or is licensed to conduct a banking business in the United States, and has capital, surplus and undivided profits of at least $500,000,000 and which issues (or the parent of which issues) certificates of deposit or commercial paper with a rating described in clause (ii) above, (iv) repurchase agreements and reverse repurchase agreements with a duration of not more than thirty (30) days with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, or (v) any money market or mutual fund which invests only in the foregoing types of investments, has portfolio assets in excess of $5,000,000,000 and is rated AAA by Standard & Poor's Ratings Service and AAA by Moody's Investors Services, Inc.

      (c)     **"Code"** means the Uniform Commercial Code as adopted in the State of New Jersey as the same may be amended from time to time.

      (d)     **"Collateral"** means all tangible and intangible property of Obligors pledged and/or granted to Bank as security for the Loans including, without limitation, the following: the Personal Property Collateral and the Bond Collateral.

      (e)     "**Default**" shall mean any event, condition or failure to act which with the giving of any required notice or the lapse of time could become an Event of Default.

3

(f)    "**Dilution Reserve**" shall mean seventy-one basis points (0.71%).

(g)    "**Existing Defaults**" shall have the meaning set forth in Background.

(h)    "**Forbearance Documents**" means this Agreement and all other documents executed in connection herewith, as each of the same may be amended, modified, supplemented and/or restated from time to time.

(i)    "**Loan Documents**" means documents included in the definition thereof in the Loan Agreement together with each of the Forbearance Documents.

(j)    All other capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Loan Agreement.

2.    **CONFIRMATION OF BACKGROUND/BINDING EFFECT OF DOCUMENTS**.  Obligors do hereby jointly and severally ratify, confirm and acknowledge that the statements contained in the foregoing Background are true and complete in all respects and that the Loan Documents including, without limitation, the Guaranties, are valid, binding and in full force and effect as of the date hereof and fully enforceable against Obligors and their assets in accordance with the terms thereof.  Guarantors further acknowledge that nothing contained in this Agreement shall be deemed to impair, reduce or release in any manner whatsoever any of the obligations of Guarantors under the Guaranties. *The Obligors acknowledge and agree that any Obligor's failure to comply with any term of this Forbearance Agreement or any of the other Forbearance Documents is and shall be an Event of Default under the Loan Documents. Notwithstanding any provisions in the other Loan Documents to the contrary, the Obligors shall not be entitled to any grace or cure period relative to the covenants and other terms and conditions set forth in the Forbearance Documents.*

3.    **GENERAL ACKNOWLEDGEMENTS**.  Obligors do hereby acknowledge and agree as follows:

(a)    They are currently in default of their obligations under the Loan Documents as a result of the occurrence of the Existing Defaults, and Obligors do hereby fully and finally waive any further notice or demands from Bank to Obligors in connection therewith;

(b)    Neither this Agreement nor any other agreement entered in connection herewith or pursuant to the terms hereof shall be deemed or construed to be a compromise, satisfaction, reinstatement, accord and satisfaction, novation or release of any of the Loan Documents, or any rights or obligations thereunder, or a waiver by Bank of any of its rights under the Loan Documents or at law or in equity;

(c)    As a result of the Existing Defaults, Bank has no further obligation to advance any additional monies under the Loans;

(d)    Except as specifically provided herein, neither this Agreement nor any other agreement executed in connection herewith or pursuant to the terms hereof, nor any actions taken pursuant to this Agreement or such other agreement shall be deemed to cure any of the Existing Defaults or any other Events of Default which may exist under the Loan Documents or

to be a waiver by the Bank of the Existing Defaults or any other existing Defaults or Events of Default under the Loan Documents, or of any rights or remedies in connection therewith or with respect thereto, it being the intention of the parties hereto that the obligations of Obligors with respect to the Loan Documents are and shall remain in full force and effect;

(e)     All liens, security interests, rights and remedies granted to the Bank in the Loan Documents are hereby renewed, confirmed and continued, and shall also secure the performance by Obligors of their respective obligations hereunder; and

(f)     If at any time a payment or payments made by any Obligor on any part of the Bank Indebtedness are subsequently invalidated, declared to be fraudulent or preferential, and are set aside or are required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or payments, the Bank Indebtedness intended to be satisfied shall be revived and continued in full force and effect as if such payment or payments had not been made.

4.     **ACKNOWLEDGEMENT OF SECURITY INTERESTS**.     Obligors acknowledge, confirm and agree that Bank has and shall continue to have, valid, enforceable and perfected first priority security interests in and liens upon the Collateral heretofore granted by any of them to Bank pursuant to the Loan Documents or otherwise granted to or held by Bank and shall also secure the performance by each of them of its respective obligations under this Agreement.  Each Obligor hereby confirms and agrees that (i) all security interests and liens granted to Bank continue in full force and effect and are hereby ratified and confirmed by Obligors, and (ii) all Collateral remains free and clear of any liens, other than liens in favor of Bank or as otherwise expressly permitted by the Loan Documents. Nothing herein is intended to impair or limit the validity, priority and extent of Bank's security interests in and liens upon the Collateral.

5.     **CHALLENGE TO ENFORCEMENT**.  Obligors do acknowledge and agree that it none of them has any defense, set off, counterclaim or challenge against the payment of any sums owing under the Loan Documents, or the enforcement of any of the terms or conditions thereof.

6.     **CONFIRMATION OF EXISTING INDEBTEDNESS**.  Obligors do hereby confirm and acknowledge that as October 24, 2022, the foregoing sums are due and owing:

**Line/Term Loan**

| Principal | $3,250,000.07 |
|---|---|
| Interest (as of 10/24/22) | $6,175.00 |

**RLOC**

| Principal | $12,000,000.00 |
|---|---|
| Interest (as of 10/24/22) | $28,800 |

5377079v.10

**Term Loan**

| Principal | $1,936,961.00 |
|---|---|
| Interest (as of 10/24/22) | $4,648.71 |

The foregoing sums, together with all accrued and unpaid interest thereon (including without limitation PIK Interest (as hereinafter defined), future advances, attorneys' fees and expenses and all other fees, costs and expenses due or to become due under the Forbearance Documents, shall be collectively referred to herein as the **"Bank Indebtedness."**

Obligors do hereby acknowledge and agree that all sums described in this **Section 6** are validly and duly owing to Bank.

7.     **FORBEARANCE**.  Bank hereby agrees to forbear from exercising the rights and remedies available to it as a result of the Existing Defaults, until the earlier of (a) the occurrence of any Default or Event of Default (other than the Existing Defaults) under this Agreement or the other Loan Documents, and (b) December 2, 2022 (such earlier date being the "**Forbearance Expiration Date**").

8.     **FORBEARANCE FEE**.  In addition to the other payments described in this Agreement, the Obligors shall pay Bank a non-refundable forbearance fee of Five Thousand Dollars ($5,000) (the "**Forbearance Fee**"), which Forbearance Fee shall be fully earned and payable on the Effective Date.

9.     **INTEREST RATE**.  From and after the date hereof, interest will accrue on outstanding principal balance of the Loans at a rate equal to Three Hundred Sixty Basis Points (3.60%) per annum (the "**Fixed Rate**").  All Loans shall bear additional interest on the outstanding principal amount of the Loans at a per annum rate equal to fifty basis points (0.50%) (the "**PIK Interest**"), which shall accrue until the Forbearance Expiration Date.  The PIK Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed, by adding such interest to the outstanding principal balance under each of the Loans on the last day of each calendar quarter, and thereafter shall itself accrue interest pursuant to the terms of this Agreement (the "**PIK Interest Payment**").  After the Forbearance Expiration Date, Bank may increase the Fixed Rate of interest to accrue on the outstanding principal balance under the Loans, including the PIK Interest previously and thereafter added to the principal balance of the Loans, by an additional five hundred basis points (5.00%) (the "**Default Rate**") as set forth in Section 2.18(b) of the Loan Agreement.  All such increases may be applied retroactively to the date of the occurrence of the Event of Default giving rise to the Forbearance Termination Date.  PIK Interest will continue to accrue after the Forbearance Expiration Date notwithstanding the Default Rate being in effect.

10.     **MODIFICAITON TO BORROWING BASE; OVERADVANCE**.

(a)     Notwithstanding anything to the contrary in the Loan Agreement or any other Loan Document, during the term of this Agreement, the Borrowing Base shall be calculated as follows:

6

"**Borrowing Base**" means (A) the product of the Dilution Reserve, multiplied by the sum of (i) seventy-five percent (75%) of Borrower's Eligible Accounts Receivable, less (ii) rebates, credits and allowances to account debtors in the form of credit memos or invoices from customers, less (iii) chargebacks accrued with respect to accounts relating to McKesson Corporation, AmerisourceBergen Drug Corporation and Cardinal Health, plus (B) fifty percent (50%) of the Borrower's Eligible Inventory, up to a maximum of fifty percent (50%) of the aggregate Borrowing Base."

(b)     Bank and Obligors acknowledge that, after giving effect to the foregoing Borrowing Base calculation, the Existing Overadvance will be $5,016,323.47.  From and after the date hereof, the Aggregate Outstandings shall not exceed the Borrowing Base, calculated in accordance herewith, by more than $5,500,000, such excess amount being the "**Approved Overadvance**".  Bank agrees that so long as (i) no Default or Event of Default (other than the Existing Defaults) shall have occurred, and (ii) the Approved Overadvance does not increase as set forth in any Borrowing Base Certificate required to be delivered pursuant to the terms hereof or the Loan Documents, the existence of the Approved Overadvance shall not constitute an Event of Default hereunder (the "**Permitted Overadvance**").

11.     **PAYMENTS OF BANK INDEBTEDNESS**.    During the term of this Agreement, Obligors will pay, or cause to be paid, to Bank the following sums:

(a)     On the Effective Date, Obligors shall pay to Bank (i) the Forbearance Fee, and (ii) a sum sufficient to reimburse Bank for all costs, legal fees and disbursements by Bank in connection with the review and enforcement of the Loan Documents, as well as in connection with the preparation, execution and delivery of this Agreement and any other costs reimbursable under the Loan Documents;

(b)     In addition to the payments required hereunder, Obligors shall continue to make payments of the Loans as set forth in the Loan Documents;

(c)     All Bank Indebtedness shall be paid indefeasibly in full on or before the Forbearance Expiration Date, including, without limitation, the PIK Interest Payment.

12.     **ADDITIONAL COVENANTS**.  In addition to all of the covenants contained in the Loan Documents, during the term of this Agreement and so long as the Bank Indebtedness is outstanding, Obligors will comply with the following:

(a)     **Consultant.**  Borrower shall engage and retain a management consultant (the "**Consultant**") acceptable to Bank in Bank's sole and absolute discretion, to assist the Borrower in, *inter alia*, evaluating its financial condition and operations, reviewing Borrower's cash flow budget, preparing a strategic business report and plan for Borrower.  Borrower agrees to the following related to the engagement of the Consultant:

(i)     On or before November 4, 2022, Obligors shall furnish to Bank an engagement letter for the Consultant, which engagement letter shall be acceptable to Bank in its

5377079v.10

sole discretion including with respect to the identity and qualifications of the Consultant and scope of services to be performed by such Consultant;

(ii)    On or before November 28, 2022, Obligors shall furnish to Bank a strategic business report prepared with the assistance of and reviewed by the Consultant, and in form satisfactory to the Bank in its sole discretion, which report shall include a cash flow budget for Borrower for the remainder of the 2022 calendar year based on facts and assumptions which Obligors and the Consultant believe to be reasonable, and recommendations regarding Borrower's business operations;

(iii)    Obligors shall work with the Consultant to provide the weekly and monthly financial reporting as set forth in **Section 12(b)** hereof, including the Cash Flow Projections (as hereinafter defined); and

(iv)    Borrower shall and does hereby authorize the Consultant to (A) share with Bank all budgets, records, projections, financial information, reports and other information relating to the operations, financial condition, taxes, reorganization, financing, capital raise, litigation and any other business issues as requested by Bank in its sole discretion, (B) make itself available to Bank as requested by Bank from time to time, to have open discussions with and to share with Bank any of the information described in the foregoing clause, information regarding the consulting services provided to Borrower and any other information concerning Borrower, its financial condition, assets, liabilities, prospects, operations or otherwise.

(b)    **Financial Reporting**

(i)    Beginning on November 15, 2022, and continuing on November 30, 2022, and each of the 15th and last day of each calendar month thereafter, Obligors shall provide to Bank 13-week cash flow projections (the "**Cash Flow Projections**"), together with a report comparing the actual results for the prior two-week period to the corresponding period in the Cash Flow Projections and accompanied by a brief explanation of any negative variance. The Cash Flow Projections shall be prepared by Obligors in consultation with the Consultant based on assumptions which Borrower and Consultant believe to be reasonable setting forth, among other things, sales, receipts, disbursements and such line-item detail as satisfactory to Bank for each period therein.

(ii)    As soon as practicable and in any event on or before the thirtieth day following each calendar month, beginning with the month ending October 31, 2022, Borrower shall furnish (or cause to be furnished) to Bank the following financial reports, which shall be prepared by Borrower in consultation with, and reviewed by, the Consultant, and delivered in form satisfactory to Bank in its sole discretion:

(A)    A monthly financial statement of Borrower including, statements of cash flow, income, retained earnings, and profit and loss and surplus for the preceding month;

(B)    a balance sheet as of the end of the preceding month; and

        (C)        a covenant compliance certificates in the form attached hereto as **<u>Exhibit A</u>** and attaching evidence satisfactory to the Bank in its sole discretion that demonstrate Borrower's compliance with the financial covenant set forth in **<u>Section 12(c)</u>** of this Agreement, which shall be accompanied by account statements or other evidence acceptable to the Bank in its sole discretion to evidence the represented cash and Cash Equivalents asserted therein, the truth and accuracy of which shall be certified by the Borrower President, Chief Financial Officer or Vice President.

Provided, however, that the foregoing deliverables for the month ending September 30, 2022, deliverable on or before October 31, 2022, need not be prepared in consultation with or reviewed by the Consultant.

        (c)        **<u>Financial Covenants</u>**.  The financial covenants set forth in Section 5.03 of the Loan Agreement are suspended for the duration of the term of this Agreement.  During the term of this Agreement, Borrower shall adhere to the following financial covenant:

        (i)        **<u>Monthly Minimum Liquidity</u>** Borrower shall maintain liquid assets consisting of unrestricted cash and Cash Equivalents of Borrower that are free and clear of any pledge, security interest, lien, claim or other encumbrance (other than in favor of Bank) an amount equal to or greater than $50,000.00 as of the end of each calendar month.

        (d)        **<u>Other Reporting</u>**.  On a monthly basis when Obligors deliver the items required by **<u>Section 12(b)(ii)</u>** of this Agreement, Obligors shall provide to Bank a written update of the status of discussions with Medicaid regarding its claim, including any offers to settle, discount, or pay the same, and including any threats by Medicaid to institute litigation or other sanctions against Borrower.

        (e)        **<u>Warehouseman's Release and Waiver Agreement</u>**. On or before November 8, 2022, Borrower shall deliver to Bank a fully executed Warehouseman's Release and Waiver Agreement acceptable to Bank in its sole discretion, the form of which is attached hereto as **<u>Exhibit B</u>**, from Eversana Life Science Services, LLC ("**Eversana**") for the storage of Borrower's inventory at Eversana's warehouse in Memphis, Tennessee.

        (f)        **<u>Additional Indebtedness</u>**.

        (i)        Attached hereto as Schedule 12(f)(i) is a true, correct and complete listing of all presently existing indebtedness of each Obligor, including the identity of the creditor, the current payment schedule and the current amount outstanding in connection therewith (the "**Additional Indebtedness**").

        (ii)        On or before November 4, 2022, Borrower will provide to Bank a Schedule 12(f)(ii), setting forth a true, correct and complete listing of all liens presently existing encumbering any assets (whether real or personal property) of each Obligor, including the identity of the creditor, the current payment schedule, the assets encumbered and the current

5377079v.10

amount outstanding in connection therewith (the "**Existing Liens**").

(iii)    Except as otherwise set forth in Schedule 12(f)(i), Obligors represent and warrant that (A) they are current with respect to all Additional Indebtedness, and (B) no default or event of default exists with respect to any Additional Indebtedness.

(iv)    Notwithstanding anything to the contrary in any Loan Document, each Obligor acknowledges and agrees that none of them shall incur any indebtedness, whether direct or indirect, other than (A) trade debt incurred in the ordinary course of business, (B) the Bank Indebtedness, and (C) the Additional Indebtedness.

(v)    Notwithstanding anything to the contrary in any Loan Document, each Obligor acknowledges and agrees that none of them shall create, incur or permit to exist any mortgage, pledge, encumbrance, lien, security interest or charge of any kind (including liens or charges upon properties acquired or to be acquired under conditional sales agreements or other title retention devices) on its property or assets, whether now owned or hereafter acquired, or upon any income, profits or proceeds therefrom, other than (A) liens in favor of Bank and (B) the Existing Liens.

(vi)    Notwithstanding anything to the contrary in any Loan Document, each Obligor acknowledges and agrees that, other than sale of inventory in the ordinary course of business, none of them shall sell, pledge, transfer or encumber any of such Obligors' assets, including without limitation Abbreviated New Drug Applications and Drug Master Files, without Bank's prior written consent.  With respect to the sale of Abbreviated New Drug Applications and Drug Master Files only, the Bank's consent shall not be unreasonably withheld or delayed.

13.    **CROSS DEFAULT**.  Notwithstanding anything to the contrary contained in the Loan Documents, the occurrence of an Event of Default or Default hereunder or under any of the Forbearance Documents shall constitute an Event of Default and Default under each of the Forbearance Documents and, following the occurrence of any such Event of Default or Default, Bank may, at Bank's option and without further notice to Obligors, exercise any and all rights available to Bank under any of the Loan Documents, at law, in equity or otherwise.

14.    **CONDITIONS**.    Without in any manner limiting the other requirements contained herein, Bank's agreement to forbear contained herein is expressly contingent upon satisfaction, as determined by Bank, of each of the following:

(a)    Receipt by Bank of this Agreement, fully executed and duly delivered by each Obligor;

(b)    Receipt by Bank of the Forbearance Fee and reimbursement of all bank expenses required pursuant to **Section 11(a)** of this Agreement;

(c)    Receipt by Bank of a Borrowing Base Certificate for the months ending August 30, 2022 and September 30, 2022, utilizing the revised definition of Borrowing Base set forth herein;

5377079v.10

(d)     Other than the Existing Defaults, there shall have occurred no Event of Default or event, which with the giving of notice or passage of time, or both, would constitute an Event of Default hereunder or under any of the Loan Documents;

(e)     Receipt by Bank of the driver's license of Nirmal Mulye;

(f)     Receipt by Bank of Borrower's agreement with Eversana for the storage of Borrower's inventory at Eversana's warehouse and other services provided by Eversana to Borrower;

(g)     Receipt by Bank of a Compliance Certificate, in the form attached hereto as **Exhibit A**, with account statements or other evidence satisfactory to Bank in its sole discretion, demonstrating Borrower's compliance with the covenant set forth in Section 12(c) hereof;

(h)     Bank shall have received a certificate of an authorized officer of Borrower and Pharmaceuticals delivering true, accurate and complete versions of (i) its certificate/articles of incorporation or organization (including any certificates of designation) and its by-laws or operating agreement (or a certification of no change, as applicable), (ii) the resolutions authorizing its execution, delivery and full performance of this Agreement and all other documents, certificates and actions required hereunder or in connection herewith, (iii) an incumbency certificate setting forth its officers (together with the corresponding signatures), and (iv) a good standing certificate (issued within 10 calendar days before the date hereof) with respect to the jurisdiction of formation for each of Borrower and Pharmaceuticals and where each of Borrower and Pharmaceuticals is qualified to conduct business under Applicable Law; and

(i)     Such other documentation as required by Bank in its sole and absolute discretion.

15.     **ADDITIONAL DOCUMENTS AND FUTURE ACTIONS**.  Obligors will, at their sole cost, take such actions and provide Bank from time to time with such agreements, financing statements and additional instruments, documents or information as Bank may in its discretion deem necessary or advisable to perfect, protect, maintain or enforce the security interests in the Collateral, to permit Bank to protect or enforce its interest in the Collateral, or to carry out the terms of the Forbearance Documents.  Obligors hereby authorize and appoint Bank as their attorney in fact, with full power of substitution, to take such actions as Bank may deem advisable to protect the Collateral and its interests thereon and its rights hereunder, to execute on Obligors' behalf and file at Obligors' expense financing statements, and amendments thereto, in those public offices deemed necessary or appropriate by Bank to establish, maintain and protect a continuously perfected security interest in the Collateral, and to execute on Obligors' behalf such other documents and notices as Bank may deem advisable to protect the Collateral and its interests therein and its rights hereunder.  Such power being coupled with an interest is irrevocable.  Obligors irrevocably authorize the filing of a carbon, photographic or other copy of this Agreement, or of a financing statement, as a financing statement and agree that such filing is sufficient as a financing statement.

16.    **REPRESENTATIONS AND WARRANTIES**.    In consideration of the forbearance extended herein by Bank, Obligors do hereby represent and warrant, as applicable, which representations and warranties shall survive until all Bank Indebtedness and all other obligations of the Obligors to Bank are paid and satisfied in full, as follows:

(a)    Except with respect to the Existing Defaults, all representations and warranties of Obligors set forth in the Loan Documents are true and complete as of the date hereof.

(b)    Other than the Existing Defaults, no condition or event exists or has occurred which would constitute a Default or an Event of Default under the Loan Documents.

(c)    The execution and delivery of this Agreement by Obligors and all documents and agreements to be executed and delivered pursuant to the terms hereof;

(i)    has been duly authorized by all requisite corporate or limited liability company, as applicable, action by Obligors;

(ii)    will not conflict with or result in the breach of or constitute a Default (upon the passage of time, delivery of notice or both) under Obligors' Articles of Incorporation or Certificate of Formation, as applicable, or By Laws or Operating Agreement, as applicable or any applicable statute, law, rule, regulation or ordinance or any indenture, mortgage, loan or other document or agreement to which any Obligor is a party or by which any of them is bound or affected; or

(iii)    will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of any Obligor, except liens in favor of the Bank or as permitted hereunder or under the Loan Documents.

17.    **CERTAIN FEES, COSTS, EXPENSES AND EXPENDITURES**.    Obligors will pay all of the Bank's expenses in connection with the review, preparation, negotiation, documentation and closing of this Agreement and the consummation of the transactions contemplated hereunder, including without limitation, fees, disbursements, expenses, appraisal costs and fees and reasonable expenses of counsel retained by Bank and all fees related to filings, recording of documents and searches, whether or not the transactions contemplated hereunder are consummated.  Nothing contained herein shall limit in any manner whatsoever Bank's right to reimbursement under any of the Forbearance Documents.

18.    **EVENTS OF DEFAULT**.    Occurrence of any one or more of the following shall constitute an Event of Default hereunder and under each of the Loan Documents:

(a)    The failure of any Obligor to comply with the terms of any of the Forbearance Documents; or

(b)    An Event of Default under the other Loan Documents; or

5377079v.10

(c)    All or any part of the Collateral or any other assets of Obligors are attached, seized, subjected to a writ or distress warrant, or levied upon, or come within the possession or control of a receiver, trustee, custodian or assignee for the benefit of creditors.

Notwithstanding the foregoing, in no event shall the Existing Defaults constitute an Event of Default hereunder.  Bank agrees to endeavor to give Obligors notice of a default or Event of Default; Obligors confirm, acknowledge and agree that (i) the agreement by Bank to give such notice does not entitle any Obligor to any grace or cure period with respect to such default or Event of Default, (ii) failure of Bank to give such notice shall not prejudice the Bank's rights and remedies hereunder or under any of the Loan Documents, at law or in equity, and (iii) the failure of Bank to give such notice shall not form the basis of any defense, claim or cause of action against the Bank or in connection with this Agreement, the Loan Documents, at law or in equity, all of which are hereby waived.

19.    **REMEDIES**.  At the option of Bank, upon the expiration or earlier termination of the forbearance period provided herein, and without further notice or demand, which notice and demand is expressly waived by Obligors, (a) the entire outstanding Bank Indebtedness shall be immediately due and payable; and/or (b) Bank may (i) terminate its obligation to forbear hereunder; and (ii) exercise each and every right and remedy under the Forbearance Documents, at law, in equity or otherwise.

20.    **RELEASE AND INDEMNIFICATION**.  In order to induce Bank to enter into this Agreement, Obligors do hereby agree as follows:

(a)    **Release**.  Obligors hereby fully, finally and forever acquits, quitclaims, releases and discharges Bank and its officers, directors, employees, agents, successors and assigns of and from any and all obligations, claims, liabilities, damages, demands, debts, liens, deficiencies or cause or causes of action to, of or for the benefit (whether directly or indirectly) of Obligors, at law or in equity, known or unknown, contingent or otherwise, whether asserted or unasserted, whether now known or hereafter discovered, whether statutory, in contract or in tort, as well as any other kind or character of action now held, owned or possessed (whether directly or indirectly) by Obligors on account of, arising out of, related to or concerning, whether directly or indirectly, proximately or remotely (i) the negotiation, review, preparation or documentation of the Loan Documents or any other documents or agreements executed in connection therewith, (ii) the administration of the Loan Documents; (iii) the enforcement, protection or preservation of Bank's rights under the Loan Documents, or any other documents or agreements executed in connection therewith, and/or (iv) any action or inaction by Bank in connection with any such documents, instruments and agreements (the **"Released Claims"**).

(b)    **Covenant Not to Litigate**.  In addition to the release contained in **Subsection 20(a)** above, and not in limitation thereof, Obligors do hereby agree that they will never prosecute, nor voluntarily aid in the prosecution of, any action or proceeding relating to the Released Claims, whether by claim, counterclaim or otherwise.

(c)    **Transfer of Claims**.  If, and to the extent that, any of the Released Claims are, for any reason whatsoever, not fully, finally and forever released and discharged pursuant to the terms of **Subsection 20(a)** above, Obligors do hereby absolutely and unconditionally grant,

13

5377079v.10

sell, bargain, transfer, assign and convey to Bank all of the Released Claims and any proceeds, settlements and distributions relating thereto.

(d)    **Indemnification**.    Obligors expressly agree to indemnify and hold harmless Bank and its officers, directors, employees, agents, successors and assigns, of and from any and all obligations, losses, claims, damages, liabilities, demands, debts, liens, costs and expenses of Bank and/or its officers, directors, employees, agents, successors and assigns that may be asserted by, or may arise out of, whether directly or indirectly, proximately or remotely, any investigation, litigation, or other proceedings initiated, undertaken or joined in by Obligors or any other third party (including, without limitation, any employee, agent, personal representative, heir, executor, successor or assign of any Obligor) (together, the "**Indemnitees**") in connection with (i) the negotiation, review, preparation or documentation of the Loan Documents or any other documents or agreements executed in connection with the Bank Indebtedness, or any of them, (ii) the administration of the Loan Documents; (iii) the enforcement, protection or preservation of Bank's rights under the Loan Documents or any other documents or agreements executed in connection with the Bank Indebtedness, or any of them, (iv) the validity, perfection or enforceability of the Loan Documents, and/or (v) any action or inaction by Bank in connection with any of the foregoing (together, "**Claims**"); provided, however, that no Obligor shall be required to indemnify the Indemnitees for Claims found by final order of a court of competent jurisdiction to have been caused by the willful misconduct or gross negligence of the Indemnitees.

Obligors acknowledge that the foregoing is intended to be a general release with respect to the matters described therein.  Obligors do hereby expressly acknowledge and agree that the waivers and releases contained in this Agreement shall not be construed as an admission of and/or the existence of any claims of Obligors, or any of them, against Bank.  Obligors do further acknowledge that, to the extent that any such claims may exist, they are of a speculative nature so as to be incapable of objective valuation and that, to the extent that any such claims may exist and may have value, such value would constitute primarily "nuisance" value or "leverage" value in adversarial proceedings between Obligors, or any of them, and Bank.  In any event, Obligors do hereby acknowledge and agree that the value to Obligors of this Agreement and of the covenants and agreements on the part of Bank contained in this Agreement substantially and materially exceeds any and all value of any kind or nature whatsoever of any claims or liabilities waived or released by Obligors hereunder.

21.    **NO COURSE OF DEALING**.

(a)    **Termination of Waivers**.    Obligors do hereby acknowledge and agree that effective as of the date hereof any waiver or implied waiver by Bank of any obligation or covenant of Obligors, or any of them, under the Loan Documents is expressly terminated and rescinded (except as expressly provided herein to the contrary) and that Obligors are obligated to, and are expected by Bank to, strictly perform and comply with all of such obligations and covenants as provided in the Loan Documents.

(b)    **Future Forbearance**.    Nothing contained herein shall be deemed to obligate Bank to enter into any other forbearance agreements or to waive any Events of Default.

5377079v.10

22.    **COMMUNICATIONS AND NOTICES**.    All notices, requests and other communications made or given in connection with this Agreement or under the Loan Documents shall be made in accordance with the provisions of the Loan Agreement.

23.    **WAIVERS.  In connection with any proceedings hereunder or in connection with any of the Bank Indebtedness, including without limitation any action by Bank in replevin, foreclosure or other court process or in connection with any other action related to the Bank Indebtedness or the transactions contemplated hereunder, each Obligor waives:**

(a)    **all errors, defects and imperfections in such proceedings;**

(b)    **all benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered in connection with the Bank Indebtedness or in any replevin or foreclosure proceeding, or otherwise providing for any valuation, appraisal or exemption;**

(c)    **all rights to inquisition on any real estate, which real estate may be levied upon pursuant to a judgment obtained in connection with any of the Bank Indebtedness and sold upon any writ of execution issued thereon in whole or in part, in any order desired by Bank;**

(d)    **presentment for payment, demand, notice of demand, notice of nonpayment, protest and notice of protest of any of the Bank Indebtedness;**

(e)    **any requirement for bonds, security or sureties required by statute, court rule or otherwise;**

(f)    **any demand for possession of any collateral prior to commencement of any suit;**

(g)    **any right to require or participate in the marshalling of any Obligors' assets; and**

(h)    **all benefits under present and future laws permitting termination of any Guarantor's obligations by delivery of notice or otherwise, other than by performance of all Guarantors' obligations hereunder and under the Guaranties.**

24.    **WAIVER OF RIGHTS UNDER THE CODE.  Each Obligor hereby waives and renounces such Obligor's:**

(a)    **rights under Section 9-611 of the Code to notification of time and place of any public sale or the time after which any private sale or other intended disposition of any collateral is to be made;**

(b)    **rights under Section 9-620 of the Code to notification of Bank's proposal to retain any collateral in satisfaction of the Bank Indebtedness; and**

15

(c)    rights under **Section 9-623** of the Code to redeem any collateral by tendering fulfillment of all obligations secured by such collateral.

Obligors further agree that disposition of any collateral by Bank at any auction performed by a duly licensed auctioneer regularly engaged in the sale by auction is a sale in conformity with reasonably commercial practices and disposition of collateral at such an auction is a commercially reasonable disposition in accordance with Section 9-627 of the Code.

25.    **EXCLUSIVE JURISDICTION**.  Obligors hereby consent to the exclusive jurisdiction of any state or federal court located within the State of New Jersey, and irrevocably agree that, subject to the Bank's election, all actions or proceedings relating to the Forbearance Documents or the transactions contemplated hereunder shall be litigated in such courts, and Obligors waive any objection which they may have based on improper venue or forum non conveniens to the conduct of any proceeding in any such court and waive personal service of any and all process upon them and consent that all such service of process be made by mail or messenger directed to them at the address set forth in **Section 22** for Obligors.  Nothing contained in this **Section 25** shall affect the right of Bank to serve legal process in any other manner permitted by law or affect the right of Bank to bring any action or proceeding against any Obligor or their respective property in the courts of any other jurisdiction.

26.    **CONSENT TO RELIEF FROM THE AUTOMATIC STAY**.  Obligors hereby agree that if, during the forbearance term provided herein, any Obligor shall (i) file, or be the subject of, any bankruptcy petition filed with any bankruptcy court of competent jurisdiction, (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for debtors, (iv) seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator, (v) be the subject of any order, judgment or decree filed against any Obligor for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief  under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, the Bank immediately, and without further action by the Bank, shall be entitled to relief from any automatic stay imposed by section 362 of Title 11 of the U.S. Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of any rights and remedies by the Bank against its collateral and any proceeds thereof which otherwise is available to the Bank under Article 9 of the Code or other applicable state law of any jurisdiction in which any collateral or proceeds may now or hereafter be located.  Obligors hereby irrevocably and unconditionally consent to such immediate relief and agrees to take any and all actions necessary or required of it to entitle the Bank to the relief provided in this **Section 26**.  Obligors' agreement and consent set forth above shall not apply to any case under chapter 11 of Title 11 of the United States Code in which an Obligor is the debtor-in-possession and where Bank is receiving adequate protection (as such term is used under 11 U.S.C. §§ 361, 362, 363 and 364) satisfactory to the Bank in its reasonable discretion; provided, however, that notwithstanding such limitation on the consent set forth in this **Section 26**, such limitation shall not otherwise restrict or limit Bank's rights under this Agreement, the Loan Documents, at law or in equity, including without limitation, to seek relief from the automatic stay pursuant to 11 U.S.C. § 362 or otherwise take any action or seek any relief.

27. **TIME OF ESSENCE**.  Time is of the essence of this Agreement.

28. **INCONSISTENCIES**.  To the extent of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of the Forbearance Documents, the terms and conditions of this Agreement shall prevail.  All terms and conditions of the Forbearance Documents not inconsistent herewith shall remain in full force and effect and are hereby ratified and confirmed by Obligors.

29. **BINDING EFFECT**.  This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

30. **SEVERABILITY**.  The provisions of this Agreement and all other Forbearance Documents are deemed to be severable, and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions which shall continue in full force and effect.

31. **NO THIRD-PARTY BENEFICIARIES**.  The rights and benefits of this Agreement and the Forbearance Documents shall not inure to the benefit of any third party.

32. **MODIFICATIONS**.  No modification of this Agreement or any of the Forbearance Documents shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

33. **HOLIDAYS**.  If the day provided herein for the payment of any amount or the taking of any action falls on a Saturday, Sunday or public holiday at the place for payment or action, then the due date for such payment or action will be the next succeeding business day.

34. **LAW GOVERNING**.  This Agreement has been made, executed and delivered in the State of New Jersey and will be construed in accordance with and governed by the laws of such State.

35. **EXHIBITS AND SCHEDULES**.  All exhibits and schedules attached hereto are hereby made a part of this Agreement.

36. **HEADINGS**.  The headings of the Articles, Sections, paragraphs and clauses of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

37. **COUNTERPARTS**.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed counterparty of a signature page to this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif") will be effective as delivery of a manually executed counterpart hereof.

38. **ENTIRE AGREEMENT**.  This Agreement constitutes the entire agreement among the parties hereto concerning the subject matter set forth herein and supersedes all prior

5377079v.10

or contemporaneous oral and/or written agreements and representations not contained herein concerning the subject matter of this Agreement.

39.    **JOINT AND SEVERAL LIABILITY**.    Obligors hereby acknowledge and confirm that all agreements, covenants, conditions and provisions of this Agreement are and shall be the joint and several obligations of each Obligor.

40.    **WAIVER OF RIGHT TO TRIAL BY JURY. OBLIGORS AND BANK WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF any Obligor WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. OBLIGORS AND BANK AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF OBLIGORS AND BANK TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. OBLIGORS ACKNOWLEDGE THAT THEY HAVE HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT THEY FULLY UNDERSTAND ITS TERMS, CONTENT AND EFFECT, AND THAT THEY VOLUNTARILY AND KNOWINGLY AGREE TO THE TERMS OF THIS SECTION.**

41.    **RESULTS OF NEGOTIATION**.    Obligors acknowledge that they have been represented by counsel in connection with the execution and delivery of this Agreement and that the terms and conditions of this Agreement are the result of negotiation between the parties hereto. Obligors further acknowledge that they have knowingly (a) waived their right to (i) trial by jury; and (ii) certain other rights as set forth in detail in Sections 23, 24, 25 and 26 above, and (b) consented to relief from the automatic stay as set forth in Section 26 above. Obligors acknowledge that such waivers and consents constitute a material inducement for Bank to enter into this Agreement and they have been fully advised of the consequences of such provisions by their counsel.

5377079v.10

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed the day and year first above written.

<u>BORROWER</u>

**NOSTRUM LABORATORIES, INC.**

By: _____

    NIRMAL MULYE, Ph.D.
    Chairman and CEO

<u>GUARANTORS</u>

**NOSTRUM PHARMACEUTICAL LLC**

By: _____

    NIRMAL MULYE, Ph.D., President

_____

**NIRMAL MULYE, Ph.D., Individually**

<u>BANK</u>

**INVESTORS BANK, a division of CITIZENS BANK, N.A.,**

By: _____

    **ERIN KANE**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed the day and year first above written.

**BORROWER**

**NOSTRUM LABORATORIES, INC.**


By:_____

        NIRMAL MULYE, Ph.D.
        Chairman and CEO


**GUARANTORS**

**NOSTRUM PHARMACEUTICAL LLC**

By:_____

        NIRMAL MULYE, Ph.D., President


_____

**NIRMAL MULYE, Ph.D., Individually**



**BANK**

**INVESTORS BANK, a division of CITIZENS BANK, N.A.,**


By:_____

        **ERIN KANE**
        Officer

19

**STATE OF FLORIDA**                                :
                                                                    SS.
**COUNTY OF** Miami-Dade                  :

    On this, the 31st day of October, 2022 before me, a Notary Public, personally appeared Nirmal Mulye who acknowledged himself to be the Chairman and CEO of Nostrum Laboratories, Inc., a New Jersey corporation, and that he as such Chairman and CEO being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chairman and CEO.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Notary Public
My commission expires:



ALLEN R CHERRY III
Notary Public-State of Florida
Commission # HH 19074
My Commission Expires
July 08, 2024

**STATE OF FLORIDA**                                :
                                                                    SS.
**COUNTY OF** Miami-Dade                  :

    On this, the 31st day of October, 2022 before me, a Notary Public, personally appeared Nirmal Mulye who acknowledged himself to be the President of Nostrum Pharmaceuticals, LLC, a Delaware limited liability company, and that he as such President being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as President.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Notary Public
My commission expires:

ALLEN R CHERRY III
Notary Public-State of Florida
Commission # HH 19074
My Commission Expires
July 08, 2024

20

**STATE OF FLORIDA**                                    :

                                                          SS.

**COUNTY OF** Miami Dade                                 :

     On this, the 31st day of October_____, 2022, before me, a Notary Public, personally appeared Nirmal Mulye, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and he/she/they acknowledged that he/she/they executed the same for the purposes therein contained.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
My commission expires:

ALLEN R CHERRY III
Notary Public-State of Florida
Commission # HH 19074
My Commission Expires
July 08, 2024

21

**EXHIBIT A**

Compliance Certificate

## **COVENANT COMPLIANCE CERTIFICATE**

_____, 20__

Investors Bank, a division of Citizens Bank, N.A.
28 State Street
Boston, MA 02109
Attention: Erin Kane
Email: erin.c.kane@citizensbank.com

The undersigned, the _____ of Nostrum Laboratories, Inc. a New Jersey corporation ("Borrower"), gives this certificate to Investors Bank, a division of Citizens Bank, N.A. ("Bank"), in accordance with the requirements of Section 12(c) of that certain Forbearance Agreement dated August [__], 2022, by and between Borrower, Guarantors and Bank ("Forbearance Agreement").  Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

1.    Based upon my review of the account statements of Borrower for the month ending _____, 20__, copies of which are attached hereto, I hereby certify that:

a.    The liquid assets consisting of unrestricted cash and Cash Equivalents of Borrower that are free and clear of any pledge, security interest, lien, claim or other encumbrance (other than in favor of Bank) are: $_____.

2.    No Event of Default, other than the Existing Defaults, exist on the date hereof, other than: _____ [if none, so state].

Very truly yours,

**NOSTRUM LABORATORIES, INC.**

By:_____
     NIRMAL MULYE, Ph.D.
     Chairman and CEO

5377079v.10

**EXHIBIT B**
Warehouseman's Release and Waiver Agreement

5377079v.10

**NOSTRUM LABORATORIES, INC.**

_____ \_\_\_, 2022

Eversana Life Science Services LLC
190 N. Milwaukee Street
Milwaukee, Wisconsin 53202
Attention: _____

Dear Madams and Sirs:

Please be advised that Nostrum Laboratories, Inc. (the "**Company**"), Nostrum Pharmaceutical LLC and Nirmal Mulye, have entered into a financing arrangement with Investors Bank, a division of Citizens Bank, N.A., as administrative agent (in such capacity, "**Lender**") and the Company has granted to Lender a first priority security interest in substantially all of its assets including, without limitation, all inventory of the Company, whether now owned or hereafter acquired ("**Inventory**"). As required by the terms of the financing arrangement, you are requested to note your receipt and acceptance of the following by signing and returning a copy of this letter to the Agent at the address set forth below.

You hereby acknowledge and agree that (i) the Company has delivered to you, or may from time to time deliver to you, certain of its Inventory for storage in your warehouse located at 4550 Mendenhall Road, Memphis, Tennessee 38141, (ii) Lender's security interest in the Inventory is and shall be senior to all liens, claims and interests, other than your warehouseman's lien, if any, for any accrued and unpaid warehousing fees charged by you for the actual storage of the Inventory, (iii) to the extent applicable, all warehouse receipts and other documents of title which evidence Inventory ("**Receipts**") shall be non-negotiable and shall be issued to or for the account of Lender, (iv) you shall provide Lender with a copy of such receipts, to the extent applicable, or other documents relating to the Inventory, including documents of title, upon Lender's request therefor, (v) you hold possession of the Inventory for Lender's benefit and that you shall continue to hold possession of the Inventory for Lender's benefit until you receive written notice from Lender that Lender's security interest has been terminated, and (vi) you have not previously been notified by any other party of a security interest claimed in the Inventory.

Lender hereby authorizes you, subject to the conditions described below, to release any of the Inventory to any authorized agent of the Company upon the Company's request. Your authority to release the Inventory to the Company is subject to the condition that upon the written direction of Lender, you shall refuse to release the Inventory to the Company and you shall only release such aforesaid property or Inventory to Lender or the party designated by Lender in such oral or written direction. You agree to permit Lender or its nominee access to the Inventory, subject to applicable restrictions under applicable law, for purposes of inspecting and removing the Inventory at Lender's request without first receiving the consent or permission of the Company.

The Company agrees that you shall have no liability to the Company if you comply with Lender's oral or written direction as described above. The Company further agrees that it will

24

continue to pay all charges, costs and expenses, if any, related to the Inventory and will reimburse you for all reasonable costs or expenses, if any, incurred as a direct result of your compliance with the terms and provisions of this letter. Lender shall not be directly or indirectly liable or responsible for any of said charges, costs or expenses, whether due or to become due.

If all or any of the Inventory stored in your facility is protected by property or casualty insurance carried by you, you agree that any proceeds received from such insurance as a result of any loss to any such Inventory, shall be paid by check or checks payable to Lender delivered to the address set forth below.

You hereby warrant and represent that you do not deal in the type of goods stored by the Company and you do not buy or sell such goods in the ordinary course of your business. You hereby warrant, represent and covenant that the Inventory owned by the Company shall not be commingled with goods owned by any other person or entity and you shall keep the Inventory separate from any other goods.

Please confirm receipt of this letter and your agreement to the above by signing the enclosed copy of this letter as indicated and returning it to the Company at the above address, Attention: Nirmal Mulye.

Very Truly Yours,

COMPANY:                                    Nostrum Laboratories, Inc.
                                            By: Nirmal Mulye, Chariman and CEO

25

Acknowledged and Agreed to this _____
day of _____, 2022:

<u>Bailee</u>:

Eversana Life Science Services, LLC

_____

(Please Print)

By:_____
Name:
Title:

**<u>Lender Address:</u>**

      Investors Bank, a division of Citizens Bank, N.A.
      28 State Street
      Boston, MA 02109
      Attention: Erin Kane
      Telephone: 401-644-4903
      Email: erin.c.kane@citizensbank.com

      With a copy to:

      Stradley Ronon Stevens & Young, LLP
      2005 Market Street
      Suite 2600
      Philadelphia, PA 19103
      Attention: Gretchen M. Santamour, Esq.
             Julie M. Murphy, Esq.
      Telephone:  215-564-8523 or 856-321-2409
      Email: gsantamour@stradley.com
           jmmurphy@stradley.com

5377079v.10

**STATE OF** _____        **:**

                                                    **:**        **SS.**

**COUNTY OF** _____        **:**

On this, the _____ day of _____, 2022, before me, the undersigned notary public, personally appeared _____ who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

Notary Public

My Commission Expires:

27

5377079v.10

# EXHIBIT G



**Stradley Ronon Stevens & Young, LLP**

2005 Market Street

Suite 2600

Philadelphia, PA 19103

Telephone 215.564.8000

Fax 215.564.8120

www.stradley.com

**Julie M. Murphy**

Partner

jmmurphy@stradley.com
856.321.2409

December 6, 2022

**VIA OVERNIGHT COURIER AND E-MAIL**

Nostrum Laboratories, Inc.                    Nirmal Mulye
9 Veronica Avenue                             1000 Biscayne Blvd
Somerset, New Jersey 08873                    Miami, FL 33132
Attn: Nirmal Mulye

Nostrum Pharmaceuticals, LLC
9 Veronica Avenue
Somerset, New Jersey 08873
Attn: Nirmal Mulye

> **Re:**  Forbearance Agreement by and between Nostrum Laboratories, Inc. ("**Borrower**"), Nirmal Mulye ("**Individual Guarantor**"), Nostrum Pharmaceuticals, LLC ("**Corporate Guarantor**", and together with Individual Guarantor, the "**Guarantors**") and Investors Bank, a division of Citizens Bank, N.A., ("**Bank**") dated as of October 31, 2022 (the "**Forbearance Agreement**") <u>**Notice of Default and Expiration of Forbearance Agreement**</u>

Dear Mr. Muyle:

As you know, this firm represents Bank in connection with the Forbearance Agreement. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Forbearance Agreement.

Obligors have defaulted under the terms of the Forbearance Agreement as a result of Borrower's failure to (a) submit a strategic business report to Bank on or before November 28, 2022, as required under Section 12(a)(ii) of the Forbearance Agreement; (b) provide Cash Flow Projections due November 15 and November 30, 2022, as required under Section 12(b)(i) of the Forbearance Agreement; (c) provide the financial statements and covenant compliance certificates, for the month ending October 31, 2022, which were each due November 30, 2022 pursuant to Section 12(a)(ii) of the Forbearance Agreement; (d) provide the quarterly financials for the quarter ending September 30, 2022, which were due no later than November 30, 2022 pursuant to Section 5.01(b)(ii) of the Loan Agreement; (e) failure to provide the Borrowing Base

Nostrum Laboratories, Inc.
Nostrum Pharmaceuticals, LLC
Nirmal Mulye
December 6, 2022
Page 2

Certificate for October 2022 on or before November 15, 2022, in violation of Section 5.01(b)(xiii) of the Loan Agreement; and (g) failure to provide the Eversana Agreement on or before November 8, 2022, as required pursuant to Section 12(e) of the Forbearance Agreement. Each of the foregoing (collectively, the "**Forbearance Defaults**") constitutes an Event of Default under the Forbearance Agreement and each of the Loan Documents.

Furthermore, the Forbearance Agreement expired on December 2, 2022, at which point Obligors were obligated, and failed, to repay the entire amount of the Bank Indebtedness, including, without limitation, the PIK Interest Payment.

**Bank hereby demands, no later than December 15, 2022, provision of the following:**

(1) the strategic business report required under Section 12(a)(ii) of the Forbearance Agreement;

(2) the Cash Flow Projections due November 15 and November 30, 2022, as required under Section 12(b)(i) of the Forbearance Agreement;

(3) the financial statements and covenant compliance certificates, for the month ending October 31, 2022, which were each due November 30, 2022 pursuant to Section 12(a)(ii) of the Forbearance Agreement;

(4) the quarterly financials for the quarter ending September 30, 2022, which were due no later than November 30, 2022 pursuant to Section 5.01(b)(ii) of the Loan Agreement;

(5) the Borrowing Base Certificate for October 2022, and November 2022 in accordance with Section 5.01(b)(xiii) of the Loan Agreement; and

(6) the fully executed Eversana Agreement.

As a result of the Forbearance Defaults and the expiration of the Forbearance Agreement, Bank has no further obligation to forbear from the exercise of its rights and remedies under the Forbearance Agreement, the Loan Documents at law or in equity. PIK Interest shall continue to accrue from and after the Forbearance Expiration Date.  In addition, Bank may without any further notice or demand, implement the Default Rate and commence the exercise of other remedies against the Borrower, the Guarantors and/or any of the Collateral, all at Bank's sole discretion, whether under the Forbearance Agreement, the Loan Documents, the Uniform Commercial Code, at law or in equity.  Bank reserves the right to implement the default rate of interest retroactively, without further notice or demand.  All such rights, remedies, privileges, powers and claims available to Bank are expressly reserved and preserved in their entirety and may be exercised or pursued at any time and from time to time in the sole and absolute discretion of Bank in accordance with the Forbearance Agreement, the Loan Agreement and the other Loan

Nostrum Laboratories, Inc.
Nostrum Pharmaceuticals, LLC
Nirmal Mulye
December 6, 2022
Page 3

Documents. The exercise of any rights or remedies, shall not constitute or be deemed to be a waiver of any other rights, remedies, or claims of Bank or otherwise waive or affect the Forbearance Defaults or any other Defaults or Events of Default that may exist or hereafter arise.

No action or inaction on Bank's part will operate as a forbearance of any kind or a waiver of any right, power or remedy of Bank, nor constitute a waiver of any other provision of, or default or Event of Default currently existing under, the Forbearance Agreement, the Loan Agreement or any other Loan Document, including the Forbearance Defaults. Further, Bank's reservation of its rights, claims and remedies shall not impair Bank's abilities under the Forbearance Agreement, the Loan Agreement or other Loan Documents to elect at any time to enforce any additional right, claim or remedy provided under the Forbearance Agreement, Loan Agreement or other Loan Documents or at law or in equity.

As of the date of this letter, there are no offers outstanding from Bank to the Obligors nor are there any oral agreements among Bank and the Obligors concerning the obligations of Obligors to Bank or the Forbearance Agreement or Loan Documents. Rather, all agreements concerning such obligations are expressed only in the existing Forbearance Agreement and the Loan Documents, and the respective duties and obligations of the Obligors and Bank shall be only as set forth in the Forbearance Agreement and the Loan Documents. For avoidance of doubt, Bank has no obligation to forbear from exercising its rights and remedies under the Forbearance Agreement, Loan Documents, at law and/or in equity.

Obligors are responsible for the payment of all costs and expenses incurred by Bank including, without limitation, fees and disbursements of legal counsel in connection with the Forbearance Defaults and Bank's exercise of rights and remedies, which shall be payable on demand.

Respectfully,

Julie M. Murphy

cc:   Erin Kane (via email)
      Law Offices of Carlton R. Asher, Jr. (by overnight mail and email)